UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARTHUR MIDDLETON<br>560 Whiskey Hill Road<br>Woodside, CA 94062<br>Derivatively on Behalf of FEDERAL<br>NATIONAL MORTGAGE ASSOCIATION,<br><br><br>Plaintiff,<br><br>vs.<br><br>FRANKLIN D. RAINES<br>3006 Albemarle Street, NW<br>Washington, DC 20008<br><br>J. TIMOTHY HOWARD<br>8400 Parham Court<br>McLean, VA 22102<br><br>DANIEL H. MUDD<br>3542 Newark Street, NW<br>Washington, DC 20016<br><br>KENNETH M. DUBERSTEIN<br>1260 S. Old Highway 51<br>Mosinee, WI 54455 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

[DEMAND REFUSED] VERIFIED SHAREHOLDERS' DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,
GROSS MISMANAGEMENT, CONSTRUCTIVE FRAUD, CORPORATE WASTE,
UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY
ACT OF 2002, SEEKING EQUITABLE RELIEF AND DAMAGES

STEPHEN B. ASHLEY                     )
4348 County Road 37                   )
Livonia, NY 14487                     )
                                      )
THOMAS P. GERRITY                     )
219 Grays Lane                        )
Haverford, PA 19041                   )
                                      )
ANN KOROLOGOS                         )
3150 South Street, NW 2A              )
Washington, DC 20007                  )
                                      )
FREDERIC V. MALEK                     )
1259 Crest Lane                       )
Mc Lean, VA 22101                     )
                                      )
DONALD B. MARRON                      )
720 Park Avenue, #6A                  )
New York, NY 10021                    )
                                      )
JOE K. PICKETT                        )
8500 Rockbridge Circle                )
Montgomery, AL 36116                  )
                                      )
LESLIE RAHL                           )
24 Willard Avenue                     )
Madison, CT 06443                     )
                                      )
H. PATRICK SWYGERT                    )
2004 11th Street, NW 338              )
Washington, DC 20001                  )
                                      )
ANNE M. MULCAHY                       )
191 Fairfield Beach Road              )
Fairfield, CT 06430                   )
                                      )
JOHN K. WULFF                         )
675 Owlshead Mountain Road            )
Waterbury, VT 05676                   )
                                      )
THE GOLDMAN SACHS GROUP, INC.         )
c/o CT Corporation System             )
111 Eighth Avenue                     )
New York, NY 10004                    )
                                      )
_____)

GOLDMAN SACHS & CO.                     )
85 Broad Street                         )
New York, NY 10004                      )
                                        )
                    Defendants,         )
         – and –                        )
                                        )
FEDERAL NATIONAL MORTGAGE               )
ASSOCIATION,                            )
a Federally Chartered Corporation Governed )
 by Delaware Law,                       )
3900 Wisconsin Avenue, NW               )
Washington, DC 20016,                   )
                                        )
                    Nominal Party.      )
_____ )

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

THE RISE AND FALL OF FANNIE MAE .................................................................... 10

    Defendants Knowingly Manipulate Fannie Mae's Accounting ........................... 12

    The Truth Begins to Come Out .......................................................................... 17

    Defendants' Accounting Manipulations Are Exposed ....................................... 20

JURISDICTION AND VENUE ..................................................................................... 28

PARTIES ....................................................................................................................... 28

CONCERTED ACTION ALLEGATIONS ................................................................... 33

Defendants intertwining relationships & conflicts of interest ........................................ 33

    Direct Responsibility and Affirmative Misconduct ......................................... 34

    Financial Benefit from the Misconduct ............................................................ 40

    Defendants' Conflicts of Interests .................................................................... 44

THE INDIVIDUAL DEFENDANTS' DUTIES ........................................................... 52

BOARD COMMITTEE MEMBERS AND BREACHES OF THEIR
FIDUCIARY DUTIES .................................................................................................. 57

    The Audit Committee ....................................................................................... 57

    The Nominating and Corporate Governance Committee .................................. 66

    The Assets and Liabilities Policy Committee .................................................... 68

    The Compensation Committee .......................................................................... 69

CHRONOLOGY OF EVENTS ..................................................................................... 73

COUNT I (Breach of Fiduciary Duty and/or Aiding and Abetting Breach of
Fiduciary Duty Against All Individual Defendants) ...................................................... 154

COUNT II (Abuse of Control Against All Individual Defendants) ............................... 156

COUNT III (Gross Mismanagement Against All Individual Defendants) ..................... 157

COUNT IV (Constructive Fraud Against All Individual Defendants) ........................... 158

**Page**

COUNT V (Corporate Waste Against All Individual Defendants)..................................158

COUNT VI (Unjust Enrichment Against All Individual Defendants)............................159

COUNT VII (Against Defendants Raines and Howard for Disgorgement Under the Sarbanes-Oxley Act of 2002) ................................................................................160

COUNT VIII (Aiding and Abetting Breach of Fiduciary Duty Against Goldman Sachs and Goldman Sachs & Co.)................................................................................160

PRAYER FOR RELIEF ................................................................................................162

JURY DEMAND............................................................................................................163

VERIFICATION ...........................................................................................................165

"It is wholly irresponsible and unacceptable for corporate leaders to say they did not know – or suggest it is not their duty to know – about the operations and activities of their company, particularly when it comes to risks that threaten the fundamental viability of their company."

Franklin D. Raines, then-Chairman and Chief Executive Officer of Federal National Mortgage Association, on March 20, 2002, before the U.S. House Committee on Financial Services.

## INTRODUCTION

1.      This is a shareholders' derivative action brought on behalf of the Federal National Mortgage Association ("Fannie Mae" or the "Company") against certain of Fannie Mae's current and former officers and/or directors and certain third parties, including Franklin D. Raines ("Raines"), the Company's now-former Chairman and Chief Executive Officer ("CEO") and J. Timothy Howard ("Howard"), the Company's now-former Vice-Chairman and Chief Financial Officer ("CFO").

2.      This action seeks to remedy defendants' breaches of fiduciary duty and other violations of law, which have had, and are expected to continue to have, a destructive effect on Fannie Mae's ability to operate.  Specifically, the action arises out of defendants' accounting manipulations whereby, between January 1, 1998, and the present (the "Relevant Period"), defendants caused Fannie Mae to report financial results that they have since admitted were materially false.  Defendants knowingly violated a number of accounting rules applicable to mortgages, leading to a massive restatement of *over $6 billion dollars*, representing one of the largest restatements in U.S. history.

3.      Defendants' financial manipulations included improperly deferring – or "cookie-jarring" – income and expenses to subsequent periods, improperly adjusting amortization factors to increase or decrease income as desired, making manual changes to interest income or expenses to meet goals, making improper use of so-called "hedge-accounting" on derivative contracts, and numerous other manipulations, all in violation of Generally Accepted Accounting Principles ("GAAP").  Defendants used these accounting manipulations to falsify Fannie Mae's publicly

disseminated financial statements during fiscal years 1998 through mid-2004 so that they and other

Company insiders could meet projected earnings per share ("EPS") targets, and thus unjustly enrich

themselves to the tune of over $245 million in undeserved incentive compensation. Defendants'

accounting manipulations also falsely inflated the Company's stock price, permitting certain

defendants to sell over $23 million worth of the Company's common stock.

4.      The accounting manipulations were so widespread that, just to be able to figure out

what its true earnings were over the Relevant Period, Fannie Mae had to hire an army of outside

consultants, devote millions of man-hours of its own employees' time, and spend $100 million on

technology upgrades – for a total out-of-pocket cost in 2005 and 2006 alone of $1.3 billion.

5.      Defendants' misconduct dates back to at least 1998. That year, in response to the

Asian financial crisis, Russia's default on international loans, and the collapse of Long-Term Capital

Management LP ("LTCM"), a U.S.-based hedge fund in which major banks and investors had

poured large sums of money, Federal Reserve Board Chairman Alan Greenspan dramatically

reduced interest rates. The plunge in interest rates led to an acceleration of mortgage pre-payments.

Consequently, Fannie Mae faced a more rapid premium amortization in its mortgage portfolio than

expected. In December 1998, the Company's own amortization models mandated that $400 million

in premium amortization expenses had to be recorded on the Company's books for fiscal 1998,

under applicable accounting rules.

6.      The situation described above created a substantial problem for Company insiders.

The Company had set an EPS target of $3.23 per share for 1998, meaning that if this target were

met, the Company's executives (including Raines and Howard) would be entitled to the maximum

payout goal on bonuses. On the other hand, if the Company recorded the $400 million in expenses,

as required under applicable accounting rules, these executives and defendants would have received

*no* bonuses for 1998. Defendants' response was to falsify the Company's financials. As would later

- 2 -

be revealed, the Company improperly deferred $200 million of the $400 million in expenses to subsequent fiscal years. Thus, the Company was able to meet the EPS target right down to the penny, $3.2309, allowing certain executives and defendants to reap millions in full – but undeserved – bonuses.

7.     The following year, defendant Raines made the bold public announcement that he was going to double the Company's earnings in the next five years. To help accomplish that goal – and to incentivize Company insiders to participate in the accounting manipulations necessary to achieve it – the Company set out an EPS Challenge Grant initiative which promised to reward management if earnings were doubled in the next five years. Nearly all of Fannie Mae's executive incentive compensation was tied to performance, and more specifically, to sustained EPS growth.

8.     However, Raines, Howard and the other defendants faced the serious problem of having to avoid earnings volatility – endemic to the interest-rate sensitive economic environment in which Fannie Mae's business operates – to meet EPS growth targets, including amortization problems similar to those in 1998. In order to overcome the volatility problem and assure significant annual bonuses, Raines, Howard and other defendants embarked on a prolonged and concerted campaign to develop policies enabling them to "manage," or more accurately, "manipulate" earnings. They also turned to third parties like Wall Street titans The Goldman Sachs Group, Inc. ("Goldman Sachs") and Lehman Brothers, Inc. ("Lehman Brothers") to engineer economically-worthless transactions to improperly shift Fannie Mae's reported income to future periods. Raines, Howard and other defendants could guarantee apparent (although fraudulent) success in meeting earnings targets, regardless of changes in economic circumstances or actual performance. These manipulations were apparent to the Board of Directors (sometimes referred to herein as the "Board") as a whole, and the Audit Committee of the Board in particular, not only via "red flags" that should have made it obvious that there was no way earnings could remain stable in such a volatile market,

- 3 -

but also internal employee complaints about the accounting manipulations that were reported to Raines, Howard and the Board.

9.    To further ensure the success of this plan, Raines was able to establish a system of perverse disincentives for Fannie Mae's Board to do anything in response to the ongoing – and obvious – accounting manipulations. As set forth below in detail, a majority of the Board's members were close associates of Raines. For example, Raines was Chairman of and controlled the Fannie Mae Foundation ("Foundation"), the Company's philanthropic arm. Raines used the Foundation to shower millions of dollars in grants, in some instances in violation of the Company's own Corporate Governance Guidelines, on various organizations at which members of the Board held high-level positions. These directors financially and personally benefited from maintaining a good relationship with Raines. Many of the numerous relationships between Raines, the Board and the Foundation were never disclosed by the Company until the scandal came to light. Partly as a result of these relationships, the Board failed to adhere to the most basic principles of corporate governance by placing their interests (and those of Raines and the Company's other insiders) ahead of the Company's, and in the process ignored both the numerous accounting "red flags" and the internal employee complaints regarding accounting manipulations at Fannie Mae.

10.    Raines and the other defendants successfully pursued their plan to double (albeit falsely) the Company's "reported" EPS in five years, from 1999 to 2003. As a result of the manipulations, management was rewarded handsomely via this "all or nothing" plan based solely on reported (not actual) earnings growth. In terms of salary, bonus and other incentive compensation, Raines himself collected $8.1 million in fiscal year 2000, $10.9 million in fiscal year 2001, $18.3 million in fiscal year 2002 and $20 million in fiscal year 2003. Over that same period, Howard received more than $3 million in salary, bonus and other incentive compensation in fiscal years 2000, 2001 and 2002, and more than $5 million in fiscal year 2003.

- 4 -

11.    Ironically, during the Relevant Period, while defendants were lying to the Company's investors and regulators for their own benefit and to the detriment of the Company, Raines was publicly championing good corporate governance to distinguish Fannie Mae from the Enrons, the Worldcoms, the Global Crossings and the Healthsouths of the corporate world. Testifying before Congress in 2002 about the collapse of Enron, Raines told lawmakers: "It is wholly irresponsible and unacceptable for corporate leaders to say they did not know – or suggest it is not their duty to know – about the operations and activities of their company, particularly when it comes to risks that threaten the fundamental viability of their company." Raines elaborated on the duties of company officers and directors:

First, *the paramount duty of the board of directors of a public corporation is to select and oversee competent and ethical management* to run the company on a day-to-day basis.

Second, it is the responsibility of management to operate the company in a competent and ethical manner. Senior management is expected to know how the company earns its income and what risks the company is undertaking in the course of carrying out its business. Management should never put personal interests ahead of or in conflict with the interests of the company.

Third, *it is the responsibility of management, under the oversight of the board and its audit committee, to produce financial statements that fairly present the financial condition of the company and make sufficient disclosures to investors* to permit them to assess the financial and business soundness of the company.

Fourth, it is the responsibility of the board and its audit committee to engage an outside auditor to audit the financial statements prepared by management and to issue an opinion on those statements based on Generally Accepted Accounting Principles. *The board, its audit committee and management must be vigilant to ensure that the corporation or its employees do not take any actions that compromise the independence of the outside auditor.*

Fifth, it is the responsibility of the outside auditor to ensure that it is in fact independent, is without conflicts of interest, employs highly competent staff, and carries out its work in accordance with Generally Accepted Auditing Standards. It is also the responsibility of the outside auditor to inform the board, through its audit committee, of any concerns it may have about the appropriateness and quality of significant accounting treatments, business transactions, and about any weaknesses in internal control systems. The outside auditor should do so in a forthright manner and on a timely basis, whether or not management has communicated to the board or the audit committee on the same matters.

12.    In September 2004, the Company's regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO") released a damning 211-page interim report (the "OFHEO Report") regarding accounting manipulations at Fannie Mae. In May 2006, OFHEO released a further damning comprehensive 348-page report (the "May OFHEO Report"). The May OFHEO Report is incorporated herein by reference. The OFHEO reports detail how defendants used numerous accounting shenanigans to fraudulently "smooth out" Fannie Mae's earnings and thus achieve their own bonus compensation targets.

13.    The release of the OFHEO Report sparked an SEC investigation and Congressional inquiries, as well as a shareholder demand pursuant to Rule 23.1 of the Federal Rules of Civil Procedure dated September 24, 2004. The Board never took action in response to the shareholder demand or even responded to it.

14.    Even as defendants' scheme collapsed, Raines remained unrepentant. During an October 6, 2004, Congressional hearing, Raines dismissed criticism of the payment of over $245 million in executive bonuses to himself and his cronies – after OFHEO had already revealed his fraudulent scheme:

> SPOKESMAN: Do you dispute the amount of $245 million over the last five years as bonuses? That's a lot of money. It's a quarter of a billion dollars. A nodding of the head doesn't get transcribed.
>
> FRANKLIN RAINES: I have to go calculate the number. It's a number that's calculable.
>
> SPOKESMAN: Do you think it's in the ballpark?
>
> FRANKLIN RAINES: It could be. You say it is a very large number. In the last five years, we've probably had after-tax income of $30 billion.
>
> SPOKESMAN: I know you have a very successful company.
>
> FRANKLIN RAINES: So it's a tiny percentage of our revenue, a tiny percentage of our profit.

Of course, in reality the "profit" of which Raines spoke – to which the employee bonuses he was asked about, including his own, were tied – was engineered by defendants through various improper accounting manipulations, and will be drastically restated downwards by 40% or more. Howard, in the meantime, tried to duck responsibility, testifying – despite serving for the preceding 14 years as the CFO of Fannie Mae – that he was not an expert in GAAP.

15.    Following the SEC's inquiry and the December 15, 2004 announcement confirming OFHEO's findings that Fannie Mae had violated U.S. accounting rules and that the SEC would require a $6+ billion earnings restatement, U.S. Representative Richard Baker ("Baker") described Fannie Mae's accounting violations as "mind-boggling." Representative Michael G. Oxley, co-author of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), which was intended to curb corporate malfeasance and self-dealing in the wake of Enron by improving transparency and accountability, also proclaimed that he was "deeply disturbed that investors, the markets and Congress were misled by deceptive practices at Fannie Mae."

16.    One week later, on December 21, 2004, in direct defiance of OFHEO's demands that the Fannie Mae Board fire Raines and Howard and require them to disgorge previously awarded incentive compensation, defendants compounded their fiduciary breaches – and demonstrated once again their bad faith and lack of independence from Raines and Howard – by announcing that they would instead accept the two men's resignations instead of firing them for cause. This paved the way for Raines and Howard to collect tens of millions of future additional dollars in undeserved severance benefits under no-fault termination provisions in their employment agreements (pursuant to amendments made to those agreements in 2004 – during the pendency of OFHEO's investigation) and to keep millions of dollars in previously received incentive compensation and stock sales proceeds the Company was entitled to rescind under Sarbanes-Oxley. In total, Raines is going to be

unjustly enriched by over $80 million as a result of defendants' breaches of fiduciary duty, and Howard is similarly going to be unjustly enriched by over $35 million.

17.     On December 30, 2004, Fannie Mae was forced to sell $5 billion worth of securities at a fire-sale price to quickly deal with the "significant undercapitalization" occasioned by the earnings restatement. Several weeks later, in a further effort to address its undercapitalization problems, Fannie Mae was forced to cut its common stock's quarterly dividends – for the first time in two decades – by 50%, from $0.52 per share to $0.26 per share. Also in January 2005, Fannie Mae was forced to significantly scale back its purchases of new mortgage assets, which will adversely affect Fannie Mae's operations.

18.     On February 22, 2005, the Company dropped another bombshell when it announced that OFHEO, in conjunction with its ongoing investigation, had identified numerous other issues concerning additional improper accounting and deficient internal controls at the Company. The Company's press release stated in part that: "The issues and questions pertain to the following areas: securities accounting, loan accounting, consolidations, accounting for commitments, and practices to smooth certain income and expense amounts. OFHEO also raised concerns regarding journal entry controls, systems limitations, and database modifications, as well as new developments relating to FAS 91." The Company also noted that, "[t]he restatement process may result in additional adjustments, perhaps material adjustments, to prior and current period financial results . . . ." Thus, as one commentator noted, Fannie Mae has now violated literally every accounting rule related to mortgages. On this news, shares of the Company's stock dropped to close at $57.16 – at that point, its lowest level in more than four years, and about 30% below its high of $80.82 the prior year.

19.     Subsequent revelations that it was going to cost the Company in excess of $420 million in 2005 alone to work toward its earnings restatement – caused the stock price to plummet further still, trading as low as $41.41 in late 2005 and hovering around $47 in recent days. Thus, the

accounting scandal has caused the Company to lose ·over $31 billion in valuable market capitalization.

20.    On December 6, 2006, Fannie Mae restated its financial results erasing $6.3 billion in earnings between 2001 and 2006. The restatement explains:

> The consolidated financial statements for the years ended December 31, 2003 and 2002 included in this Annual Report on Form 10-K include restatement adjustments that we have categorized into the following seven areas: our accounting for debt and derivatives; our accounting for commitments; our accounting for investments in securities; our accounting for MBS trust consolidation and sale accounting; our accounting for financial guarantees and master servicing; our accounting for amortization of cost basis adjustments; and other adjustments.

> The overall impact of our restatement was a total reduction in retained earnings of $6.3 billion through June 30, 2004. This amount includes:

> - a $7.0 billion net decrease in earnings for periods prior to January 1, 2002 (as reflected in beginning retained earnings as of January 1, 2002);

> - a $705 million net decrease in earnings for the year ended December 31, 2002;

> - a $176 million net increase in earnings for the year ended December 31, 2003; and

> - a $1.2 billion net increase in earnings for the six months ended June 30, 2004.

*    *    *

> *Replacement of Independent Auditors.* In December 2004, the Audit Committee of our Board of Directors dismissed KPMG LLP ("KPMG") as our independent registered public accounting firm. KPMG had served as our independent auditor since 1969 and had audited the previously issued financial statements that we have restated. The Audit Committee engaged Deloitte & Touche LLP ("Deloitte & Touche") to serve as our independent registered public accounting firm effective January 2005. The consolidated financial statements included in this Annual Report on Form 10-K have been audited by Deloitte & Touche.

*    *    *

> *OFHEO Final Report and·Settlement.* On May 23, 2006, OFHEO issued a final report on its special examination. OFHEO's final report concluded that, during the period covered by the report (1998 to mid-2004), a large number of our accounting policies and practices did not comply with GAAP and we had serious problems in our internal controls, financial reporting and corporate governance. On May 23, 2006, we agreed to OFHEO's issuance of a consent order that resolved open matters relating to their investigation of us. Under the consent order, we neither admitted nor denied any wrongdoing and agreed to make changes and take actions in specified

- 9 -

areas, including our accounting practices, capital levels and activities, corporate governance, Board of Directors, internal controls, public disclosures, regulatory reporting, personnel and compensation practices. In addition, as part of this consent order and our settlement with the SEC discussed below, we have paid a $400 million civil penalty, with $50 million paid to the U.S. Treasury and $350 million paid to the SEC for distribution to stockholders pursuant to the Fair Funds for Investors provision of the Sarbanes-Oxley Act of 2002.

*    *    *

*SEC Investigation and Settlement.* The SEC initiated an investigation of our accounting practices and, in May 2006, without admitting or denying the SEC's allegations, we consented to the entry of a final judgment which resolved all of the SEC's claims against us in its civil proceeding. The judgment permanently restrains and enjoins us from future violations of specified provisions of the federal securities laws. In addition, as discussed under "OFHEO Final Report and Settlement" above, as part of our settlements with OFHEO and the SEC, we have paid a $400 million civil penalty, with $50 million paid to the U.S. Treasury and $350 million paid to the SEC for distribution to stockholders pursuant to the Fair Funds for Investors provision of the Sarbanes-Oxley Act of 2002.

<strong>THE RISE AND FALL OF FANNIE MAE</strong>

21.    Fannie Mae is the nation's single biggest source of mortgage finance. In 1938, in the wake of the Depression, President Franklin Delano Roosevelt created Fannie Mae to help banks and savings-and-loan associations finance home mortgages. Fannie Mae does not lend money to home-buyers. It buys mortgages from the mortgage lenders and banks in the secondary, or resale, mortgage market. Roosevelt's thinking was that the Federal National Mortgage Association, as it was then known, would ensure that lenders always had enough money to make new loans, thus helping make mortgages – and homes – more affordable for Americans. Fannie Mae was spun off from the federal government in 1968 under President Lyndon B. Johnson, went public in 1970 and, in 1997, adopted its long-standing nickname: Fannie Mae. According to the Company's official publications, today Fannie Mae operates under a Congressional charter while seeking to maximize profit for shareholders.

22.    The Company decided to voluntarily register its common stock with the SEC under §12(g) of the Securities Exchange Act of 1934 ("1934 Act"), effective March 31, 2003. Since that

time, the Company has filed reports, Proxy Statements and other information, including Form 4s

indicating stock sales by officers and/or directors. Also beginning in March 2003, Raines and

Howard began voluntarily certifying the Company's periodic financial reports on Forms 10-Q and

10-K under Sarbanes-Oxley, including those filed for fiscal 2002, for the first three quarters of fiscal

2003, for fiscal 2003 and for the first two quarters of fiscal 2004.

23.    Fannie Mae operates two business segments: (i) its mortgage portfolio business buys

mortgages originated by lenders; and (ii) its credit guarantee business helps lenders convert their

mortgages into mortgage-backed securities ("MBS"). Both businesses are designed to help lenders

replenish their funds to lend.



24.    One of the rules governing Fannie Mae's accounting is Financial Accounting

Standards Board ("FAS") Rule 91 ("FAS 91"). Under FAS 91, companies must record purchases of

loans and mortgage-backed securities at the net purchase price. That means they must take into

account any premiums, discounts or price adjustments, such as those related to fees Fannie Mae

collects for guaranteeing the mortgages it buys. For a fee, usually about 20 basis points, or one-fifth

of one percentage point, Fannie Mae will guarantee the full payment of principal and interest on the

- 11 -

mortgage-backed securities. Those guarantee fees can be negotiated. Fannie Mae might arrange a "buy up" with a mortgage lender, in which the lender – usually a bank – pays Fannie Mae cash up front in return for a lower guarantee fee. Fannie Mae also does the reverse, which is called a "buy down." In that case, Fannie Mae pays the lender in return for a higher guarantee fee. Under FAS 91, Fannie Mae must recognize such adjustments to its income by estimating the effective yield of its mortgages and mortgage securities every time it reports results to investors. In doing so, Fannie Mae must consider how fast homeowners might prepay their mortgages and must adjust the effective yields on its securities and make a new estimate about future payments. The revision in expected yields must be booked immediately as an adjustment to interest income.

25.    Fannie Mae is also governed by, among others, an accounting rule called FAS Rule 133 ("FAS 133"). FAS 133 says that in an earnings statement, companies must book as gains or losses swings in the value of their derivatives – financial contracts typically held to hedge against risks. Because Fannie Mae holds billions of dollars of derivatives, whose value yo-yos in tandem with interest rates, the rule virtually assures volatility in Fannie Mae's earnings. Purportedly to "minimize the volatility," Howard and other Fannie Mae executives looked to something called hedge accounting. It lets a company spread losses on derivatives over a number of years rather than recognize them immediately. But, FAS 133 sets stringent standards for what kind of derivative transactions qualify for hedge accounting and how they must be documented.

**Defendants Knowingly Manipulate Fannie Mae's Accounting**

26.    Raines originally assumed the role of Vice Chairman of Fannie Mae in 1991. In that post, Raines spearheaded Fannie Mae's legal, credit and finance policies and worked closely with defendant Howard. After a brief stint in government, Raines returned to Fannie Mae, and in January 1999 assumed the role of Chairman and CEO. But Raines chose a turbulent time to assume control of the Company. The wave of devaluation, bankruptcy and default that had swept East Asia in 1997

- 12 -

was spilling into Russia. In Greenwich, Connecticut, LTCM, the hedge fund run by John Meriwether, was bleeding money on its bond trades. In September 1998, LTCM buckled, and William McDonough, then president of the Federal Reserve Bank of New York, summoned Wall Street executives to arrange a bailout. Fannie Mae Controller Leanne Spencer ("Spencer") characterized the situation as follows: "You had global economic meltdown occurring." Fannie Mae was in the middle of that meltdown.

27.    As stocks slid and investors rushed for the safety of treasuries, bond yields – and mortgage rates – kept sinking. In October 1997, thirty-year mortgage rates tumbled to 6.49% from 8.18% in April 1997. Homeowners began to pay down loans and refinance mortgages at new, lower interest rates. Those faster prepayments significantly – and negatively – impacted Fannie Mae's mortgage portfolio.

28.    Prior to taking the helm as Fannie Mae's Chairman of the Board and CEO in January 1999, Raines served as the Company's Vice Chairman for many years and was named as the designee for the top positions in May 1998. In the summer of 1998, Fannie Mae's Chief Operating Officer ("COO") informed Raines that non-public projections of financial results showed a large shortfall. Coming on the heels of a disappointing year in 1997 when EPS fell outside the maximum-bonus range, the 1998 shortfall loomed large as senior management were not on target to receive maximum bonuses. The COO further informed Raines that Fannie Mae's "piggy bank" and "magic bullets" could not make up the anticipated shortfall. Raines' desire and efforts to make up the shortfall were thwarted when interest rates dropped further in the latter half of 1998 and prepayments increased.

29.    By late 1998, Fannie Mae's amortization models showed the Company had incurred an estimated expense of $400 million on its mortgage holdings. That is the amount by which Fannie Mae would have had to adjust its reported income downwards under GAAP to account for the

impact of changing prepayments. Actual unanticipated amortization costs were $440 million, which, if booked, would have caused Fannie Mae's EPS to fall below the minimum target range and would have meant no bonuses for Raines, Howard, Mudd and other senior executives. After the year ended but before the books were closed, Fannie Mae's Controller presented to Raines and other senior executives three alternatives to manipulate earnings that each would result in the Company meeting the maximum EPS target.

30.    Under the alternative chosen by Raines, rather than adjust its income by $440 million, as required by GAAP, Fannie Mae adjusted it by only $240 million, deferring the other half to subsequent years. Inside Fannie Mae, the $200 million of deferred expenses became known as "the catch-up."

31.    Fannie Mae's auditor, KPMG LLP ("KPMG"), initially disagreed with the way the Company decided how much to book in 1998. When challenged by KPMG regarding the lower adjustment, Company officials were unable to present any analysis to support the deferred expenses. But KPMG, which was paid tens of millions of dollars over the years by Fannie Mae, ultimately agreed to help conceal the unrecorded $200 million deferred expenses by internally characterizing it as an "audit difference." Since the catch-up was never fully recorded, it created a "cookie jar" reserve. According to Karen Hastie Williams ("Williams"), a Washington lawyer then on Fannie Mae's Board, the Audit Committee discussed the issue with KPMG, Raines and Howard. Williams says the Committee "concluded that these were judgmental questions" and that it was "appropriate for the executives to have a different perspective. . . .  It was a question of interpretation." Defendants never disclosed this significant accounting issue, stating that it was not deemed material. However, this manipulation was just part of a pattern over the years of manipulating accounting to show steady gains in earnings and disguise the volatility of the Company's business. During OFHEO's investigation, defendant Gerrity admitted that the $200 million audit difference was

- 14 -

material. "The 1998 violation was not a singular event," OFHEO director Armando Falcon, Jr. ("Falcon") told lawmakers at an October 6, 2004, Congressional hearing. "[I]t represented a continuous effort to artificially guarantee success in meeting targets."

32.    Even after Raines (with the Audit Committee's blessing) refused to book the full $440 million adjustment required by FAS 91, Fannie Mae's EPS had not reached the $3.23 figure required to trigger maximum bonuses. Undeterred, Raines and other senior executives decided to accelerate booking an additional after-tax adjustment of almost $109 million that was planned for 1999 relating to Low Income Housing Credits. Still short of the maximum bonus EPS target, Fannie Mae's executives boosted income with a last-minute transfer to income of $3.9 million from a "cookie jar" general ledger account, which finally created total income in the exact amount needed to max out bonuses for 1998.

33.    The catch-up unjustly enriched Raines, Howard and other Fannie Mae executives, because without it, Fannie Mae would not have paid executives any annual bonuses for 1998. Management had set a 1998 EPS goal of $3.23. If Fannie Mae reached that goal, executives stood to collect the maximum bonus payout, or more than $245 million in all. If reported EPS fell below $3.13, however, executives would receive no bonuses. The estimated $200 million catch-up ensured Fannie Mae hit its target. After taxes, the deferred expenses boosted reported earnings by $130 million that year. The (manipulated) 1998 EPS number turned out to be $3.2309, a result that meant Fannie Mae met the EPS maximum payout goal right down to the penny.

34.    Subsequently, Fannie Mae continued to "manage" the catch-up, eventually adopting a policy of holding the figure to within 1-2% of its income from interest and mortgage guarantee fees. Company officers have since admitted this practice violates GAAP. Furthermore, in order to "smooth out" quarterly earnings, Fannie Mae also manipulated adjustments to interest income in violation of FAS 91 by, among other things, inputting reconciliation differences as future deferrals

- 15 -

instead of the current period's income and expenses; using negative factors in amortization and allowing amortization to exceed 100%; using "on top" manual entries in order to make income and margin calculations meet the Company's desired objectives; and using a miscellaneous balance sheet account in order to manage reporting of some income in periods other than when it was received.

35.    As stated in the May OFHEO Report, "from the very beginning of Mr. Raines' tenure as CEO, his goal was clear:  EPS results mattered, not how they were achieved.  In the following years, time and time again, Fannie Mae employed adjustments that enabled it to meet its EPS targets, whether on a quarterly basis to meet analysts' expectations or on an annual basis to meet compensation targets."

36.    The Board's approval of the challenge to double the Company's EPS from $3.23 to $6.46 in five years galvanized all managers to focus on precise income numbers to hit earnings targets in not only the current but also the upcoming years.  Even the head of the internal audit department encouraged internal auditors in a wildly-inappropriate speech in 2000 to focus intently on EPS targets:

> By now every one of you must have [$]6.46 branded in your brains.  You must be able to say it in your sleep, you must be able to recite it forwards and backwards, you must have a raging fire in your belly that burns away all doubts, you must live, breathe and dream [$]6.46, you must be obsessed on [$]6.46. . . After all, thanks to Frank, we all have a lot of money riding on it. . . .  We must do this with a fiery determination, not on some days, not on most days but day in and day out, give it your best, not 50%, not 75%, not 100%, but 150%.  Remember, Frank has given us an opportunity to earn not just our salaries, benefits, raises, ESPP, but substantially over and above if we make [$]6.46.  So it is our moral obligation to give well above our 100% and if we do this, we would have made tangible contributions to Frank's goals.

37.    In 2000, defendant Mudd was already focusing on forecasted shortfalls for 2003, writing a memorandum to senior executives on October 12, 2000, stating:  "We also need to continue to focus on our 2003 challenge.  Our outlook for that year has improved from the last forecast, but we still have a gap of nearly $375 million in pre-tax income."

38.    Raines, Howard and other senior management used stock buybacks and debt repurchases by the Company as a type of contingency reserve for meeting the EPS Challenge Grant earnings goal of $6.46 by year-end 2003. The May OFHEO Report states that the Board was aware that stock buybacks were being used to influence EPS goals and approved such buybacks. The May OFHEO Report further states that the "primary" reason for conducting debt repurchases was to achieve specific EPS goals.

39.    Raines and other senior management also used contributions to the Fannie Mae Foundation to manage earnings and smooth reported income. In November 2001, Fannie Mae's Controller, Leanne Spencer, wrote a memorandum to Raines advising that debt repurchases combined with a special contribution to the Fannie Mae Foundation would reduce reported earnings in 2001 to meet a $5.20 EPS target. In late 2001, the Board of Directors approved a $300 million contribution from the Company to the Fannie Mae Foundation – which, in turn, was used to fund charities controlled by many of the Board members.

40.    Defendants also used improper accounting standards for derivatives contracts and used improper hedges (which are used to hedge interest rate and other risks) in violation of FAS 133. The SEC said Fannie Mae internally developed its own "unique" – *i.e.*, improper – methodology to assess whether hedge accounting was appropriate.

**The Truth Begins to Come Out**

41.    There were internal rumblings about improprieties with the Company's accounting long before OFHEO began its investigation. Several years ago, a mid-level Fannie Mae manager and accountant, Roger Barnes ("Barnes"), began to have doubts about accounting practices that had evolved under Raines and Howard. Barnes spotted last-minute unexplained adjustments, known internally as "on top" changes, that often happened to miraculously bring actual results exactly in

line with projections. One Fannie Mae executive told Barnes in 2001 that he was "prepared to generate any results desired by . . . Mr. Howard through the [amortization] modeling process."

42.    Barnes said that by mid-2002, it was a joke inside the Company that the Controller's division could produce any income statement the Company wanted. In an unsigned memorandum to defendants Raines and Howard that year, Barnes warned of accounting abuse that "reaches hundreds of millions of dollars and possibly affects the integrity of . . . financial statements." Howard and Raines, who were reaping personal profits from the accounting manipulations – which they not only were aware of but orchestrated – never responded to this memorandum.

43.    In the meantime, in June 2003, Freddie Mac stunned the investment community when it disclosed it had understated profits by approximately $4.5 billion for fiscal years 2000-02 in an effort to smooth earnings and maintain its image on Wall Street as a steady performer. The accounting crisis resulted in the ouster of several top executives at Freddie Mac, investigations by the Department of Justice (the "DOJ") and the SEC, and a $400 million fine in a settlement with the SEC and OFHEO, which regulates both Fannie Mae and Freddie Mac and is responsible for ensuring that they are adequately capitalized and operating safely.

44.    The accounting manipulations at Freddie Mac were detailed in a 107-page report released on July 23, 2003, after an investigation by a team of attorneys led by former SEC General Counsel James R. Doty ("Doty Report"). The Doty Report was commissioned in response to two anonymous letters, one of which was sent to defendant Raines who then forwarded the letter to the then-CEO of Freddie Mac. While Raines was more than willing to expose the fraud at his Company's major rival, as discussed below, he did just the opposite – nothing – when he received an anonymous memo from one of his own employees (Barnes), detailing his own Company's accounting fraud.

45.    At the same time Freddie Mac's accounting fraud was coming to light, in the summer of 2003, Fannie Mae's Board knew that Fannie Mae's earnings could not legitimately be "smoother" than Freddie Mac's and almost all other companies in the Standard & Poor's ("S&P") 500, given the nature of Fannie Mae's business and the economic climate of the times. Nonetheless, because of the financial and personal ties between Raines and the other Board members, it was in everyone's interest to keep quiet about it, so nothing was said or done to fix Fannie Mae's accounting mess or stop the ongoing manipulations and false financial reports. To the contrary, during the Relevant Period certain of the Individual Defendants sold 325,708 shares of Fannie Mae stock for over $23 million in proceeds. Many of these shares were obtained through the exercise of stock options received as a part of their compensation package, permitting these insiders to purchase stock for pennies on the dollar. But for defendants' accounting manipulations, and their concealment thereof, these illegal insider proceeds would not have been available.

46.    On August 4, 2003, on the heels of the Board and Audit Committee meetings, where the Board ignored signs that Fannie Mae was indeed another Freddie Mac, Barnes alerted internal auditors to a $6.5 million accounting change that appeared to be aimed at offsetting a shortfall in net interest income that the controller's office had predicted internally a few days earlier. Barnes gave auditors a detailed memorandum of adjustments he considered improper – which miraculously exactly offset the $6.5 million shortfall – and alleged that "the Company was manipulating and managing income" once again to make profit look more stable than it was.

47.    Defendants' cover-up was launched, and just four days later, on August 8, 2003, an internal audit official convened a meeting and reported that, despite Barnes' allegations, the Company's accounting was in accord with Fannie Mae policies.

48.    Four days after that, on August 12, 2003, the Audit Committee met to discuss the specific accounting improprieties identified by Barnes. Present at this meeting were Audit

Committee defendants Thomas P. Gerrity ("Gerrity"), Frederic V. Malek ("Malek"), Joe K. Pickett

("Pickett") and Anne M. Mulcahy ("Mulcahy"), as well as management defendants Raines, Daniel

H. Mudd ("Mudd") and Howard. Barnes' allegations were fully discussed at this meeting, but

because it was in everyone's interest to support a cover up of those allegations, the Audit Committee

concluded that nothing was improper about the accounting practices Barnes was complaining about.

**Defendants' Accounting Manipulations Are Exposed**

49.    Shortly after the August 12, 2003 Audit Committee meeting, OFHEO began its

investigation of Fannie Mae. Company insiders deliberately isolated Barnes from the OFHEO

investigation. In November 2003, unable to tolerate any longer the culture of accounting

manipulations at Fannie Mae and the retaliation he had suffered for trying to bring those

manipulations to light, Barnes resigned from the Company. Subsequently, he became involved with

the OFHEO investigation.

50.    On September 22, 2004, the 211-page OFHEO Report was released, substantiating

the accounting violation allegations made by Barnes. The report confirmed that management at

Fannie Mae "deliberately developed and adopted" inappropriate accounting policies and supported

widespread violations of GAAP. Specifically, OFHEO found that the Company:

- deliberately developed and adopted accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple reporting periods;

- established an improper materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under GAAP;

- made discretionary adjustments to the Company's financial statements, for the sole purpose of minimizing volatility and achieving desired financial results;

- forecasted and managed the future unrecognized income associated with misapplied GAAP;

- capitalized reconciliation differences as "phantom" assets or liabilities and amortized them at the same speeds as 30-year, fixed-rate mortgages;

- developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by GAAP for current and future periods;

- developed and implemented processes to generate multiple estimates of amortization with varying assumptions in order to select estimates that provided optimal accounting results;

- swept under the rug Barnes' concerns regarding illogical or anomalous amortization results, along with his further allegations of an intent to misstate reported income (which were brought to the attention of, but covered up by, defendants Howard and Raines and then defendants Gerrity, Malek, Pickett, Mudd and Mulcahy as well);

- tolerated significant weaknesses in internal controls surrounding the amortization process; and

- inappropriately deferred $200 million of estimated amortization expense in 1998, which had significant effects on executive compensation.

News of the OFHEO Report caused the Company's stock price to plummet over 17% to $63.05 by September 30, 2004, as the market digested the Report – erasing over $9 billion in market capitalization.

51.    On September 24, 2004, a shareholder demand pursuant to Rule 23.1 of the Federal Rules of Civil Procedure was made on Fannie Mae's Board. The Board never complied with the demand or even responded to it.

52.    It also was revealed on October 1, 2004, that the DOJ was probing Fannie Mae and that the Company had been ordered to preserve documents – that probe was upgraded to a formal inquiry on October 19, 2004. The SEC also began a formal inquiry into the accounting issues raised in the OFHEO Report, and on December 15, 2004, the SEC announced that its own investigation, commenced in the wake of OFHEO's findings, had confirmed that Fannie Mae had violated accounting rules and that it would require Fannie Mae to restate previously reported financial results for the past four years.

53.    The magnitude of Fannie Mae's earnings restatement is staggering. Through accounting smoke and mirrors, between 1998 and mid-2004, Fannie Mae had reported to its shareholders aggressively increasing profitability of approximately $3.9 billion in fiscal 1999, $4.5

billion in fiscal 2000, $5.9 billion in fiscal 2001, $4.6 billion in fiscal 2002, $7.9 billion in fiscal 2003, and over $3 billion in the first six months of fiscal 2004 – meeting Raines' goal of doubling the Company's reported EPS in five years and rewarding himself and his cronies for purportedly meeting that goal. However, now that the truth is known, at least $6.3 billion of the $21.4 billion in earnings Fannie Mae reported – over 40% – has been eliminated.

54.    The reaction of investors and analysts to these shocking revelations was swift. Fannie Mae's reputation and standing in the investment communities was severely damaged and its stock was downgraded by multiple analysts including Morgan Stanley Dean Witter & Co. ("Morgan Stanley"), Prudential Equity Group LLC ("Prudential"), Wachovia Securities ("Wachovia") and Friedman Billings Ramsey Group, Inc. ("Friedman Billings"). The Company's important debt ratings were also cut by Moody's Investors Services ("Moody's"), Fitch Ratings ("Fitch") and S&P. The debt-rating reductions will undoubtedly significantly increase Fannie Mae's cost of borrowing on its $957 billion in outstanding debt for the foreseeable future. At the same time, as a result of the required earnings restatement, Fannie Mae was faced with having to increase its core capital to meet its minimum capital requirement, which was increased by 30% by OFHEO in the wake of its September 2004 findings. If the 30% increase announced in September 2004 had been in effect as of June 30, 2004, Fannie Mae would have been underfunded by approximately $7.4 billion.

55.    Defendants' response, on the other hand, was to further reward Raines and Howard. Despite knowing that Raines and Howard were involved in and exercised oversight over the accounting improprieties, and despite having a definition of "for cause" termination that clearly covered Raines' and Howard's misconduct, defendants inexcusably allowed both Raines and Howard to "resign" and/or "retire" on a "not-for-cause" basis in December 2004. This decision to allow a not-for-cause retirement/resignation, when the Fannie Mae Board was well aware that there was a basis to terminate Raines and Howard "for cause," constituted a wasteful gift of up to $31+

- 22 -

million in unjust enrichment to the very architects of the fraud and underscores the Board's bad faith and numerous conflicts of interest.

56.    On December 30, 2004, to meet OFHEO's increased capitalization requirements, Fannie Mae was forced to sell $5 billion worth of securities at a fire-sale price to quickly deal with the "significant undercapitalization" occasioned by the earnings restatement. Shortly thereafter, on January 18, 2005, Fannie Mae announced that it was slashing its common stock's quarterly dividends by 50%, from $0.52 per share to $0.26 per share. To that point, Fannie Mae's dividends had offered one of the most generous policies, increasing at a compound annual rate of 13.83% over the past 18 years. This caused the Company's stock to become less attractive to investors and will make it more difficult for the Company to issue new securities. Also in January 2005, Fannie Mae was forced to significantly scale back its purchases of new mortgage assets, which will adversely affect Fannie Mae's operations.

57.    Subsequently, on February 22, 2005, OFHEO, in conjunction with its ongoing investigation, revealed that it had identified numerous other issues concerning additional improper accounting and deficient internal controls at the Company. It now appears that defendants caused Fannie Mae to violate virtually every accounting rule applicable to mortgages. The Company's press release that date stated in relevant part:

> OFHEO also has notified Fannie Mae's Board of Directors and management of several accounting and internal control issues and questions the agency has identified in its ongoing special examination, and directed that these matters be included in the internal reviews by Fannie Mae's board and management and reviewed by the company's external auditor. ***OFHEO indicated that it has not completed its review of all aspects of these issues, but has identified policies that it believes appear to be inconsistent with generally accepted accounting principles as well as internal control deficiencies that it believes raise safety and soundness concerns***. The issues and questions pertain to the following areas: securities accounting, loan accounting, consolidations, accounting for commitments, and practices to smooth certain income and expense amounts. OFHEO also raised concerns regarding journal entry controls, systems limitations, and database modifications, as well as new developments relating to FAS 91.

- 23 -

58.    On this additional shocking news, shares of the Company's stock dropped again to close at $57.16 – representing its lowest level in more than four years and about 30% below the high of $80.82 in 2004 and representing a loss over $17 billion in market capitalization.

59.    In August 2005, Fannie Mae announced that it does not foresee completing its earnings restatement process until the latter half of 2006, and that the out-of-pocket cost to the Company of completing that restatement will be staggering.  As reported in an August 11, 2005, article by *Datamonitor*, entitled "Fannie Mae to devote up to eight million person-hours on SEC restatement":

> US mortgage giant Fannie Mae has announced it is to devote between six and eight million labor-hours and a further $100 million in technology projects, in order to complete its multi-billion dollar SEC earnings restatement.

> Fannie Mae president and CEO Daniel Mudd said that the restatement, which was requested by the SEC to correct for errors in its accounting for deferred purchase price adjustments, could take a full year to complete.

> Mr. Mudd said that Fannie Mae's safety and soundness regulator, OFHEO, also raised questions with respect to the company's accounting techniques.

> This has led to the company-wide review of all Fannie Mae's accounting policies and practices, including those related to derivatives, mortgage purchase and sale commitments, and investment securities.

> According to the company's statements and filings, more than 30% of its employees will spend more than half their time working on the restatement this year. An additional 1,500 consultants will also be brought in.  Related administrative expenses will add up to more than $420 million this year alone.

> "We are leaving no stone unturned," said Mr. Mudd.  "We estimate we will need to record over one million lines of journal entries, determine hundreds of thousands of commitment prices and securities values, and verify some 20,000 derivative prices."

60.    The recent release of the May OFHEO Report also exposed publicly for the first time that Goldman, Sachs & Co., Inc. ("Goldman Sachs & Co."), Lehman Brothers and Radian Insurance Inc. ("Radian") each participated in transactions designed and implemented to assist Fannie Mae with the improper manipulation of reported earnings during the Relevant Period.  Subsequent to

- 24 -

assisting Fannie Mae with its fraud, both Goldman Sachs and Lehman Brothers were awarded

lucrative positions as lead managers or co-managers of multi-billion offerings of securities issued by

Fannie Mae, reaping millions of dollars in fees. Further, Goldman Sachs and Lehman Brothers also

participated in a select group of core dealers chosen to transact Fannie Mae's buybacks of

outstanding bonds and notes during the Relevant Period. The May OFHEO Report explains that

Fannie Mae's "debt buybacks offered powerful opportunities for adjusting earnings."

61.    The result of this fiasco has been one of the most shocking exposures of fraud,

deception, failure of management, unjust enrichment and directorial misconduct in the history of

United States financial fraud – being arrogantly conducted right under the noses of our nation's

regulators. Fannie Mae's corporate reputation and goodwill have been greatly damaged by these

exposures. Its credibility with the investment community has been severely undermined. Fannie

Mae has been badly damaged by defendants' fraudulent misconduct. Defrauded investors have sued

the Company in massive class action suits in this district, which expose the Company to billions of

dollars of damage and will cost many millions of dollars to defend. Moreover, another class action

has been filed against the Company in this district by participants in the Company's Employee Stock

Ownership Plan. This suit is brought for violations of the Employee Retirement Income Security

Act ("ERISA") and alleges the defendants breached their fiduciary duties by offering Fannie Mae

stock as the only investment option for the plan when they knew or should have known it was not a

suitable and appropriate investment because of the financial scandal (the "ERISA class action").

This suit likewise exposes the Company to massive liability to its own employees and will cost

hundreds of thousands of dollars or more to defend.

62.    In addition, the Company has been subjected to several governmental and regulatory

investigations, including investigations by the SEC, the DOJ, OFHEO and the DC Attorney General,

which will cost millions in defense costs, fines or penalties and continue to result in further large

fines and/or penalties. In May 2006, the Company agreed to pay a fine of $400 million to settle an enforcement proceeding brought against the Company by the SEC and a related OFHEO proceeding. The SEC's complaint charged that between 1998 and 2004, Fannie Mae engaged in a financial fraud to portray false stable earnings growth and reduce reported income volatility to meet forecasted earnings and maximize bonuses. In addition, the SEC specifically charged Fannie Mae with blatant violations of GAAP, including management's improper implementation of a policy to adjust loan fees, premiums and discounts as required by FAS 91 and failure to comply with FAS 133, which resulted in materially false and misleading financial statements for 2001 through second quarter 2004. The SEC also alleged that Fannie Mae's senior management directed or implemented a wide-spread course of business involving numerous acts and practices of improper accounting to hit established EPS targets. The SEC specifically charged that management's purposeful failure to record the full adjustment required by FAS 91 in fourth quarter 1998 resulted in understated expenses and overstated income in a pre-tax amount of $199 million in 1998 and triggered maximum bonuses.

63. Finally, the fact that Fannie Mae's woefully deficient internal controls contributed in large part – if not caused – the earnings restatement will feed the fervor of many of Fannie Mae's political foes who say Fannie Mae's and Freddie Mac's special status as so-called government-sponsored enterprises, or GSEs, gives them unfair advantages over big banks and mortgage lenders and will likely threaten the political privileges and preferences Fannie Mae once enjoyed, estimated to be worth $10 billion annually. "The recent Fannie revelations have caused us to push even harder," says Michael House, executive director of FM Policy Focus, a Washington-based lobbying group funded by rivals of Fannie Mae and Freddie Mac. "I don't care whether you're a child or a large financial institution – if you are not properly regulated and disciplined, you are going to get out of hand."

64.    While Fannie Mae and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the directorial oversight failings by the Fannie Mae Board, the insiders and directors of this public company have not only suffered no damages, but, in fact, have profited from their participation in the illegal conduct. The managers of Fannie Mae pocketed millions of dollars in salaries, bonuses and stock option exercises and stock sales as a result of their deceptive activities.

65.    Only since the Company's accounting manipulations have come to light has the Board received intense scrutiny concerning numerous conflicts of interests and close personal, professional and business connections many Board members have to Raines, the Company, to each other and to the Foundation – the Company's philanthropic arm which Raines chaired and used as a slush-fund to pour millions of dollars into organizations in which Fannie's so-called independent directors held senior posts. Because many of these extensive conflicts were never revealed by the Company in its Proxy Statements or other public documents, Fannie Mae had previously received high marks for its corporate governance. However, once the accounting chicanery came to light followed by the disclosures in the news media of these conflicts, those who had previously given the Company high marks for its corporate governance quickly changed course. For example, *the Corporate Library mistakenly gave Fannie Mae a sterling grade – in part because it failed to examine ties between the Fannie Mae Foundation and directors. In hindsight, the Corporate Library now refers to Fannie Mae's initial "A" grade as a "false positive."* Now the Company deserves an "F" for agreeing to Raines' and Howard's compensatory packages and for their oversight of the accounting scandal.

**JURISDICTION AND VENUE**

66.    This Court has original jurisdiction over this action under 12 U.S.C. §1723a, pursuant to the holding of *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247 (1992). This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

67.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

68.    Venue is proper in the Court pursuant to 12 U.S.C. §1717, which requires Fannie Mae's principal office to be located in this District and deems it a resident of this District for purposes of venue in civil actions. In addition, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

**PARTIES**

69.    Plaintiff Arthur Middleton is, and was at all times relevant hereto, an owner and holder of Fannie Mae common stock. Plaintiff has continuously held shares of Fannie Mae common stock since 1994 and currently holds 24,200 shares of Fannie Mae common stock.

70.    Nominal party Fannie Mae is a federally chartered corporation established in 1938. The Company became a stockholder-owned and privately managed corporation in 1968 pursuant to the Federal National Mortgage Association Charter Act, 12 U.S.C. §§1716 *et seq.*, and the Company's stock has traded on the NYSE since that time and trades under the symbol "FNM." The Company's debt, equity and mortgage-related securities are exempt from registration with the SEC under the Securities Act of 1933 and are exempted securities under the 1934 Act. The Company decided to voluntarily register its common stock with the SEC under §12(g) of the 1934 Act,

effective March 31, 2003. Since that time, the Company has filed reports, Proxy Statements and other information, including Form 4s indicating stock sales by officers and/or directors. Pursuant to 12 C.F.R. §1710.10, Fannie Mae has the authority to elect and designate the body of law that will govern its corporate governance practices and procedures. Pursuant to §1.05 of Fannie Mae's By-laws, the Company has designated Delaware General Corporation Law to govern its corporate governance practices and procedures. Fannie Mae's principal place of business is located at 3900 Wisconsin Avenue N.W., Washington, DC 20016.

71.    Defendant Raines served as Chairman of Fannie Mae and its CEO from January 1999 (and designee to those positions from May 1998 to December 1998) and as Chair of its Executive Committee until his resignation on December 21, 2004. As set forth throughout this complaint, Raines is (i) directly responsible for the affirmative misconduct alleged herein, (ii) personally profited off of the misconduct alleged herein, and (iii) has significant conflicts of interests with and among other named defendants.

72.    Defendant Howard was employed with Fannie Mae from 1982 until his resignation in late December 2004, and had served as Vice Chairman and CFO since May 2003, Executive Vice President and CFO from 1990 to May 2003, and a director since 2003. As set forth throughout this complaint, Howard is (i) directly responsible for the affirmative misconduct alleged herein, (ii) personally profited off of the misconduct alleged herein, and (iii) has significant conflicts of interests with and among other named defendants.

73.    Defendant Mudd served as Vice Chairman of Fannie Mae's Board and as Chief Operating Officer ("COO") of the Company beginning in February 2000. On December 21, 2004, upon Raines' departure, Mudd assumed the position of interim CEO and Executive Vice President of the Company and in June 2005 officially was appointed as its CEO and President. As set forth throughout this complaint, Mudd is (i) directly responsible for the affirmative misconduct alleged

herein, (ii) personally profited off of the misconduct alleged herein, (iii) has significant conflicts of interests with and among other named defendants, and (iv) was dominated and controlled by Raines during the Relevant Period.

74.    Defendant Kenneth M. Duberstein ("Duberstein") began serving as a director of Fannie Mae in 1998 and during the Relevant Period served as a member of its Executive, Assets and Liabilities Policy (Chair), Technology and Nominating and Corporate Governance Committees. Duberstein is also Chairman and CEO of The Duberstein Group, an entity that does significant business with the Company.  As set forth in detail herein, Duberstein is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

75.    Defendant Stephen B. Ashley ("Ashley") began serving as a director of Fannie Mae in 1995 and during the Relevant Period served as a member of its Executive, Nominating and Corporate Governance, Technology and Housing and Community Development (Chair) Committees. Defendant Ashley assumed the position of Chairman of Fannie Mae's Board after Raines resigned and OFHEO mandated the separation of the Chairman and CEO positions.  As set forth in detail herein, Ashley is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

76.    Defendant Gerrity began serving as a director of Fannie Mae in 1991, and during the Relevant Period served as a member of its Executive, Audit (Chair) and Nominating and Corporate Governance Committees.  As set forth in detail herein, Gerrity is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

77.    Defendant Ann Korologos ("Korologos") began serving as a director of Fannie Mae in 1994 and during the Relevant Period served as a member of its Executive, Compensation and

Nominating and Corporate Governance (Chair) Committees. Shortly after the May OFHEO Report was released, on June 14, 2006, Korologos resigned from Fannie Mae's Board, effective July 31, 2006. As set forth in detail herein, Korologos is (i) directly responsible for the affirmative misconduct alleged herein, (ii) personally profited off of the misconduct alleged herein, and (iii) has significant conflicts of interests with and among other named defendants.

78.    Defendant Malek began serving as a director of Fannie Mae in 2002 and during the Relevant Period served as a member of its Audit and Assets and Liabilities Policy Committees. Malek retired from Fannie Mae's Board at the end of 2005. As set forth in detail herein, Malek is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

79.    Defendant Donald B. Marron ("Marron") began serving as a director of Fannie Mae in 2001 and during the Relevant Period served as a member of its Nominating and Corporate Governance and Assets and Liabilities Policy Committees. Shortly after the May OFHEO Report was released, in early July 2006, Marron resigned from Fannie Mae's Board, effective July 31, 2006. As set forth in detail herein, Marron is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

80.    Defendant Pickett began serving as a director of Fannie Mae in 1996 and during the Relevant Period served as a member of its Executive, Audit, Technology (Chair) and Compensation Committees. As set forth in detail herein, Pickett is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

81.    Defendant Leslie Rahl ("Rahl") began serving as a director of Fannie Mae in February 2004 and during the Relevant Period served as a member of its Assets and Liabilities

Policy and Housing and Community Development Committees. As set forth in detail herein, Rahl is directly responsible for the affirmative misconduct alleged herein.

82. Defendant H. Patrick Swygert ("Swygert") began serving as a director of Fannie Mae in 2000 and during the Relevant Period served as a member of its Assets and Liabilities Policy and Housing and Community Development Committees. As set forth in detail herein, Swygert is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

83. Defendant Mulcahy was, at all relevant times prior to her resignation effective October 19, 2004, a director of Fannie Mae since 2000 and during the Relevant Period served as a member of its Executive, Audit and Compensation (Chair) Committees. On the same day that she signed letters amending defendants Raines', Howard's and Mudd's employment agreements with Fannie Mae, September 17, 2004, Mulcahy resigned from the Board, effective October 19, 2004. As set forth in detail herein, Mulcahy is (i) directly responsible for the affirmative misconduct alleged herein, and (ii) has significant conflicts of interests with and among other named defendants.

84. Defendant John K. Wulff ("Wulff") has served as a director of Fannie Mae since being appointed by defendants Raines and Howard on December 9, 2004, before Raines and Howard were permitted by Wulff and the other Board members to leave the Company on a "not for cause" basis. Wulff was appointed to the Audit and Compensation Committees. As set forth in detail herein, Wulff personally participated in and is directly responsible for corporate waste and unjust enrichment in regard to the decision to accept the resignations of Raines and Howard rather than taking action to (i) terminate them for causes, and (ii) enforce the Company's rights under Sarbanes-Oxley.

85. Defendant Goldman Sachs is an integrated financial institution that, through subsidiaries such as defendant Goldman Sachs & Co., provided investment banking, underwriting

and advisory services to Fannie Mae. Goldman Sachs and Goldman Sachs & Co. actively participated in Fannie Mae's fraudulent conduct to manipulate reported income to maintain the appearance of steady EPS growth during the Relevant Period. Goldman Sachs and Goldman Sachs & Co. regularly conduct business in this District.

### CONCERTED ACTION ALLEGATIONS

86.    Defendants schemed, pursued a common course of conduct, acted in concert with, conspired with and aided and abetted one another to accomplish the wrongs complained of herein.

### DEFENDANTS INTERTWINING RELATIONSHIPS
### & CONFLICTS OF INTEREST

87.    Plaintiff brings this action derivatively in the right and for the benefit of Fannie Mae to redress damage already suffered and to be suffered by the Company as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control, waste of corporate assets and constructive fraud. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Fannie Mae and its shareholders in enforcing and prosecuting their rights.

88.    In October 2004, Mulcahy resigned. In December 2004, Wulff joined the Board and Raines and Howard resigned. Those Board members who permitted Raines and Howard to resign, rather than terminating them for cause – thus permitting Raines and Howard to unjustly reap millions of additional dollars in compensation, bonuses and the like – and who further prevented Fannie Mae from exercising its rights under Sarbanes-Oxley to recoup millions of dollars in incentive-based or equity-based compensation and profits realized from the sale of securities by Raines are: Mudd, Duberstein, Ashley, Gerrity, Korologos, Malek, Marron, Pickett, Rahl, Swygert and Wulff. Each of these defendants, are directly responsible for the affirmative misconduct alleged herein, have personally profited off of the misconduct alleged herein, and have irreparable conflicts of interests with and among each other, including Raines and Howard.

**Direct Responsibility and Affirmative Misconduct**

89.    Plaintiff has alleged herein that the director defendants (sometimes referred to herein as the "Individual Defendants") have committed corporate waste, and permitted unjust enrichment, by undertaking a series of actions designed to allow defendants Raines and Howard to resign and retire, respectively, on a "not for cause" basis, thereby allowing Raines and Howard to receive benefits potentially in excess of $100 million collectively.    In connection with this specific misconduct, the Individual Defendants unjustifiably agreed to modify Raines' and Howard's employment agreements by (arguably) eliminating the ability of the Board to fire Raines and Howard "for cause" and avoid paying millions in undeserved severance benefits.    Once it was publicly disclosed that Raines and Howard engineered one of the largest financial debacles in this country's history and could not remain at the Company, the Individual Defendants affirmatively agreed to permit Raines and Howard to leave the Company in a manner than guaranteed them tens of millions, if not hundreds of millions of dollars worth of undeserved benefits.    Moreover, these same directors have failed to take the appropriate and necessary steps, as set forth in §304 of the Sarbanes-Oxley Act, to recoup the payments of well over $100 million to Raines and Howard for executive compensation that was wrongly paid to these defendants, as CEO and CFO of Fannie Mae, during the restatement period.

90.    Also as alleged herein each of the Individual Defendants are directly responsible for affirmative conduct in connection with the Company having issued false financial statements, or have aided and abetted therein, which caused the Company to, among other things: (i) restate its earnings by at least $6.3 billion; (ii) lose over $31 billion in market capitalization; (iii) be subject to SEC and criminal investigations; (iv) sell over $5 billion of securities at "fire-sale" prices to avoid being undercapitalized; (v) be exposed to hundreds of million of dollars in potential damages for securities fraud and ERISA violations; (vi) pay $400 million in civil penalties to settle OFHEO and

SEC matters; (vii) incur over $420 million in professional and consultant fees to figure out Fannie Mae's real earnings over the restatement period; (viii) incur expenses associated with the restatement, regulatory examinations, investigations and litigation in excess of $1.3 billion for 2005 and 2006 alone; and (ix) became more limited in its ability to compete in the public marketplace.

91.    Many of the Individual Defendants also signed certain of the Company's admittedly false and misleading financial reports, including the Annual Reports on Form 10-K for fiscal years 2002 and 2003 (except for Rahl, who only signed the 2003 Form 10-K).  Defendant Howard also signed the Company's admittedly false and misleading Form 10-Q financial statements filed with the SEC during the Relevant Period, and Raines and Howard each certified the Company's admittedly false and misleading financial reports issued from 2003 through mid-2004.  As a result of this and other affirmative misconduct alleged herein, Raines and Howard are named defendants in the pending securities fraud class action, and Raines, Howard, Mudd, Korologos, Marron, Pickett and Mulcahy are named defendants in the ERISA class action.

92.    Furthermore, Fannie Mae's Board during the Relevant Period was not a passive Board and can be held personally responsible for the misconduct that occurred at the Company. Three of the defendants, Raines, Mudd and Howard, were actively involved in the day to day operations of the Company.  A fourth defendant, Duberstein, was in regular business with Fannie Mae.  As the Company acknowledged in its 2004 Annual Proxy Statement, "Messrs. Raines, Mudd and Howard are not considered to be independent directors under the Guidelines because of their positions as officers of Fannie Mae. Mr. Duberstein is not considered independent because of his business relationship [fostered and promoted by Raines] with Fannie Mae . . . ."

93.    In addition, the ten other defendants (not including Raines, Howard and Mudd, who were Fannie Mae officers and direct beneficiaries of the misconduct) were on one or more committees of the Board that had an active role in effectuating the misconduct alleged herein.

- 35 -

Defendants Korologos, Pickett and Mulcahy (Committee Chair) (collectively, "Compensation Committee Directors") served on the Company's Compensation Committee during the Relevant Period. The Compensation Committee Directors, among other things, were affirmatively required to: (a) ensure that compensation programs reflect Fannie Mae's pay for performance philosophy and that stock compensation aligns the interests of employees, executives and directors with those of shareholders; and (b) approve of all contracts entered into with and the compensation to be paid to Fannie Mae's senior officers.

94.     As detailed herein, the Compensation Committee Directors abdicated their responsibilities by paying – wasting – hundreds of millions of dollars in incentive-based compensation to executives based on the purported financial success of the Company when in fact the Company had not been successful, had not met the stated financial criteria and was only facially successful because many of these same defendants were not ensuring that the Company was accurately reporting its true financial condition.

95.     Additionally, the Compensation Committee was responsible for negotiating and signing (by defendant Mulcahy) significant amendments to employment contracts with defendants Raines and Howard that are the subject of this litigation. Defendants are now trying to justify the improper payment of over $30 million in severance benefits to Raines and Howard with the 2004 amendments to Raines' and Howard's employment agreements, which they claim eliminated "for cause" termination. To the extent these amendments can be interpreted to have eliminated "for cause" termination, thereby eliminating the right to withhold significant benefits upon termination, this decision, if in fact it was made, served no corporate function and resulted in the waste of corporate assets. Indeed, these agreements were entered into at the same time the Board was aware that OFHEO was in the midst of a significant probe into the conduct of Raines and Howard and

while the entire Board knew about or had in its possession the OFHEO Report that detailed Raines' and Howard's misdeeds.

96.    Defendants Gerrity, Malek, Pickett and Mulcahy (collectively, the "Audit Committee Directors"), were each on the Company's Audit Committee during the Relevant Period. According to Fannie Mae's charter, the Audit Committee Directors had affirmative responsibilities to, *inter alia*: (i) assure the integrity of the accounting, reporting and financial practices of Fannie Mae before recommending that they be included in the Company's 10-K; (ii) create and administer financial controls sufficient to ferret out financial improprieties; (iii) assure Fannie Mae's compliance with legal and regulatory requirements; (iv) ensure outside auditors' qualifications and independence; (v) provide technology and systems oversight of Fannie Mae's technological improvements; and (vi) assure that Fannie Mae's internal audit function and Fannie Mae's outside auditor were undertaking sufficient steps to assure that the Company was appropriately stating its financial position. The designated accounting experts on Fannie Mae's Audit Committee were Malek and Mulcahy.

97.    As set forth herein, the Audit Committee Directors failed in their direct oversight responsibilities and allowed, indeed recommended, that the Company include false financial statements in public filings. Fannie Mae's financials and reporting were not sound. There were no legitimate internal controls. The outside auditors were not adequately supervised and there was insufficient guidance by the Audit Committee Directors for the Company's internal audit function.

98.    Upon information and belief, the Audit Committee Directors, via their direct oversight of the Company's internal auditor, were put on notice of the improper accounting at Fannie Mae by at least 2003. For example, a Company executive, Barnes, specifically alerted internal auditors to a $6.5 million change that appeared to be aimed at offsetting a shortfall in net interest income that the controller's office had predicted internally a few days earlier. Barnes gave the internal auditors a detailed memorandum of adjustments he considered improper and expressly

stated that "the company was manipulating and managing income" to make profit look more stable than it was. Because of their chartered responsibilities and the information they had at their direct disposal, the Audit Committee Directors are directly responsible for the false financial statements at the Company and the price the Company is and will continue to pay for allowing and perpetuating this misconduct.

99.    In mid-May 2006, OFHEO alerted Fannie Mae executives to the imminent release of the May OFHEO Report and provided Fannie Mae with an advance copy. Within days of receiving the May OFHEO Report and prior to public release of the report, Fannie Mae announced that defendant Gerrity was stepping down as Chair and a member of the Audit Committee and would be leaving the Board by the end of 2006.

100.    Defendants Duberstein (Committee Chair), Malek, Marron, Swygert and Rahl (collectively "Assets and Liabilities Policy Committee Directors") served on the Company's Assets and Liabilities Policy Committee. The Assets and Liabilities Policy Committee was specifically charged with oversight of management's interest rate risk, credit risk and capital management activities. It was required by charter to develop an in-depth and specialized knowledge on matters relating to assets and liabilities management and to use that knowledge to review management's policy proposals and performance, and thereafter, make recommendations and reports to the Board on matters relating to Fannie Mae's assets and liabilities. In this capacity, the Assets and Liabilities Policy Committee Directors, among other things, reviewed (i) credit and interest rate risk management policies and performance, (ii) investment guidelines for the liquid investment portfolio and management's compliance with those guidelines, (iii) the use of derivative contracts, and (iv) dividend payments.

101.    During the Relevant Period, the Assets and Liabilities Policy Committee Directors wholly abdicated their authority and responsibilities and breached their fiduciary duties. They are

- 38 -

direct participants in the wrongdoing detailed herein, *inter alia*, because they failed to disclose and recommend that the Company discontinue its improper application of FAS 133 relating to derivative instruments, which OFHEO and the SEC determined violated GAAP, and which has resulted in the massive $6.3 billion restatement of the Company's past financial results and has exposed the Company to massive liability. This is particularly true with respect to defendant Rahl, who had an expertise and was recognized as one of the country's foremost experts in the very accounting that OFHEO and the SEC determined violated applicable accounting rules.

102.    Rahl is the founder and president of a financial advisory firm, Capital Market Risk Advisors, Inc. ("CMRA"), which specializes in risk management, hedge funds and capital market strategy. Prior to starting her own firm in 1994, Rahl spent 19 years at Citibank, including nine years as co-head of Citibank's derivatives business. Rahl was named one of the Top 50 Women in Finance by Euromoney in 1997, was profiled in both the fifth and tenth anniversary issues of Risk Magazine and was listed in "Who's Who in Derivatives" by *Risk Magazine*. Indeed, on its website CMRA refers to Rahl as "a pioneer in the development of the swaps and derivatives business." Moreover, Rahl was the author of "Hedge Fund Transparency: Unravelling the Complex and Controversial Debate," published in March 2003 by Risk Books. Accordingly, Rahl had special capabilities to understand Fannie Mae's finances and was required to apply those abilities to prevent the financial defalcations alleged herein. This is especially true with respect to the Company's accounting violations relating to its derivative instruments. Thus, Rahl has a specific expertise in the very accounting that OFHEO and the SEC determined violated applicable accounting rules, yet, despite her fiduciary obligations to do so, she, along with the rest of the Assets and Liabilities Policy Committee Directors, failed to prevent the accounting fraud that resulted in the massive $6.3 billion restatement of the Company's past financial results and has exposed the Company to massive liability.

103.    Defendants have incentive not to sue themselves or other directors for the misconduct alleged above.  By suing themselves, and/or other directors, these individuals would void any directors' and officers' liability insurance coverage otherwise available.  Directors and officers insurance policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against it would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

**Financial Benefit from the Misconduct**

104.    The members of the Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, stock and/or options and/or other emoluments by virtue of their membership on the Board and their control of Fannie Mae.  In addition to their regular salary as a Board member, defendants received benefits that were only available to them because of the misconduct alleged herein.  Since defendants have benefited from the wrongs herein alleged, they have thereby been unjustly enriched by the misconduct alleged herein.  Each of these defendants is personally liable for their own unjust enrichment and/or for aiding and abetting in the unjust enrichment of others.

105.    Specifically, during the Relevant Period and while in possession of material, non-public information, Raines sold at least 94,070 shares of Fannie Mae stock for proceeds of $6,888,658.87.  Through his domination and control of the Fannie Mae Board, Raines was permitted to use the Company as his own private piggy-bank while he ran Fannie Mae and has been permitted to continue using the Company as his own private piggy-bank upon his departure.  For fiscal years 1998-2003, based on the Company's improper financial results, Fannie Mae paid Raines the following in total compensation (including salary, bonuses and all other compensation) and Long-Term Incentive Performance Payouts ("LTIP"), and awarded him the following options to purchase Fannie Mae shares:

| Fiscal Year | Salary and Cash Bonuses | Long-Term Incentive Payments | Stock Option Grants |
|---|---|---|---|
| 2003 | $5,435,362 | $11,621,280 | $3,006,895 |
| 2002 | $4,480,421 | $7,233,679 | $6,680,395 |
| 2001 | $4,146,200 | $6,803,068 | $7,945,648 |
| 2000 | $3,517,133 | $4,588,616 | $5,829,071 |
| 1999 | $2,875,915 | $1,329,448 | $4,358,406 |
| 1998 | $1,656,443 | $794,873 | $4,052,484 |
| **TOTAL:** | **$22,111,474** | **$32,370,964** | **$31,872,899** |

106.    Raines received a bonus in 1998 of $1,109,589, which was only achieved through the Company's accounting manipulation by deferring over $200 million in expenses to subsequent fiscal years. The more than 2 million stock options awarded to Raines as compensation during 1998 to 2003 were collectively valued by Fannie Mae at $31,872,899. He received additional stock options worth $4,358,515 million in 2003 under the EPS Challenge Grant program that he instituted in 1998, vowing to double EPS in five years. In total, Raines received compensation of $90 million during the period he manipulated earnings to double Fannie Mae's EPS, and over $52 million of this compensation was directly tied to achieving EPS targets.

107.    The Individual Defendants permitted Raines to resign – with generous undisclosed severance packages – and to keep the millions of dollars in salary, bonuses, stock options, restricted stock and other compensation received by him during the Relevant Period. In addition, Raines received the following benefits payable to him under the terms of their employment contracts because he resigned rather than being fired: (i) all accrued but unpaid base salary for this year; (ii) all unpaid annual bonuses for 2004; (iii) all restricted stock awarded through Fannie Mae's performance share program throughout the years; (iv) all of his stock options, which became immediately exercisable; (v) a prorated share of Fannie Mae's annual incentive plan, which ties cash bonuses to multi-year internal EPS targets; (vi) a prorated share of Fannie Mae's so-called performance shares, which are restricted stock awards also tied to hitting multi-year internal EPS targets; (vii) *a minimum base annual salary for Raines' lifetime equal to his salary as of June 30, 2004, which*

*was close to $1 million a year*, and Raines' wife will continue to receive this amount after his death

if he predeceases her; and (viii) other benefits, including life and health insurance.

108.    Defendant Howard has done almost as well. During the Relevant Period, while in

possession of material, non-public information, Howard sold at least 126,683 shares of Fannie Mae

stock at inflated prices for proceeds of $9,100,863. Additionally, for fiscal years 1998 through 2003,

based on the Company's improper financial results, Fannie Mae paid Howard the following in total

compensation (including salary, bonuses and all other compensation) and LTIP, and awarded him

the following options to purchase Fannie Mae shares:

| Fiscal Year | Salary and Cash Bonuses | Long-Term Incentive Payments | Stock Option Grants |
|---|---|---|---|
| 2003 | $1,835,338 | $3,470,578 | $2,491,974 |
| 2002 | $1,293,246 | $1,947,368 | $1,749,995 |
| 2001 | $1,171,551 | $1,987,119 | $2,166,427 |
| 2000 | $1,002,504 | $2,088,542 | $2,035,589 |
| 1999 | $944,397 | $860,464 | $1,154,593 |
| 1998 | $898,837 | $909,196 | $938,912 |
| **TOTAL:** | **$7,145,873** | **$11,263,267** | **$10,537,490** |

109.    Howard received a bonus in 1998 of $493,750, which was only achieved through the

Company's accounting manipulation by deferring over $200 million in expenses to subsequent fiscal

years. The 433,766 stock options awarded to Mudd as compensation during 1998 to 2003 were

collectively valued by Fannie Mae at $10,537,490. He received additional stock options worth

$1,292,085 million in 2003 under the EPS Challenge Grant program that Raines instituted in 1998,

vowing to double EPS in five years. In total, Mudd received compensation of $30 million during the

period he manipulated earnings to double Fannie Mae's EPS, and almost $17 million of this

compensation was directly tied to achieving EPS targets.

110.    Additionally, like Raines, the Individual Defendants permitted Howard to retire –

with generous undisclosed severance packages – and to keep the millions of dollars in salary,

bonuses, stock options, restricted stock and other compensation received by him during the Relevant

Period. Howard, too, received the following benefits payable to him under the terms of their employment contracts because they resigned rather than being fired: (i) all accrued but unpaid base salary for this year; (ii) all unpaid annual bonuses for 2004; (iii) all restricted stock awarded through Fannie Mae's performance share program throughout the years; (iv) all of his stock options, which became immediately exercisable; (v) a prorated share of Fannie Mae's annual incentive plan, which ties cash bonuses to multi-year internal EPS targets; (vi) a prorated share of Fannie Mae's so-called performance shares, which are restricted stock awards also tied to hitting multi-year internal EPS targets; (vii) *over $430,000 in annual pension benefits for the rest of his life*, and Howard's wife will continue to receive this amount if he predeceases her; and (viii) other benefits, including life and health insurance.

111.    While in possession of material, non-public information, Mudd sold at least 27,248 shares of Fannie Mae stock for proceeds of $1,699,062. In addition to being awarded $1,319,533 in Restricted Stock Awards for fiscal years 2000-2003, based on the Company's improper financial results, Fannie Mae paid Mudd the following in total compensation (including salary, bonuses and all other compensation) and LTIP, and awarded him the following options to purchase Fannie Mae shares:

| Fiscal Year | Salary and Cash Bonuses | Long-Term Incentive Payments | Stock Option Grants |
|---|---|---|---|
| 2003 | $2,105,181 | $4,674,015 | $2,355,030 |
| 2002 | $1,611,301 | $2,339,702 | $1,776,933 |
| 2001 | $1,749,270 | $1,188,846 | $2,498,108 |
| 2000 | $1,667,422 | $414,090 | $2,516,927 |
| TOTAL: | $7,133,174 | $8,616,653 | $9,146,998 |

112.    The 480,446 stock options awarded to Mudd as compensation during 2000 to 2003 were collectively valued by Fannie Mae at $9,146,998. He received additional stock options worth $1,928,049 million in 2003 under the EPS Challenge Grant program that Raines instituted in 1998, vowing to double EPS in five years. In total, Mudd received compensation of $26 million during the

period he manipulated earnings to double Fannie Mae's EPS, and approximately $15 million of this compensation was directly tied to achieving EPS targets.

113.    Fannie Mae's Board approved the EPS Challenge Option Grant by resolution in November 1999, even though Fannie Mae's Annual Incentive Plan bonuses and long-term compensation plan awards were heavily dependent on EPS performance as well. Moreover, defendants allowed the same set of executives, all subject to these compensation incentives, to establish EPS targets and measure and report results. As set forth in the May OFHEO Report, to manage earnings to reap financial rewards, Raines, Howard and other Fannie Mae senior executives, manipulated accounting related to amortization, tax-related transactions and stock and debt buybacks. From 1998 through 2002, senior executives improperly adjusted earnings to hit (sometimes within fractions of a cent) EPS goals that ensured a maximum bonus payout. The May OFHEO Report stated that such "misconduct can only occur in the absence of appropriate internal controls and proper Board of Directors oversight."

114.    Finally, during the Relevant Period, while in possession of material, non-public information, Korologos sold at least 186 shares of Fannie Mae stock for proceeds of $12,834, and Swygert sold at least 554 shares of Fannie Mae stock for proceeds of $38,348.

**Defendants' Conflicts of Interest**

115.    At least eight of the fourteen defendants (Raines, Mudd, Duberstein, Marron, Swygert, Malek, Korologos and Gerrity) are conflicted due to their association with the Foundation. Raines was Chairman of the Board of the Foundation when the grants described below were handed out. Swygert served on the Board of the Foundation until he was removed after his conflicts of interest were exposed, and Mudd, the Foundation's former Vice Chairman, continues to serve on its Board as its Chairman. The Foundation, when chaired by Raines, poured millions of dollars in grants into organizations in which other members of Fannie Mae's Board held senior positions,

creating numerous and direct conflicts of interests between the Board and Raines. Most of these relationships between the specific board members and the Foundation were not disclosed in the Company's Proxy Statements. Had they been exposed, a majority of the Fannie Mae Board would not have been deemed independent by Fannie Mae's own Corporate Governance Guidelines, which were adopted in January 2003.

116. A Fannie Mae director suffers a severe conflict when he/she serves as an executive officer, employee, director or trustee of a nonprofit organization to which Fannie Mae or the Foundation has made payments exceeding $100,000 in any year. The Board members were aware that contributions to their affiliated charities creates a conflict of interest, but to avoid scrutiny of those donations, they enacted spurious guidelines to view charitable contributions prospectively. Although all other financial conflict guidelines such as employment or contractual relationships contained a 5-year look-back period, the Board eliminated the 5-year look-back period for donations to their affiliated charities, regardless of how large those contributions were. By eliminating a look-back period for donations exceeding $100,000 to their related charities, defendants Swygert, Korologos and Malek all avoided disclosing their perilous conflicts of interest.

117. Board members submitted annually to Fannie Mae and to the Foundation forms listing charitable and other organizations with which they were affiliated. Foundation grants to the Board members' affiliated organizations more than doubled after members joined the Board. The Foundation made grants to some of those affiliated organizations for the first time after the affiliated Board member was appointed to Fannie Mae's Board.

118. Specifically, Duberstein has served on the Board of Trustees of The Brookings Institution since 1981. The Foundation has given seventeen grants to The Brookings Institution totaling $3,906,000, including a grant of $500,000 in 2004 and a $2 million dollar grant in 2002 and

is listed on its "Honor Role of Contributors." For 2004, the foundation's grant was among the dozen highest. Fannie Mae did not disclose this relationship in its Proxy Statements.

119.    Duberstein also served on the Board of Trustees of the John F. Kennedy Center for Performing Arts, and was its Vice Chairman. Marline A. Malek, the wife of defendant Malek, also serves on the Board of Trustees of the John F. Kennedy Center for the Performing Arts. The Foundation has given forty-one grants totaling $2,971,350 to the John F. Kennedy Center for the Performing Arts between 1980 and 2004, including a grants exceeding $1 million each in 1999 and 2003 and over $250,000 in 1998 and is one of the Center's top donors, listed on its website under "The Kennedy Center Corporate Fund Contributors" under the "Corporate 300 Club," reserved for an elite group of the Center's top corporate donors. Fannie Mae did not disclose these grants in its Proxy Statements.

120.    Duberstein also served on the Board of Directors of the National Alliance to End Homelessness, Inc. The Foundation has given twenty grants totaling $1,071,823 to the National Alliance to End Homelessness between 1989 and 2004, including grants of over $100,000 in 1998 and 1999. Fannie Mae did not disclose this relationship in its Proxy Statements.

121.    Duberstein served as a trustee at Johns Hopkins University. The Foundation gave grants totaling $240,000 to Johns Hopkins University between 1997 and 2001 including a grant of $100,000 in 1998.

122.    Although Fannie Mae's proxy statements disclosed Duberstein's conflict of interest because of his lobbying contract with the Company, Duberstein participated in Executive-Session discussions with independent directors and participated in meetings regarding Raines' compensation, notwithstanding outside consultants' recommendations to the contrary.

123.    Similarly, Marron served for years as the Chairman of the Center for the Study of the Presidency.   The Foundation has given grants of $40,000 to the Center for the Study of the Presidency.

124.    Swygert is both a benefactor and a recipient of grants from the Foundation.  Swygert is president of Howard University, which has received more than $450,000 in grants from the Foundation since 1996, including a grant of $125,000 in 2000 (not disclosed in the Company Proxy Statements).   The Foundation also contributed several thousand dollars to pay expenses for Swygert's inauguration as Howard's president in 1996, and Fannie Mae hired Swygert's son, who is no longer with the Company, as an employee.  Fannie Mae and Howard University were also partners in the revitalization of LeDroit Park located on the University's campus.  As part of this initiative, Fannie Mae provided Howard University with a full-time loan executive.  In addition, as part of this project, Fannie Mae extended Howard University an $800,000 line of credit.  As noted on the University's website: "In partnership with Riggs Bank, Fannie Mae provided financing for the development and construction phases of the University's rehabilitation of its residential properties. In addition, Fannie Mae partnered with the District of Columbia Housing Financing Agency (DCHFA), enabling the DCHFA to offer below-market interest rate mortgages for buyers of the University's homes."

125.    Swygert also has been a long-time friend, business associate and ardent supporter of Raines throughout this debacle.  Swygert proclaimed following the release of the OFHEO Report that: "No one should draw an implication that we are moving to a change in management."  Swygert and Raines testified before Congress together as part of the African American Leadership Summit on April 28, 2004, and they were both participants in the Congressional Black Caucus swearing-in ceremony in January 2003.  As a result of the many gifts that Raines garnered for Howard University, Raines was given an honorary degree to Howard University, and during his Charter Day

Address given on March 8, 2002, Swygert stated, "Howard University and Fannie Mae have a terrific partnership with tangible results, results we are never tired of pointing out all over the country."

126.    Korologos has been a Fannie Mae director since 1994, and during that period also served as a top official of the District-based Aspen Institute, currently serving as Chairman Emeritus since August 2000, Chairman from October 1996 to August 2000 and Vice Chairman from August 1993 to September 1996. Defendant Malek also serves on the Board of Trustees at the Aspen Institute. The Foundation contributed $280,000 to the Aspen Institute over the years, including $135,000 in grants in 2002. Fannie Mae did not disclose this relationship in its Proxy Statements.

127.    Korologos has also been a visiting fellow at the Urban Institute, which has received over $2.75 million in grants from the Foundation since 1990, including grants of over $100,000 in 2004, 2003, 2002 and 2001. Fannie Mae did not disclose this relationship in its Proxy Statements.

128.    Korologos sits on the corporate council of the Conservation Fund, a nonprofit group that has received $54,000 from the Foundation since 1995.

129.    Korologos is a past President (1990-1995), and Malek, Swygert and Korologos are all current trustees of the Federal City Council, another nonprofit organization based in Washington, that has received $127,500 in grants from the Foundation since 1993.

130.    Finally, Korologos serves as a member of the Board of Overseers of Wharton School of the University of Pennsylvania, where defendant Gerrity serves as a Professor of Management and formerly served as Dean. For 2003, Fannie Mae and the Foundation both contributed between $10,000 and $24,999 to Wharton, and both are listed as "Managing Partners" under the school's "Partnership for Corporations & Foundations."

131.    At least seven of the Individual Defendants also have business and/or personal relationships with each other, or with immediate families of other defendants. For example,

- 48 -

defendant Duberstein serves as chairman and CEO of The Duberstein Group, Inc. a strategic planning and consulting company which has provided services to Fannie Mae since 1991. During 2003 alone, Fannie Mae paid The Duberstein Group $375,000. Defendants concede in the Company's 2004 annual Proxy Statement that it will continue to purchase these services for the foreseeable future.

132.    While he was a director of the Company, Pickett had a direct financial relationship with Fannie Mae. Pickett retired from HomeSide International, Inc. ("HomeSide") on June 30, 2001, where he had served as Chairman from February 1996. He also served as CEO of HomeSide from February 1996 to February 2001, during which time he was a director of the Company. HomeSide was one of the largest full-service residential mortgage banking companies in the United States. HomeSide would pool its conforming conventional mortgage loans under purchase and guarantee programs sponsored by Fannie Mae for Fannie Mae MBS. HomeSide paid Fannie Mae certain guarantee fees in connection with this program and would then sell the Fannie Mae securities to securities dealers. From March 1996 and continuing each year through September 2001, between 27% and 61% of the loans originated by HomeSide were sold to Fannie Mae.

133.    As noted in the Company's Proxy Statement for the fiscal year ended 2001:

Mr. Pickett is Chairman of HomeSide International, Inc., and is a nominee for election to the Board of Directors. HomeSide, through its primary subsidiary HomeSide Lending, Inc. (HSL), is active in the mortgage banking and servicing business and, as such, engages with Fannie Mae in the types of transactions described above. During 2000, HSL transferred $5,995 million of mortgages pursuant to swap transactions involving Fannie Mae; Fannie Mae purchased mortgages with aggregate principal balances of $66 million of its own portfolio from HSL; and HSL serviced 742,138 mortgages in Fannie Mae MBS and portfolio with balances of $66,521 million. *Fees generated from such servicing were approximately $216 million*.

134.    Additionally, defendant Korologos' husband, Tom Korologos, is the Founding President of Timmons & Company, Inc. recognized as one of Washington's premiere lobbying and consulting firms. Defendant Duberstein was Vice President of Timmons & Company from 1984 to

1986. Duberstein and defendant Marron both serve on the Board of Directors of Collegiate Funding Services, Inc. with Marron serving as Chairman of the Board and both serve on the Company's Corporate Governance Committee together and Duberstein also serves on the Company's Audit and Compensation Committees. Additionally, defendants Duberstein and Marron are both closely linked to the securities industry. Marron is a former director of the NYSE and former governor of the Securities Industry Association. Duberstein serves as a governor of the American Stock Exchange and the NASD, Inc.

135.    Korologos has been an ardent supporter of Raines throughout this debacle, calling Raines a "first class" CEO and a "world-class executive" for his handling of the "situation" immediately following the release of the OFHEO Report, and stating he was handling the situation "with honor and absolute integrity."

136.    Korologos and her husband served as National Council Members of the Aspen Center for Integrative Health. Malek and his wife are founders of the Aspen Center for Integrative Health and Ms. Malek serves as a Trustee. Korologos and defendant Marron also serve together on the Board of Directors of the Dana Foundation, a private philanthropic organization with interests in science, health, and education.

137.    Ashley has served as chairman and CEO of The Ashley Group, a group of commercial and multifamily real estate, brokerage, and investment companies, since January 1997. Prior to that, Ashley ran Sibley Mortgage Corp. ("Sibley") when he initially joined the Board in 1995. At Sibley, Ashley did millions of dollars in business with Raines and Fannie Mae, according to Fannie Mae's Proxy Statements released in 1995 and 1996. Sibley transferred $40.7 million in mortgages through various swaps transactions to Fannie Mae in 1994, and serviced 4,350 of Fannie Mae's mortgages or securities worth about $350.5 million, generating servicing fees for Sibley of roughly $1 million. Fannie Mae also purchased roughly $14.2 million in mortgages from Sibley in

1994. Fannie Mae did about the same amount of business with Ashley's company in 1995, when he joined the Fannie Mae Board.

138.    Malek and Raines are close personal friends with extensive business dealings. For example, Malek and Raines are both general partners in the Washington Baseball Club ("WBC"), an investment group of high-profile Washington insiders consisting of eight general and three limited partners formed in 1999 seeking to buy, in a deal that is estimated to cost over $300 million, the major league baseball team that recently relocated to Washington, with Raines serving as chairman of the Club's Executive Committee. Indeed, as reported by the *Washington Post* in an August 17, 2004, article entitled "With a Light Touch, Heavy Hitters Pursue D.C. Team; Baseball Group Hopes Payoff is Near After Years of Perseverance," it was Malek who brought Raines into the WBC. As reported in the same article, as of August 2004, the WBC had already spent more than $1 million promoting the city's bid for a team. The WBC hired Goldman Sachs as an advisor to provide strategic advice and financial services and, in January 2002, entered into an exclusive agreement with the D.C. Sports & Entertainment Commission to work together to bring a team to the city. Malek is also the past deputy director of the U.S. Office of Management and Budget, where Raines served as a former director.

139.    Malek and Marron both serve as Trustees on the George Bush Presidential Library Foundation.

140.    Marron was CEO of PaineWebber Group, Inc. from 1980 until its merger in November 2000, and served as CEO of its successor, UBS Paine Webber Inc. until January 2001, and as chairman, UBS America, at UBS until September 2003. According to Thompson Financial, these firms garnered tens of millions in fees for selling billions of Fannie Mae securities. As noted in the Company's Proxy Statement for the fiscal year ended 2001:

> Until January 22, 2001, prior to his election to Fannie Mae's Board in May 2001, Mr. Marron served as Chief Executive Officer of UBS PaineWebber Inc., a wholly-

owned subsidiary of UBS AG. During 2001, UBS AG directly and through its subsidiaries, provided various investment banking services to Fannie Mae and may continue to provide similar or other service during 2002. Marron currently serves as Chairman of UBS America, a non-executive position.

### THE INDIVIDUAL DEFENDANTS' DUTIES

141.    By reason of their positions as officers, directors and/or fiduciaries of Fannie Mae and because of their ability to control the business and corporate affairs of Fannie Mae, the Individual Defendants owed Fannie Mae and its shareholders fiduciary obligations of good faith, candor, trust, loyalty and care in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. In addition, as officers and/or directors of publicly-held companies, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and projections, so as to (i) fulfill their fiduciary duties; and (ii) so that the market prices of the Company's stock would be based on truthful and accurate information.

142.    To discharge their duties, the directors of Fannie Mae were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Fannie Mae. By virtue of such duties, the officers and directors of Fannie Mae were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of Fannie Mae in accordance with all applicable law (including the U.S. securities laws, Delaware corporate law and Sarbanes-Oxley), government rules and regulations and the charter and bylaws of Fannie Mae;

(b)    neither engage in self-dealing nor knowingly permit any officer, director or employee of Fannie Mae to engage in self-dealing;

(c)    neither violate nor knowingly permit any officer, director or employee of Fannie Mae to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Fannie Mae's operations, including its expenses in relation to prepayment of mortgages and its accounting for derivative contracts, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to its shareholders;

(e)     prudently protect the Company's assets;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Fannie Mae and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Fannie Mae's financial statements – including its expenses, accounting for derivative contracts and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise reasonable control and supervision over the public statements to the securities markets and trading in Fannie Mae stock by the officers and employees of Fannie Mae; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from Fannie Mae and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Fannie Mae and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

143.    During all times relevant hereto, all of the defendants occupied positions with Fannie Mae or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Fannie Mae and its operations, finances and financial condition. Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding the expenses for early prepayment and improper derivative hedge accounting treatment had not been disclosed to and were being concealed from the Company's shareholders and the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Fannie Mae and to take any and all action necessary to ensure that the officers and directors of Fannie Mae did not act upon such privileged non-public information in a manner which caused the Company to violate the law. Because of the Individual Defendants' positions, they knew the adverse non-public information about Fannie Mae's operations and finances, as well as its accounting practices, markets and business prospects via access to internal corporate documents (including Fannie Mae's financial condition, operations, expenses, derivative contracts, future business prospects of Fannie Mae, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof via reports and other information provided to them in connection therewith. Each of the Individual Defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Fannie Mae shareholders.

144.    The Individual Defendants, because of their positions of control and authority as directors or officers of Fannie Mae, were able to and did, directly and indirectly, control the wrongful acts complained of herein, including the decisions to accept the resignations of Raines and Howard and Fannie Mae's violations of the U.S. securities laws and falsification of various public

- 54 -

statements issued by the Company to its shareholders and to the investment community to which they affixed their signatures.

145.    The conduct of Fannie Mae's directors and officers complained of herein involves fraudulent misconduct – a knowing, intentional and culpable or grossly negligent and reckless violation of their obligations as directors of Fannie Mae, and the absence of good faith on their part for their duties to the Company and its shareholders. The misconduct of Fannie Mae's officers (managing directors) has been ratified by Fannie Mae's Board, which has failed to take any legal action on behalf of the Company against them.

146.    Both Fannie Mae's Charter and OFHEO's corporate governance regulation set forth affirmative duties of the Board of Directors. OFHEO stated in the May OFHEO Report that the Board failed in a number of ways that put the safety and soundness of Fannie Mae at risk. Specifically, the Report states that the Board:

- failed to monitor against earnings manipulations, after having approved an executive compensation system that created incentives to manipulate earnings;

- failed to stay informed of Fannie Mae corporate strategy, major plans of action and risk policy;

- failed to provide delegations of authority to management that reflected the current size and complexity of the Enterprise;

- failed to assure the effective operation of its own Audit and Compensation Committees;

- failed to act as a check on the authority of Chairman and CEO Franklin Raines, and allowed him to concentrate considerable power in the hands of one person, CFO Timothy Howard;

- failed to initiate an independent inquiry into Fannie Mae's accounting following the announcement of Freddie Mac's restatement and subsequent allegations by Roger Barnes, both of which involved earnings management;

- failed to assure itself that Fannie Mae's regulators were properly informed of Barnes' allegations; and

- failed to ensure timely and accurate reports to federal regulators.

147.    In its investigation, OFHEO found that the Board abandoned its oversight responsibilities and acquiesced in allowing management unbridled authority over the Board, including allowing Raines to concentrate power in defendant Howard and place him on the Board. It further found that the Board failed to adopt or enforce any policies requiring oversight of critical accounting policies and failed to vet major transactions.

148.    In addition, as a result of defendants' improper and illegal actions and course of conduct during the Relevant Period, Fannie Mae is now the subject of numerous civil actions that allege, among other things, violations of federal securities laws. Defendants' misconduct has severely damaged the Company, not only costing it the hundreds of millions of dollars in out of pocket costs for the restatement – not to mention the possible stock delisting – but also causing the Company to:

- lose over $31 billion dollars of valuable market capitalization;

- be subjected to a formal investigation by the SEC, which found that the Company violated applicable accounting rules and instructed it to make the $6.3 billion restatement of its past financial results;

- be subject to a congressional inquiry that has put in jeopardy the special status and federal perquisites Fannie Mae receives, estimated by the Congressional Budget Office in March 2004 to be worth $10 billion annually;

- be forced to sell $5 billion of securities at a fire-sale price to quickly deal with the "significant undercapitalization" occasioned by the massive fraud and earnings restatement;

- be required to increase its minimum capital requirements by 30% in 2005, creating a huge capital shortfall which the Company has and/or will have to fund through selling portions of its mortgage portfolio and attempting to access the capital markets in its damaged condition;

- cut its dividend in half – the first dividend cut at Fannie Mae in over two decades;

- be unable to conduct public offerings to raise additional capital because the Company is not current with its filings with the SEC;

- have its debt ratings lowered and to be downgraded by multiple analysts, which is likely to significantly increase the cost of servicing the $957 billion in debt the Company already has outstanding;

- be exposed to hundreds of millions of dollars in potential liability for violations of the federal securities laws, which will cost the Company millions to defend and hundreds of millions more to settle;

- be exposed to hundreds of millions of dollars in potential liability for ERISA violations in a class action brought against the Company by its own employees which will likewise cost the Company millions to defend and hundreds of millions more to settle;

- have to waste millions of dollars in legal and professional fees in defending itself before the SEC, in the criminal investigation before the DOJ, defending itself in the securities fraud and ERISA class action and to pay for a so-called independent investigation; and

- suffer severe and irreparable damage to its credibility, reputation and goodwill particularly by being publicly scorned by news media, analysts, congressional members and others across the country. Indeed, the Company reputation and credibility have been so tarnished that its accounting debacle is now referred to in the same breath as the Enron fiasco, with analysts referring to the Company as "*Fanron*."

## BOARD COMMITTEE MEMBERS
## AND BREACHES OF THEIR FIDUCIARY DUTIES

149.   During the Relevant Period, Fannie Mae had several standing committees of the Board occupied by certain Board members including an Audit Committee, Compensation Committee, Assets and Liabilities Policy Committee and Nominating and Corporate Governance Committee. The directors who served on these committees assumed additional powers, authority and responsibilities requiring diligent attention to their duties as members of the committees. Their responsibility encompassed all matters passed upon by the committee on which they served and as committee members, because of that participation, the diligence and fiduciary duties required of them was greater and the liability stricter.

**The Audit Committee**

150.   During the Relevant Period the following Individual Defendants served on the Company's Audit Committee: Gerrity (Chair), Malek, Pickett and Mulcahy. Malek and Mulcahy were designated as accounting experts.

151.    According to the Company's Proxy Statements during the Relevant Period, as members of the Audit Committee, these defendants were responsible for, among other things, overseeing the accounting, reporting and financial practices of Fannie Mae, including the integrity of Fannie Mae's financial statements as well as assuring the adequacy and effectiveness of the Company's internal controls and overseeing the performance of the Company's internal audit function.

152.    Specifically, the Company's most recent Proxy Statement states that the Audit Committee oversees:

- the accounting, reporting and financial practices of Fannie Mae, including the integrity of Fannie Mae's financial statements;

- *the creation and administration of financial controls*;

- *Fannie Mae's compliance with legal and regulatory requirements*;

- outside auditors' qualifications and independence;

- technology and systems oversight of Fannie Mae's technological improvements; and

- *the performance of Fannie Mae's internal audit function and Fannie Mae's outside auditor.*

153.    As stated by the SEC, "[a]udit committees oversee and monitor management and the independent auditors in the financial reporting process, and thereby play a critical role in assuring the credibility of financial reporting." Audit Committee Disclosure (S.E.C. Release No. 34-41987), 1999 WL 955908, at *2 (Oct. 7, 1999).

154.    The Audit Committee operated pursuant to a written charter. The charter, attached as Appendix A to the Company's most recent Proxy Statement states that the purpose of the Audit Committee shall be to:

- *oversee (a) the accounting, reporting, and financial practices of the corporation and its subsidiaries, including the integrity of the corporation's financial statements, (b) the corporation's compliance with legal and regulatory requirements, (c) the outside auditor's qualifications and*

- 58 -

*independence, and (d) the performance of the corporation's internal audit function and the corporation's outside auditor*; and

- prepare the report required by the rules of the Securities and Exchange Commission to be included in the corporation's annual proxy statement.

155.    Additionally, among its duties and responsibilities, the Audit Committee shall,

according to the Charter:

(i)    Be directly responsible for the appointment, compensation, retention and oversight of the work of the outside auditor. In this regard, the Committee shall have the sole authority to appoint and retain, and terminate when appropriate, the corporation's outside auditor, and review and assess the activities of the outside auditor. The outside auditor shall report directly to the Committee. The corporation shall provide appropriate funding, as determined by the Committee, for payment of compensation to the outside auditor.

*            *            *

(ix)    Review and discuss with management and the outside auditor the annual audited and quarterly unaudited financial statements of the corporation, including: (a) an analysis of the outside auditor's judgment as to the quality of the corporation's accounting principles; (b) significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including any significant changes in the corporation's selection or application of accounting principles and financial statement presentations; and (c) the corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(x)    Receive, review and discuss reports from the outside auditors on: (a) all critical accounting policies and practices to be used; (b) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the outside auditor; and (c) other material written communications between the outside auditor and management, such as any management letter or schedule of unadjusted differences.

(xi)    *Recommend to the Board, based on the review and discussion described in paragraphs (viii) – (x) above, whether the audited financial statements should be included in the annual report on Form 10-K.*

(xii)    Review earnings releases, and review and discuss generally the types of information to be disclosed and the type of presentations to be made, including the use of "non-GAAP financial measures," in the corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies. The chair of the Committee may represent the entire Committee for purposes of the review of earnings releases and such other information.

(xiii)    *Review and discuss with management, the head of the internal audit department and the outside auditor the adequacy and effectiveness of: (a) the corporation's internal controls, including any significant deficiencies in internal controls, significant changes in internal controls reported to the Committee by the outside auditor or management, and any special steps adopted in light of material control deficiencies; and (b) the corporation's disclosure controls and procedures and management reports thereon.*

(xiv)    *Review and discuss with the CEO and CFO the basis for the certifications to be provided in the corporation's Form 10-K and Form 10-Qs.*

(xv)    Review and discuss with management and the outside auditor any correspondence with regulators or governmental agencies which raises material issues regarding Fannie Mae's financial statements, financial disclosures or accounting policies.

(xvi)    Review and discuss with management the corporation's major risk exposures, management's policies on risk management and risk assessment, and the corporation's compliance with those policies.

*Oversight of Internal Audit Function*

(xvii)    *Oversee and discuss the internal auditing activities and performance, including the appointment, and replacement when appropriate, of the head of the corporation's internal audit department, the internal audit charter, and the budget and staffing for the internal audit department. Discuss with the head of the corporation's internal audit department the scope and performance of the internal audit function, including a review of the annual internal audit plan, and whether there are any restrictions or limitations on the department.*

(xviii)    *Obtain periodic reports from the head of the internal audit department regarding internal audit findings and the corporation's progress in remedying any material control deficiencies.*

156.    Further, included in its Compliance Oversight Responsibilities, the Audit Committee shall, according to its Charter:

(xix)    *Review and discuss the status of compliance with accounting, legal, regulatory, tax, and other developments of major significance to the corporation, and oversee the corporation's responses to any regulatory examination or other inquiry.*

(xx)    *Review and discuss Fannie Mae's Code of Business Conduct ("Code") and the activities of management's Corporate Compliance Advisory Committee, including the monitoring of compliance with the Code and any significant violations of the Code.*

(xxi)    *Establish procedures for the receipt, retention and treatment of complaints received by the corporation regarding accounting, internal accounting controls or*

***auditing matters, including procedures for confidential, anonymous submission of concerns by employees regarding accounting or auditing matters.***

(xxii) ***Meet with representatives from the Office of Federal Housing Enterprise Oversight as required.***

157.    In addition, each of the Company's Proxy Statements or Reports, either filed with the

SEC on Forms DEF-14A, or prior to the Company filing with the SEC, in its Proxy Statements

disseminated to shareholders and contained on the Company's website for fiscal years 2000 and

2001, contained an Audit Committee Report which represented and stated that the Audit Committee

had "reviewed, and discussed with management, the audited financial statements" for the end of that

specific fiscal year. Additionally, in the Company's Proxy Statements file with the SEC on April 23,

2004 and April 17, 2003 for the fiscal years ending 2003 and 2002, respectively, the Audit

Committee Reports also stated and represented the Audit Committee "reviewed and discussed the

scope and resources for the internal audit function." Moreover, because of the passage of Sarbanes-

Oxley at the end of July 2002, both Audit Committee Reports also stated and represented the Audit

Committee "reviewed and oversaw the process by which Fannie Mae's Chief Executive Officer and

Chief Financial Officer certified Fannie Mae's periodic disclosures."

158.    The Audit Committee Report of the fiscal year ending 2003 also provided that:

> For the year ended December 31, 2003, the Audit Committee met 9 times.
> During the year, the Committee met with members of senior management (including
> the Chairman and Chief Executive Officer, the Vice Chairman and Chief Operating
> Officer, the Vice Chairman and Chief Financial Officer, the Controller, the head of
> the internal audit department, the Chief Technology Officer, the Executive Vice
> President for Law & Policy, and the General Counsel) ***and internal tax, finance,
> legal, technology, and internal audit personnel***, as well as representatives from
> Fannie Mae's outside auditors, to discuss and review the audit scope and plans, the
> results of internal and external audit examinations, evaluations by the auditors of
> Fannie Mae's internal controls, the quality of Fannie Mae's financial reporting,
> Fannie Mae's compliance with legal and regulatory requirements, and Fannie Mae
> employees' compliance with the Code of Business Conduct, and other matters. . . .

159.    Similarly, the Audit Committee Report of the fiscal year ending 2002 also provided

that:

For the year ended December 31, 2002, the Audit Committee met seven times. During the year, the Committee met with members of senior management (including the Chairman and Chief Executive Officer, the Vice Chairman and Chief Operating Officer, the Vice Chair, the Chief Financial Officer, the Controller, the head of the internal audit department, the Chief Technology Officer, the Executive Vice President for Law & Policy, the General Counsel, and the Senior Vice President for Human Resources) *and internal tax, finance, legal, technology, and internal audit personnel*, as well as representatives from Fannie Mae's outside auditors, to discuss and review the audit scope and plans, the results of internal and external audit examinations, evaluations by the auditors of Fannie Mae's internal controls, the quality of Fannie Mae's financial reporting, Fannie Mae's compliance with legal and regulatory requirements, and Fannie Mae employees' compliance with the Code of Business Conduct, and other matters.

160. The Company did not disseminate Proxy Statements for fiscal years 1998 and 1999. However, the Company did disseminate to shareholders and place on the Company's website, its Annual Reports for those two years. In each Annual Report for fiscal years 1998 and 1999, it was represented that the Audit Committee had periodically met with management and the Internal Office of Auditing and evaluated the effectiveness with which they discharged their duties relating to the Company's financial reporting.

161. In each of the Audit Committee Reports during the Relevant Period, the Audit Committee recommended that the Company's false and misleading financial results be included in the Company's Annual Reports.

162. In its special investigation, OFHEO found that Fannie Mae operated in a culture of literally non-existent internal controls including:

- a dysfunctional and ineffective process for developing accounting policies;

- an operating environment that tolerated weak or non-existent accounting policies;

- key person dependencies and poor segregation of duties;

- incomplete and ineffective reviews by the Office of Auditing; and

- an inordinate concentration of responsibility vested with the CFO.

163. Furthermore, the concerns of improper accounting raised by Barnes were brought to the Audit Committee's attention on August 14, 2003, in a presentation by Sam Rajappa ("Rajappa"),

Senior Vice President of Operations Risk, who reported directly to defendant Howard. The Audit

Committee's Charter charged the Audit Committee with responsibility to "cause an investigation to

be made into any matter within the scope of its responsibility that is brought to its attention." The

Audit Committee failed to investigate Barnes' claims and failed to question management's false

representation that Barnes' allegations were unsubstantiated. Their failure to do so was a breach of

their fiduciary duties.

164.    As set forth in the May OFHEO Report, the Audit Committee Charter was revised in

2003, in conjunction with Fannie Mae's SEC registration, and heightened the Audit Committee's

financial statement and disclosure responsibilities. In addition to its already-existing oversight

responsibilities, the Audit Committee was required to:

(1)    discuss and analyze the external auditor's judgment as to the quality of
Fannie Mae's accounting principles, significant financial reporting issues and
management discussion and analysis ("MD&A") disclosures;

(2)    review and discuss with the external auditor all critical accounting policies,
any alternative treatments under GAAP and material communications with
management; and

(3)    review and discuss with management and the external auditor any
correspondence with regulatory or governmental agencies that raise material issues
regarding the Company's financial statements and disclosures.

The Audit Committee failed to carry out any of these oversight activities required by its Charter.

Instead, as set forth in the May OFHEO Report, the Audit Committee members were complacent in

their oversight activities and exercised little, if any, meaningful active oversight. OFHEO's

investigation found scant evidence of adequate inquiry or thoughtful requests for information or

explanation from KPMG by the Audit Committee members. The May OFHEO Report states that

KPMG improperly provided unqualified opinions on Fannie Mae's financial statements even though

the financial statements "contained significant departures from GAAP." Had the Audit Committee

questioned KPMG and inquired into management's practices, many of the accounting problems,

earnings manipulation and fraudulent financial reporting at Fannie Mae would have been avoided.

165.    The Audit Committee also failed to properly oversee Fannie Mae's internal auditing and the head of the Office of Auditing. The Audit Committee breached its fiduciary duty to provide "robust oversight and involvement" as required by its Charter and SEC and NYSE regulations. OFHEO's investigation revealed that the Audit Committee's internal audit oversight responsibilities were utterly lacking. The Committee failed to challenge or even evaluate Rajappa's qualifications for head of Fannie Mae's Office of Auditing, including disabling conflicts arising from his former Controller position; his lack of independence created by an EPS-driven compensation system; and his lack of experience or credentials such as the fact that he was not a certified public accountant.

166.    When questioned during OFHEO's investigation, defendant Gerrity, the Audit Committee Chairman, did not know why Rajappa was selected as the head of auditing and stated that he did not believe that it was problematic that Rajappa was conducting audits of his former department. Lack of internal controls and oversight by the Audit Committee disabled the Office of Auditing from conducting audits and issuing findings with appropriate scrutiny. Significant audits were reported only to Raines and not to the Audit Committee. The reporting structure also jeopardized the independence of the internal audit department – in 2002, the reporting structure was changed to require Rajappa to report directly to defendant Howard, the CFO. Howard also oversaw all credit and interest rate risk policy functions. Rajappa complained of the inappropriate change to defendant Gerrity as a violation of best practices, but Gerrity failed to evaluate the change or discuss it with the other members of the Audit Committee. When Howard assumed the Chief Credit Officer's responsibilities as well, defendant Ashley raised concerns with management, but he and other Board members took no steps to remedy the concentration of power or lack of internal controls. Defendant Howard and management exerted undue influence over Rajappa and Fannie Mae's Office of Auditing. As a result of Gerrity's, the Audit Committee's and the entire Board's

breaches of their duties, the Board allowed fraudulent accounting and earnings manipulation to occur.

167.    The Audit Committee also failed to ensure that Rajappa and others in the Office of Auditing undertook steps to test the Company's accounting for GAAP compliance. Rajappa told OFHEO during its investigation that the internal auditors were not responsible for GAAP compliance, although defendant Gerrity indicated to OFHEO that the internal auditors were to serve as "watchdogs" for GAAP compliance. Gerrity further indicated that he was not aware of how Fannie Mae formulated its accounting policies or who was responsible for them. He stated that the Audit Committee relied on management or the internal auditors or KPMG to raise significant accounting policies such as FAS 91 and FAS 133 with the Audit Committee. Even when KPMG raised system control issues in the wake of management's improper $200 million FAS 91 adjustment in 1998, Gerrity and the Audit Committee failed to follow up to implement system improvements or a formal FAS 91 policy.

168.    The Audit Committee and the full Board of Directors, at a minimum, should have questioned Fannie Mae's continued reporting of minimal earnings volatility after the implementation of FAS 133. Had they done so, management's earnings manipulations would have been uncovered. Failing to do so constitutes a failure to properly discharge their fiduciary duties. The May OFHEO Report states that Gerrity's and the Audit Committee's passive approach to critical accounting policies "contravenes all applicable governance standards."

169.    During the Relevant Period, as members of the Audit Committee, these defendants abrogated their authority and responsibilities and breached their fiduciary duties and are direct participants in the wrongdoing detailed herein, *inter alia*, because:

(a)    they improperly recommended that that the Company's now admittedly false and misleading audited financial statements be included in Fannie Mae's Annual Reports and the Annual Reports on Form 10-K;

(b)    defendants Gerrity, Malek, Pickett and Mulcahy each signed the Company's admittedly false and misleading Annual Reports on Form 10-K for fiscal years 2002 and 2003 and defendant Rahl signed the Company's admittedly false and misleading Annual Report on Form 10-K for fiscal year 2003;

(c)    they approved the Company's false and misleading financial statements during the Relevant Period;

(d)    they allowed the Company to operate with utterly deficient internal controls;

(e)    they permitted Howard to serve not only as CFO but also Chief Risk Officer and head of the audit function, which essentially allowed him to "grad[e] his own papers," in the words of Patrick McGurn, special counsel to Institution Shareholder Services, thus allowing Howard to continue to engage in the improper accounting and misconduct detailed herein;

(f)    they failed to investigate and disclose the numerous and serious accounting violations identified by Barnes; and

(g)    they allowed defendants Raines, as CEO, and Howard, as CFO, to falsely certify the Company's periodic financial disclosures in violation of Sarbanes-Oxley.

**The Nominating and Corporate Governance Committee**

170.    During the Relevant Period, the following Individual Defendants served on the Company's Nominating and Corporate Governance Committee: Ashley, Gerrity, Korologos (Chair) and Marron.

171.    According to the Company's most recent Proxy Statement, the Nominating and Corporate Governance Committee was responsible for developing and monitoring implementation of

the Company's corporate governance guidelines and conducting periodic benchmarking its corporate governance practices and recommending appropriate changes and otherwise playing a leading role in the Company's corporate governance practices. Additionally, the Nominating and Corporate Governance Committee was also responsible for identifying individuals to become members of the Board and recommending to the Board the slate of director nominees to be elected by the shareholders and recommending directors to be elected by the Board to fill any vacancies.

172.    During the Relevant Period, as members of the Nominating and Corporate Governance Committee, these defendants abrogated their authority and responsibilities and breached their fiduciary duties and are direct participants in the wrongdoing detailed herein, *inter alia*, because:

(a)    they failed to disclose and remedy the numerous conflicts of interest the Board had via the personal, professional, financial and business relationships between Board members and defendant Raines and between and among themselves, despite the fact they were keenly aware of these conflicts because they themselves had numerous personal, professional, financial and business relationships with defendant Raines, each other and other Board members;

(b)    they failed to disclose the relationships between Board members and the Foundation despite the fact certain of these relationships violated director independence standards of the Company's own Corporate Governance Guidelines; and

(c)    they continued to recommend slates of director nominees to be elected by the shareholders that included Raines, themselves and other individuals without disclosing the numerous conflicts of interest these nominees had via their personal, professional, financial and business relationships between defendant Raines and others, despite having knowledge of the same.

**The Assets and Liabilities Policy Committee**

173.    During the Relevant Period, the following Individual Defendants served on the Company's Assets and Liabilities Policy Committee: Duberstein (Chair), Malek, Marron, Rahl and Swygert.

174.    According to the Company's most recent Proxy Statement, the Assets and Liabilities Policy Committee had the following duties and responsibilities:

> *The Assets and Liabilities Policy Committee*, which assists the Board in its oversight of management's interest rate risk, credit risk, and capital management activities by:
>
> - *developing an in-depth and specialized knowledge on matters relating to assets and liabilities management; and*
>
> - reviewing management's policy proposals and performance, and making recommendations and reports to the Board, on matters relating to Fannie Mae's assets and liabilities. *In this capacity, the Assets and Liabilities Policy Committee, among other things, reviews*: credit and interest rate risk management policies and performance; investment guidelines for the liquid investment portfolio and management's compliance with those guidelines; *the use of derivative contracts*; and dividend payments.

175.    The members of the Assets and Liabilities Policy Committee were required to develop specialized knowledge relating to the assets and liabilities of the Company and specifically to review the Company's use of derivative contracts and to assist the Board and management in its oversight of the use of derivative contracts.

176.    During the Relevant Period, as members of the Assets and Liabilities Policy Committee, these defendants abrogated their authority and responsibilities and breached their fiduciary duties and are direct participants in the wrongdoing detailed herein, *inter alia*, because they failed to disclose and recommend that the Company discontinue its improper application of FAS 133 relating to derivative instruments that OFHEO and the SEC determined violated GAAP and will require the massive restatement of the Company's past financial results. This is particularly true with respect to defendant Rahl, who as described in ¶106 above, had an expertise and was

recognized as one of the country's foremost experts in the very accounting that OFHEO and the SEC determined violated applicable accounting rules.

**The Compensation Committee**

177.    During the Relevant Period, the following Individual Defendants served on the Company's Compensation Committee: Korologos, Pickett and Mulcahy (Chair).

178.    The Company's most recent Proxy Statements succinctly describes the duties and responsibilities of the Company's Compensation Committee as follows:

> *The Compensation Committee*, which discharges the responsibilities of the Board relating to compensation of Fannie Mae's executives and oversees and advises the Board on the adoption of policies that govern Fannie Mae's annual compensation and stock ownership plans. The Compensation Committee, among other things:
>
> - ensures that compensation programs reflect Fannie Mae's pay for performance philosophy and that stock compensation aligns the interests of employees, executives, and directors with those of shareholders;
>
> - ***approves the compensation of Fannie Mae's senior officers***;
>
> - reviews and advises Fannie Mae on the process used for gathering information on the compensation paid by other similar businesses;
>
> - reviews Fannie Mae's succession plans relating to the Chief Executive Officer and other senior officers; and
>
> - reviews periodic reports from management on matters relating to personnel appointments and practices.

179.    One of the primary tenants of the Company's compensation philosophy is performance, and Fannie Mae's compensation structure strongly emphasized and rewarded employees and executives for hitting EPS targets. As stated in the Company's most recent Proxy Statement:

> [The company's] executive compensation program has three primary tools: base salary, an annual bonus award, and variable long-term incentive awards. The program ties a large portion of each officer's total compensation to performance over different time periods.

180.    As noted above, OFHEO has already found the defendants undertook improper accounting actions for the purpose of increasing their compensation, such as in 1998 by inappropriately deferring $200 million of estimated amortization expenses. This deferral allowed the payment of approximately $27 million in bonuses, including nearly $6 million to defendants Raines and Howard, as well as other Company shareholders, that would not have been paid otherwise.

181.    The Company's bonus, or Annual Incentive Plan, is tied directly to growth in EPS. The Company establishes a target EPS at the beginning of each fiscal year, and bonuses are paid on achievement by the Company and executives base on meeting the target EPS. As stated in the Company's Proxy Statement for fiscal year 2002: "For 2002, the corporate financial goal was an aggressive earnings per share . . . growth measure that Fannie Mae has exceeded."

182.    The Company's variable Long-Term Incentive Awards are delivered in the form of stock options and performance shares or restrictive stock. The performance shares are pay for incentive awards for meeting performance objectives of a three-year period which is in large part tied to growth of EPS. The award payouts can range from 40% of the threshold achievement to 150% of threshold. Stock option awards are directly linked to an increase in the Company's common stock price. In the Company's 2002 Proxy Statement, Fannie Mae reported that for the three-year cycle from January 1999 through December 2001, maximum payouts of the award opportunity range were achieved based in large part on meeting targets for EPS growth. Moreover, because of the Company's purported extraordinary performance in fiscal year 2001, the Compensation Committee and the Board approved a special award to each to the Company's executives in the form of shares of the Company's common stock.

183.    According to a report in the October 8, 2004 edition of *Insider Mortgage Finance*, for fiscal year 2002, defendants Raines, Mudd and Howard, and one other company insider received $31,551,101 in total compensation. Of this compensation, 91%, 87%, 67% and 89%, respectively,

was based upon EPS and stock performance. The Company's Proxy Statements for fiscal years 2000, 2001 and 2002 each note that maximum payouts were awarded to defendants because they continued to meet or exceed the target EPS.

184.    Like other Board committees, The Compensation Committee operated under a Charter, with its primary responsibility to "discharge the responsibilities of the Board relating to compensation of Fannie Mae's executives." OFHEO and NYSE rules also governed the structural and procedural requirements for the committee. The NYSE rules require a compensation committee to be composed of independent directors, which Fannie Mae's Board violated under its own definition of independence.

185.    The Compensation Committee Charter established the role of the committee to support Fannie Mae's core compensation philosophy to "pay for performance" and comparability and mandated that stock-based compensation be used to align employees' and directors' interests with shareholders' interests. These purposes went unfulfilled. The OFHEO investigation found that the Compensation Committee failed in supervising compensation programs in the following ways:

- having approved an EPS-based executive compensation program that provided strong incentives for earnings management, the Compensation Committee failed to monitor it or ensure that the proper checks and balances were in place to prevent manipulation of earnings targets or results;

- together with the Audit Committee, the Compensation Committee permitted executive management to compensate senior internal auditors under the same EPS-based plans that created the perverse incentives to manipulate earnings and undermined their independence; and

- the Compensation Committee allowed management to script its meetings and rubber-stamped executive compensation proposals made by senior management.

186.    After establishing the single focus on EPS, the Compensation Committee failed to monitor or scrutinize senior management's uncanny ability to consistently and precisely meet EPS targets associated with maximum bonus payouts. The committee allowed senior management unbridled authority for stock buybacks and debt repurchases, without questioning the rationales for

the transactions or their impact on management's ability to meet EPS targets. Defendant Marron raised questions regarding why Fannie Mae was buying back debt and related policies, noting that the transactions caused billions in losses. His challenges to the debt-repurchase practices were summarily dismissed by the Board after assurances by defendant Howard that management had "all bases covered." OFHEO found that the Board's failure to impose guidelines on such major transactions or to provide adequate oversight of these business activities was a "significant dereliction of duty."

187.    Given the overlap between the Audit Committee and the Compensation Committee members, all members of the committees and the full Board should have been aware of the earnings manipulation practices at Fannie Mae. Each year from 1998 through 2004, the Audit and Compensation Committees shared one member that served on both committees. In 2003, three members, including defendants Mulcahy and Pickett, served on both committees. Even after Barnes' allegations of fraudulent earnings management in 2003, neither the Audit Committee nor the Compensation Committee bothered to question Fannie Mae's compensation structure or its impact on earnings manipulation. Instead, the Compensation Committee, with the blessing of the full Board, awarded Raines, Howard, Mudd and other executives millions of dollars in stock options under the EPS Challenge Grant for reportedly doubling EPS from 1998 to 2003.

188.    Most disturbing of the Compensation Committee's failings is the routine practice of letting senior management script meetings of the Compensation Committee and dictate how meetings were conducted. The Compensation Committee further let Raines dictate the choice of consultants used by the Committee, notwithstanding that Raines was not on the Committee and allowed Raines to edit the purportedly-independent Committee's annual report to shareholders.

189.    As set forth herein, based on the Company's false financial reporting and false EPS growth, the Compensation Committee breached their fiduciary duties and participated in the

misconduct by approving and awarding executives with over $245 million dollars in unjust and undeserved compensation – which was only achieved through the Company accounting manipulations, including manipulation of the Company's EPS growth.

190.    Defendant Korologos breached her fiduciary duty and participated in the misconduct by approving the illicit bonuses paid to defendants Raines, Howard and other Company insiders for fiscal year 1998 totaling nearly $6 million dollars, which were only achieved through the Company's accounting manipulation by deferring over $200 million in expenses to subsequent fiscal years.

191.    By the Company achieving an EPS of $3.23 in fiscal year 1998, these executives would have been entitled to the maximum payout goal on bonuses. As stated in the OFHEO Report on this issue, "[r]emarkably, the 1998 EPS number turned out to be $3.2309, a result that meant that Fannie Mae met the EPS maximum payout goal right down to the penny." Indeed, one of OFHEO main findings was that the Company maintained "an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation."

## CHRONOLOGY OF EVENTS

192.    Fannie Mae provides financing for home mortgages in the United States. The Company was chartered by the United States Congress to provide liquidity in the secondary mortgage market to increase the availability and affordability of home ownership for low, moderate and middle-income Americans.

193.    The year 1998 was – or rather should have been, if defendants had followed accounting rules – an economically challenging year for Fannie Mae. The wave of devaluation, bankruptcy and default that had swept East Asia in 1997 was spilling into Russia. In Greenwich, Connecticut, LTCM, the hedge fund run by John Meriwether, was bleeding money on its bond trades. In September 1998, LTCM called upon the Federal Reserve Bank of New York to arrange a

bailout from Wall Street executives.  Fannie Mae Controller Spencer characterized the situation as a "global economic meltdown."

194.    As stocks slid and investors rushed for the safety of Treasuries, bond yields – and mortgage rates – kept sinking.  Thirty-year mortgage rates tumbled to 6.49% that October from 8.18% in April 1997, and from even higher rates in the preceding years:

| YEAR | ANNUAL AVERAGE |
|------|----------------|
| 1998 | 6.94 |
| 1997 | 7.60 |
| 1996 | 7.81 |
| 1995 | 7.93 |
| 1994 | 8.38 |
| 1993 | 7.31 |
| 1992 | 8.39 |
| 1991 | 9.25 |
| 1990 | 10.13 |
| 1989 | 10.32 |
| 1988 | 10.34 |
| 1987 | 10.21 |
| 1986 | 10.19 |
| 1985 | 12.43 |
| 1984 | 13.88 |
| 1983 | 13.24 |
| 1982 | 16.04 |
| 1981 | 16.63 |
| 1980 | 13.74 |
| 1979 | 11.20 |
| 1978 | 9.64 |
| 1977 | 8.85 |
| 1976 | 8.87 |
| 1975 | 9.05 |
| 1974 | 9.19 |
| 1973 | 8.04 |
| 1972 | 7.38 |

195.    The plunge in interest rates led to an acceleration of mortgage pre-payments.  Homeowners began to pay down loans and refinance mortgages at new, lower interest rates.  Those faster prepayments significantly – and negatively – impacted Fannie Mae's mortgage portfolio.

Consequently, Fannie Mae faced a more rapid premium amortization in its mortgage portfolio than expected.

196.    Yet despite this "global economic meltdown" and its obvious negative impact on Fannie Mae, the Company continued to report positive earnings. On March 31, 1998, Fannie Mae announced earnings for 1Q98. The Company reported net income of $824 million, or $0.77 per common share, up from earnings of $794 million, or $0.74 per common share, in the fourth quarter of 1997. Commenting on these results former Fannie Mae CEO James A. Johnson ("Johnson") stated:

> I am pleased to report that the first quarter of 1998 was a successful one for Fannie Mae . . . . We completed our 41st consecutive quarter of growth in operating earnings per share. . . .

*    *    *

> Fannie Mae's superb financial performance helps us fulfill our mission to serve America's home buyers. We continue to demonstrate an unparalleled ability to translate steady business growth into a consistent increase in earnings per share. . . .

Only by failing to properly apply amortization expenses to the Company's mortgage holdings were defendants able to report this earnings growth.

197.    On May 21, 1998, Fannie Mae entered into an employment agreement with Raines, whereby Raines would serve as the Company's Chairman and CEO effective January 1, 1999.

198.    On June 30, 1998, Fannie Mae announced earnings for 2Q98. The Company reported net income of $848 million, or $0.80 per common share, up from both the prior year's second quarter net income of $753 million, or $0.69 per common share, and the first quarter 1998 earnings of $824 million, or $0.77 per common share. Commenting on these results, Johnson stated:

> In the second quarter of 1998, Fannie Mae posted its 42nd consecutive quarter of growth in operating earnings per share. At the same time, we helped over one million American families achieve the dream of homeownership. The current U.S. housing market is exceptionally strong, with a vibrant economy, excellent job growth, low mortgage rates, and high consumer confidence – putting mortgage originations on a record pace. Total originations are expected to exceed $1.2 trillion in 1998, and with consumers showing an overwhelming preference for a 30-year,

fixed-rate mortgages when buying a home or refinancing an existing mortgage, Fannie Mae is well positioned to achieve record volumes this year. Through our Trillion Dollar Commitment, we continue to bring more families into the housing market, opening doors of opportunity and transforming the housing finance system onto one that works for all Americans. And Fannie Mae's technology is making it increasingly easier and less costly to obtain a mortgage.

Strong business volumes, growth in fee income, and further declines in credit losses were key to the Company's successful second quarter. Record purchases for our portfolio of $44 billion helped offset a lower net interest margin, and we issued $83.9 billion of Mortgage-Backed Securities (MBS), another quarterly high. We are poised to establish new records this year for portfolio purchases and MBS issues.

Record business volumes led to the generation of greatly increased fee and other income, with technology services continuing to contribute to this growing source of revenue. Fee and other income rose to $79 million in the second quarter, an increase of $23 million from the first quarter of 1998, and $47 million over the second quarter of 1997.

Again, only by failing to properly apply amortization expenses to the Company's mortgage holdings were defendants able to report earnings growth.

199. Fannie Mae's reported income and EPS for second quarter 1998 included manufactured results from a Short-Term Investment Securities ("STIS") transaction that was designed and proposed to Fannie Mae by defendant Lehman Brothers. According to the May OFHEO Report, this STIS transaction had no meaningful business purpose, but rather was used solely by Fannie Mae to defer $341 million in taxes to meet earnings goals. The transaction exploited an IRS provision that Howard and others at Fannie Mae applied to recognize early months' interest income from a pool of mortgages over the life of the pool. After substantial work by Lehman Brothers, KPMG's tax advisors worked with Fannie Mae to execute the transaction on April 1, 1998. Defendant Howard is reported in the May OFHEO Report as having pushed completion of the STIS transaction as a way to improve income. Fannie Mae paid KPMG $1.8 million in fees for its work on the transaction, which KPMG and Lehman Brothers knew had no economic purpose other than shifting income and therefore violated GAAP. Also, later, in 2005, the IRS disallowed 75% of the 1998 tax deduction related to the STIS transaction.

200.    On September 30, 1998, Fannie Mae announced earnings for 3Q98. The Company reported net income of $857 million, or $0.81 per common share compared to earnings of $848 million, or $0.80 per common share for the second quarter of 1998, and $775 million, or $0.72 per common share, for the third quarter of 1997. Commenting on these results, Johnson stated:

> Fannie Mae and its shareholders enjoyed an exceptional third quarter as the company achieved its 43rd consecutive quarter of record earnings. . . .
>
> The third quarter provided an excellent business environment for Fannie Mae. . . .
>
> Fannie Mae established new records in commitments, mortgage purchases and record Mortgage-Backed Security issuances. Commitments exceeded $45 billion in the third quarter of 1998, an increase of $525 million over second quarter and more than double our third quarter 1997 purchase commitments. With purchases for our portfolio of $47.3 billion, our quarterly mortgage portfolio growth was an annualized 30.7 percent. The record MBS issues of $86 billion surpassed the second quarter's total issuances by over $2 billion, and was up over $45 billion from third quarter 1997. The exceptional volume growth of the third quarter pushed Fannie Mae's total book of mortgages outstanding – mortgage portfolio and net MBS – past the $1 trillion level for the first time in our history.

Once again, only by failing to properly apply amortization expenses to the Company's mortgage holdings were defendants able to report earnings growth.

201.    On November 17, 1998, a meeting of the Audit Committee was held at which Audit Committee defendants Gerrity and Pickett were present. Also present were defendants Raines and Howard, as well as representatives of KPMG. At this meeting, KPMG representatives discussed the business and audit implications of the high market volatility in the current year. KPMG representatives explained that the implications of market volatility include potential effects on: (1) the correlation of instruments used for hedging and portfolio balancing; (2) the budgeting, planning and forecasting process; and (3) the ability to manage net interest income spreads and avoid unprofitable or overly risky transactions and positions. KPMG representatives stated that audit work had focused heavily on hedging and debt issuance activities, non-recurring adjustments, one-time

transactions and monitoring controls. KPMG representatives confirmed that management was aware of these issues and needed to monitor and control their impacts.

202.    Also at this meeting, John K. Watsen ("Watsen") stated that an *internal audit had not been satisfied with management's 1998 progress in correcting system access control weaknesses that were previously identified and reported*. He also stated that a *recent audit had indicated that access security weaknesses were more pervasive than previously realized*. Watsen also stated that the systems supporting the asset servicing business were some of *Fannie Mae's oldest systems and they simply were not designed to handle many of the kinds of* transactions that were being processed at that time. He noted that the systems were constantly being enhanced but, until they were completely replaced, such operating difficulties were to be expected.

203.    On January 14, 1999, Fannie Mae issued a press release entitled "Fannie Mae Reports Record 1998 Earnings of $3.418 Billion and $3.23 Per Common Share; 1998 Earnings Per Common Share Up 14.1 Percent Over 1997." The Company reported net income for the fourth quarter of 1998 on $888.5 million, or $0.84 per common share, diluted compared with net income of $857.4 million, or $0.81 per common share, for the third quarter of 1998 and $794.0 million, or $0.74 per common share, for the fourth quarter of 1997. The Company reported earnings for 1998 of $3.418 billion and $3.23 per common share, diluted compared to earnings of $3.056 billion or $2.83 per common share for 1997. Commenting on these results defendant Raines stated:

> *1998 was the most successful year in Fannie Mae's history. In a year of severe credit dislocation in virtually all other areas of the credit markets, Fannie Mae was able to provide uninterrupted financing to a record number of American homeowners at the lowest interest rates in a generation. At the same time, we reported our twelfth consecutive year of record earnings.*

204.    Raines also said that Fannie Mae's portfolio purchase and Mortgage-Backed Securities issuance volumes set records during the year. He also noted that with 1998 EPS of 14%

compared with 1997, Fannie Mae was one of the few large capitalization companies to produce full-year EPS growth that exceeded the expectations of security analysts at the beginning of the year.

205.    Defendant Raines, who had taken over the position of Chairman and CEO of Fannie Mae effective January 1, 1999, also added:

> I take on the leadership of a company that is exceptionally well positioned to extend its record of serving home buyers and delivering results to shareholders well into the next century.

Additionally, Lawrence M. Small ("Small"), Fannie Mae's then-President and COO, stated:

> [T]he company's record 1998 performance was paced by 31 percent growth in the Company's mortgage portfolio between December 31, 1997 and December 31, 1998, a $161.1 million increase in net interest income, a $150.0 million increase in fee and other income, and a $90.0 million decline in credit-related losses.

> The growth in Fannie Mae's mortgage portfolio in 1998 was simply phenomenal. During the year, the portfolio grew by nearly $100 billion. That is more portfolio growth, in dollar terms, than the company achieved in the first fifty years of its existence.

> Small said that commitments to purchase mortgages totaled $191.9 billion in 1998 compared with $68.7 billion in 1997. Mortgage purchases in 1998 were $188.4 billion, compared with $70.5 billion in 1997. At December 31, 1998 Fannie Mae's mortgage portfolio was $415 billion, compared with $316 billion at December 31, 1997.

206.    These false results were incorporated into the Company's Annual Report for fiscal year 1998 distributed to its shareholders and signed by Spencer and defendant Howard.

207.    The foregoing "record" results reported by Fannie Mae were only achieved through accounting fraud. Specifically, Fannie Mae's amortization models showed the Company had incurred an estimated expense of $440 million on its mortgage holdings. That is the amount by which Fannie Mae would have had to adjust its reported income downwards under GAAP to account for the impact of changing prepayments. Rather than adjust its income by $440 million, Fannie Mae adjusted it by only $240 million, deferring the other half to subsequent years. Inside Fannie Mae, the $200 million of deferred expenses became known as "the catch-up."

208.    Fannie Mae's auditor, KPMG, disagreed with the way the Company decided how much to book in 1998. But KPMG, which was been paid tens of millions of dollars over the years by Fannie Mae, ultimately agreed to help conceal the unrecorded $200 million deferred expenses by internally characterizing it as an "audit difference." Since the catch-up was never fully recorded, it created a "cookie jar" reserve. According to Williams, a Washington lawyer then on Fannie Mae's Board, *the Audit Committee discussed the issue with KPMG, Raines and Howard. Williams says the Committee "concluded that these were judgmental questions" and that it was "appropriate for the executives to have a different perspective. . . .* It was a question of interpretation." Defendants never disclosed this significant accounting issue, claiming that it was not deemed material. This manipulation was part of a pattern and practice over the years of manipulating accounting to show steady gains in earnings and disguise the volatility of the Company's business. "The 1998 violation was not a singular event," OFHEO director Falcon told lawmakers at an October 6, 2004, Congressional hearing. "[I]t represented a continuous effort to artificially guarantee success in meeting targets."

209.    Given the sensitivity of Fannie Mae's business and financial results to economic conditions, interest rate fluctuations and overall market volatility, Fannie Mae's record earnings results – which culminated in Fannie Mae's "most successful year ever" – should have been and undeniably were a "red flag" of serious accounting manipulations to management, the Audit Committee and the Board as a whole, especially given that it was recognized that these record results were achieved "in a year of severe credit dislocation in virtually all other areas of the credit markets." At a Board meeting on January 14, 1999, the Board members all were presented with dollar amounts related to the last-minute year-end adjustments, and defendant Gerrity already had been informed by KPMG of its disagreement with the deferred $200 million in expenses. Yet no

defendant stepped forward to stop the accounting manipulations from occurring or to prevent the Company from reporting false financial results.

210.    Following the earnings announcement, on January 19, 1999, a meeting of Fannie Mae's Compensation Committee was held. Defendants Korologos (then named McLaughlin) and Raines were present at this meeting, at which the Committee determined that the EPS achieved and reported by the Company of $3.2309 for 1998 was greater than the maximum payout goal set by the Board at its January 1998 meeting. It was noted at this meeting that *despite increasingly aggressive goals, actual results have met or exceeded targets each year*. The Compensation Committee noted the outstanding performance of Fannie Mae's management in all areas and noted that the Company's growth in EPS was 14.515% for the Award Period, which represents another year of record performance. The Committee then recommended the maximum award of 150% for the corporate performance assessment portion of the program target.

211.    The Board of Directors again met on February 16, 1999. Included among those present at this meeting were defendants Raines, Duberstein, Gerrity, Pickett and Howard. At this meeting, Howard delivered the Finance Report, noting that in January (reported) net income exceeded plan due to much higher than expected net interest income, fee and other income, and a better than expected credit performance. He reviewed the positive foreclosed property expense numbers and noted that in general, 1999 was off to a good start. These results did not include the $200 million of improperly deferred 1998 expenses, which defendants ultimately began to "manage," adopting a policy of holding the figure to within 1-2% of the Company's income from interest and mortgage guarantee fees, a policy that obviously, and now admittedly, violates GAAP.

212.    The Audit Committee met later that same day, with Audit Committee defendant Gerrity and defendants Raines and Howard among those present, as well as KPMG representatives (by telephone). At this meeting, Spencer reviewed EPS growth, reporting that the record mortgage

market helped Fannie Mae to extend its string of (reported) record earnings to *twelve consecutive years* in 1998, with earnings at $3.23 per share for 1998, up 14% over 1997.  Spencer noted that the strong growth in earnings was driven by a record volume of mortgage purchases, record mortgage-backed security issues, increased fee and other income, strengthened credit performance, and the continued effective management of interest rate risk.

213.    These apparent "results" were only possible by virtue of the improper deferral of $200 million in amortization expenses.  Given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, these results should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole.  No defendant stepped forward to stop the blatant accounting manipulations from occurring or to prevent the Company from reporting false financial results.

214.    On April 13, 1999, Fannie Mae issued a press release entitled "Fannie Mae Reports Record First Quarter 1999 Earnings of $924.9 Million or $0.88 Per Common Share; Earnings Per Common Share Up 14 Percent Over First Quarter 1998."  The Company reported earnings for the first quarter of 1999 of $924.9 million, or $0.88 per common share, diluted, compared with earnings of $888.5 million, or $0.84 per common share, for the fourth quarter of 1998 and $824.2 million, or $0.77 per common share, for the first quarter of 1998.  Commenting on these results defendant Raines stated:

> "Fannie Mae has begun the year on a very positive note, with record earnings, excellent business growth, and continued stellar credit results." . . . "With this strong start to the year, we are extremely well positioned to equal if not exceed the excellent earnings per share growth we posted in 1998."

215.    These financial results, which stemmed from accounting violations including the $200 million unreported amortization expense "catch up," were false, yet, defendants did nothing to stop the accounting manipulations or to keep the Company from reporting false financial results.

216.    On April 20, 1999, the Board of Directors held a meeting, attendees included defendants Raines, Ashley, Duberstein, Gerrity, Korologos, Pickett and Howard. During the Monthly Finance Report which was delivered by Howard, who stated that Fannie Mae experienced a very strong first quarter with (reported) EPS at $0.88, up 14% from the last quarter of 1998, and above plan and analysts' expectations. Howard also reviewed the financial projections process for the full year and the recently updated four-year plan, stating that it was hard to understand why Fannie Mae's stock was doing so poorly given the exceptionally strong "reported" first quarter, the projection for the full year having improved so much, and the outlook for the out years being better than it had been in a long time. Howard noted that as of the prior Friday, April 16, Fannie Mae stock was down 11% on the year, while the Dow was up 14% and the S&P 500 was up 7%.

217.    The Board of Directors again met on May 20, 1999. The pre-meeting materials for this meeting included a section titled "Remarks of Franklin D. Raines," in which Raines stated:

> Nineteen ninety-eight alone was an extraordinary year for Fannie Mae. We broke every business record on the book, including a 129 percent increase in business volume and produced another record EPS. Double-digit growth for more than a dozen years straight is unheard of among financial institutions. And there are only seven companies in the S & P 500 who can match our record of growth.

> So let me begin my tenure by setting before you my expectations for the next five years.

> •    Fannie Mae will continue to deliver double-digit EPS growth.

> •    In fact, I expect that Fannie Mae's EPS growth over the next five years will match or exceed the average 13.6 percent EPS growth of the past five years.

> •    And in my review, the future is so bright I am willing to set as a goal that our EPS will double over the next five years.

> ***When Fannie Mae pledges double-digit growth, we deliver***

> *        *        *

> And Fannie Mae will keep growing. To reiterate my expectations:

> *        *        *

- Fannie Mae will continue to deliver double-digit EPS growth.

- We expect Fannie Mae's average EPS growth over the next five years will match or exceed the average 13.6 percent EPS growth of the past five years.

218.    This was reiterated in early 2000 in the Company's 1999 Annual Report by Raines:

The future should bring continued growth for Fannie Mae. Launching my first year as Chairman and CE) – and my seventh with Fannie Mae – I made a bold statement to investors last May. Over the five years ending in 2003, Fannie Mae is committed to at least 10 percent EPS growth each year; we expect our EPS to match or exceed the average 13.6 percent annual growth over the give years ending in 1998; *and we have set as a goal to double our 1998 EPS by the end of 2003.*

219.    These pronouncements set the stage for further, and increasingly widespread, accounting violations at Fannie Mae. To help accomplish Raines' stated goals – and to incentivize Company insiders to participate in the accounting manipulations necessary to achieve this goal – the Company set out a challenge grant initiative which promised to reward management if earnings were doubled in the next five years. Nearly all of Fannie Mae's executive incentive compensation was tied to performance, and more specifically, to sustained EPS growth.

220.    Raines, Howard and the other defendants faced the serious problem of having to avoid earnings volatility – endemic to the interest-rate sensitive economic environment in which Fannie Mae's business operates – to meet EPS growth targets, including amortization problems similar to those in 1998, to be able to reap their performance bonuses. Thus, Raines, Howard and other defendants embarked a prolonged and concerted campaign to develop policies to gain earnings flexibility and the ability to minimize earnings volatility and to "smooth out" the Company's earnings, enabling them to artificially demonstrate success in meeting targets regardless of changes in economic circumstances or actual performance.

221.    On July 13, 1999, Fannie Mae issued a press release entitled "Fannie Mae Reports Record Second Quarter 1999 Earnings of $957.6 Million, or $0.91 Per Common Share; Earnings Per Common Share Up 14 Percent Over Second Quarter 1998." The Company reported net income of

$1.883 billion, or $1.79 per common share, compared with $1.672 billion, or $1.58 per common share, for the same period in 1998. Commenting on these results defendant Raines stated:

> Fannie Mae's second quarter results once again exhibited the predictable performance that sets us apart from other financial companies.

*    *    *

> Fannie Mae's prospects for the balance of the year and for the year 2000 are very bright. In fact, they seem even better today than when I rejoined the company last spring.

222.    These financial results, which stemmed from accounting violations including the $200 million unreported amortization expense "catch up," were false, yet, because of their conflicts of interest and bad faith, defendants did nothing to stop the accounting manipulations or to keep the Company from reporting false financial results.

223.    Around this time, to further its ability to "manage" earnings and meet Raines' 5-year goal, Fannie Mae began development of a new program to determine the rate at which to amortize Fannie Mae's assets. The Amortization Integration Modeling System ("AIMS"), was intended to serve as a modeling program to determine the cash flows and income generated by Fannie Mae's deferrals on mortgage and MBS products. Jeffrey Juliane ("Juliane"), a manager in the Controller's division, led the development of AIMS. The collective management of the Controller's division, including Barnes, were involved in and frequently discussed the development of the system.

224.    From the outset of the development of AIMS, Barnes expressed doubts about its validity and propriety during meetings and in conversations with his managers in the Controller's division. On June 15, 1999, for example, Juliane distributed a memorandum in which he stated that the purpose of the new amortization system would be to "manage the recognition of income and expense" more effectively than the programs in use at the time. Barnes indicated to his superiors that Juliane's use of the term "manage" was problematic. It suggested, as Barnes' observed, that the system would be used to manipulate the reporting of income and expenses, rather than for legitimate

- 85 -

accounting purposes, in violation of GAAP and in particular FAS 91. Barnes also expressed concern that use of the system in that manner could cause Fannie Mae to issue materially inaccurate financial statements.

225.    On July 19 and 20, 1999, the Board of Directors held a meeting attended by, among others, defendants Raines, Ashley, Duberstein, Gerrity, Korologos, Pickett and Howard. At this meeting, Howard made a presentation entitled "Sizing the Financial Challenge." Howard summarized the Company's presentation at the May 1999 Biennial Investor/Analyst Conference, at which Raines stated that (1) Fannie Mae would continue its 12-year record of annual double-digit operating EPS growth for at least the next five years; (2) during the next five years Fannie Mae expected to match or exceed the average 13.6% EPS growth of the past five years; and (3) the corporation had set a goal of doubling earnings per share by the end of 2003.

226.    Also at this meeting, the Board discussed that Fannie Mae's business strategies were changing, so Fannie Mae should expect an increase in the need to have certain Fannie Mae officers and managing directors of the American Communities Fund and other business units to serve on the boards of directors of for-profit organizations in order to "monitor and protect Fannie Mae's interests and investments." The Board approved this measure and gave to Raines the authority to indemnify certain employees for any liability the employee might face in carrying out his or her job responsibilities.

227.    The Audit Committee again met on July 20, 1999. Committee members present at this meeting included its chairman, defendant Gerrity. Also present were Raines and Howard. KPMG representatives participated by telephone. At this meeting, Spencer discussed several accounting developments that might affect Fannie Mae's financial statements. Spencer reported that, even though the effective date for FAS 133 "Accounting for Derivative Investments and Hedging Activities" had been deferred to January 1, 2001, Fannie Mae had developed a system to

implement and analyze the impact of the new standard, particularly its effect on volatility in shareholder equity. The system developed was specifically designed to frustrate FAS 133 – to smooth out earnings and help achieve Raines' five-year plan, to the personal benefit of defendants – rather than to implement and properly apply the new rule.

228. On October 13, 1999, Fannie Mae issued a press release entitled "Fannie Mae Reports Record Third Quarter 1999 Earnings of $991.0 Million, or $0.94 Per Common Share; Earnings Per Common Share Up 16 Percent Over Third Quarter 1998." The Company reported earnings for the third quarter of 1999 of $991.0 million, or $0.94 per common share, diluted, compared with earnings of $957.6 million, or $0.91 per common share, for the second quarter of 1999 and $857.4 million, or $0.81 per common share, for the third quarter of 1998. Reported earnings per common share in the quarter were up by 16% over the third quarter of 1998. The Company also reported that for the first nine months of 1999, Fannie Mae's net income was $2.874 billion, or $2.73 per common share, compared with $2.529 billion, or $2.39 per common share, for the same period in 1998 and that earnings per common share for the first nine months of 1999 were 14% above the corresponding period in 1998. Commenting on these results defendant Raines stated: "Fannie Mae's excellent third quarter results were fueled by continued strong growth in our mortgage portfolio and further declines in our credit costs." "With these results," Raines added, "the company is on a pace to achieve the ambitious earnings objectives I set at our biennial investor conference in May."

229. These financial results, which stemmed from accounting violations, including the $200 million unreported amortization expense "catch up," were false, yet defendants did nothing to stop the accounting manipulations or to keep the Company from reporting false financial results.

230. On November 15, 1999, the members of the Compensation Committee held a meeting. Attendees of this meeting included defendant Raines. At this meeting, the Committee adopted management's proposal concerning a one-time stock grant to all employees with vesting tied

to the corporate goal of doubling EPS by the end of 2003. While the Committee set the number of shares granted to management group employees at 50% of their annual November 1999 grants, based on Raines' recommendation, the grant to non-management group employees was set at 348 shares, the same number of shares that each employee could purchase under the 1999 offering of the Company's Employee Stock Purchase Plan. This further incentivized Company insiders to participate in the accounting fraud perpetrated by defendants.

231.    The next day, on November 16, 1999, the full Board of Directors held a meeting. Those present included defendants Raines, Ashley, Duberstein and Gerrity. At this meeting, Raines presented the Chairman's report in which he reviewed a number of the challenges the Company faced in 1999, including the budget, the Company's relationship with mortgage insurers and customers and their respective trade associations, the emergence of FM Watch (a coalition of financial sector and housing related trade associations that acts as a watchdog group focused on Fannie Mae and Freddie Mac), and the development of alliance agreements.

232.    Fannie Mae implemented the AIMS system in 2000. Thereafter, Barnes became increasingly concerned about serious flaws in the program, and several of the Controller's division's processes related to amortization. He raised these concerns with his superiors, including questions about repeated retroactive factor changes, and also questioned why the system employed factors that resulted in negative amortization, or in amortization that exceeded 100%, and why AIMS was designed and employed to not retain as audit trails of each modeling sensitivity run that was executed. Janet Pennewell ("Pennewell") (the Senior Vice President for the Controller's division), Mary Lewers ("Lewers") (the Director of Finance Accounting), and Juliane dismissed Barnes' concerns and told him they were working to accomplish the objectives set by Spencer, the Company's Controller, and defendant Howard, which was to reduce the Company's earnings volatility – which they accomplished, in violation of numerous accounting rules.

233.    On January 13, 2000, Fannie Mae issued a press release entitled Fannie Mae Reports Record 1999 Earnings of $3.912 Billion and $3.72 Per Diluted Common Share; 1999 Earnings Per Diluted Common Share Up 15 Percent Over 1998." The Company reported that net income for the fourth quarter of 1999 was $1.038 billion, or $0.99 per common share, diluted, compared with net income of $991.0 million, or $0.94 per common share, for the third quarter of 1999 and $888.5 million, or $0.84 per common share, for the fourth quarter of 1998. For the full year, the Company reported earnings for 1999 of $3.912 billion or $3.72 per common share, diluted, compared with earnings of $3.418 billion, or $3.23 per common share for 1998. The Company reported that earnings per share in 1999 were up 15.2% compared with 1998.

234.    These false results were incorporated into the Company's Annual Report for fiscal year 1999 distributed to its shareholders and signed by Spencer and defendant Howard.

235.    The Board of Directors next held a meeting on January 18, 2000. Attendees included defendants Raines, Ashley, Duberstein, Gerrity, Korologos, Pickett, Howard and Swygert. Small reviewed the Company's financial performance noting that (reported) earnings for the year 1999 were up over half a billion dollars over 1998. He also reviewed the Company's increase in earnings per share of 15.2% to $3.72 a share – $.02 ahead of the analyst consensus of $3.70. Small noted that this was the *13th consecutive year and 48th consecutive quarter of double-digit EPS growth*. Howard acknowledged that the year and the competitive environment had been very "challenging."

236.    Given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, Fannie Mae's smooth earnings results - which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole, especially given the "very challenging competitive environment." Yet none of the Board members stepped forward to question the results,

to stop the manipulations from occurring or to prevent the Company from reporting false financial results.

237.    On January 18, 2000, a meeting of the Compensation Committee was held. Attendees included defendants Korologos and Raines. The Committee discussed the Annual Incentive Plan awards for 1999. After being asked to determine the extent to which the corporate goals had been met under the 1999 Annual Incentive Plan, the Committee determined that the (reported) EPS of $3.7199 achieved by the corporation were greater than the maximum payout goal set by the Board at its January 1999 meeting. The Committee then granted the award payouts made under the 1997-99 Performance Share Plan cycle that ended December 31, 1999. Absent defendants' accounting manipulations, those targets would not have been met, but it was not in the interests of defendants to draw that distinction, so nothing was said. Later at this same meeting, Small reiterated the point that should have been a "red flag" if any of the defendants had been doing their jobs – Fannie Mae had achieved the best business year it has ever had *even in a very challenging competitive and political environment*.

238.    On February 15, 2000, a meeting of the Audit Committee was held. Attendees included Audit Committee Chairman and defendant Gerrity, as well as defendants Raines and Howard. KPMG representatives also attended. At this meeting, Spencer informed the Board that Fannie Mae *extended its string of record earnings to thirteen consecutive years* with (reported) earnings of $3.72 per share in 1999, up 15% over 1998. The Committee also discussed certain 1999 audit "differences" – *i.e.*, the exact kinds of manipulations that have given rise to Fannie Mae's massive earnings restatement – which Spencer characterized as immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Howard explained to the Committee how these differences related to amortization of mortgage premium and discounts arise and how Fannie Mae handled these differences systematically overtime, without bias as to direction. Russell then

- 90 -

told the Board that KPMG representatives regularly reviewed these audit differences and, that no comment about them was required in the financial statements, in management's discussion and analysis of the financial statements, or in KPMG's opinion on the financial statements.

239.    These "differences" should have been and undeniably were a "red flag" of serious accounting manipulations to management, the Audit Committee and the Board as a whole, especially given that it was recognized that they occurred in a "very challenging competitive and political environment." Yet no director stepped forward to challenge the results, stop the manipulations from occurring or to prevent the Company from reporting false financial results.

240.    On April 12, 2000, Fannie Mae issued a press release entitled "Fannie Mae Reports Record First Quarter 2000 Earnings of $1.062 Billion, or $1.02 Per Diluted Common Share; Earnings Per Diluted Common Share Up 16 Percent Over First Quarter 1999." The Company reported earnings for the first quarter of 2000 of $1.062 billion, or $1.02 per common share, diluted, compared with earnings of $1.038 billion, or $0.99 per common share, for the fourth quarter of 1999 and $924.9 million, or $0.88 per common share, for the first quarter of 1999. Commenting on these results defendant Raines stated: "Strong growth in revenues enabled Fannie Mae to begin the new decade with *another quarter of record earnings*." Raines said that the Company's first quarter 2000 performance was characterized by solid growth in its mortgage portfolio and net MBS outstanding, as well as by increases in both its net interest margin and average guaranty fee rate. Raines added that Fannie Mae's (reported) 16% EPS growth in the first quarter of 2000 compared with the first quarter of 1999 was above the pace required to meet the Company's goal of doubling its EPS in the five years ending in 2003. "We are very encouraged by our progress towards meeting this ambitious goal, and optimistic about our prospects for achieving it," said Raines.

241.    The Board of Directors again met on April 18, 2000, attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Pickett, Swygert and Howard. At this

meeting, Howard delivered the Financial Performance Review and Portfolio Business Update in which he reported that the year was off to a very good start. Howard noted that the earnings reported the week before were – miraculously – a penny over analysts' consensus and 15.9% above the year-ago quarter. These financial results, which stemmed from accounting violations including the $200 million unreported amortization expense "catch up," were false, yet defendants did nothing to question the results, stop the accounting manipulations or to keep the Company from reporting false financial results.

242.     On July 13, 2000, Fannie Mae issued a press release entitled "Fannie Mae Reports Record Second Quarter 2000 Earnings of $1.097 Billion, or $1.05 Per Diluted Common Share; Earnings Per Diluted Common Share Up 15 Percent Over Second Quarter 1999." The Company reported earnings for the second quarter of 2000 of $1.097 billion, or $1.05 per common share, diluted, compared with earnings of $1.062 billion, or $1.02 per diluted common share, for the first quarter of 2000 and $957.6 million, or $0.91 per diluted common share, for the second quarter of 1999. The Company also reported that for the first six months of 2000, Fannie Mae's net income was $2.159 billion, or $2.08 per diluted common share, compared with $1.883 billion, or $1.79 per diluted common share, for the same period in 1999 and that the Company's earnings per share for the first six months of 2000 were 16.2% above the first six months of 1999. Commenting on these results defendant Raines stated: "With these second quarter results, Fannie Mae has achieved our *50th consecutive quarter of record operating earnings per common share. We have reached this milestone in spite of increasing interest rates, and with a credit-loss rate that has fallen to its lowest level since 1973.*" Raines added, "Fannie Mae has a record of growth and stability in earnings that few companies in any industry can match. We have consistently shown ourselves to be one of the strongest and most reliable financial institutions in America." Raines noted that Fannie

Mae's EPS growth for the first six months of the year remained ahead of the pace required to meet the Company's goal of doubling its EPS in the five years ending in 2003.

243.    These results were once again a fabrication that denied the economic reality of the times, which would have served as a "red flag" to any true fiduciary. Indeed, in preparation for the Board of Directors meeting on July 17 and 18, 2000, a pre-meeting packet was distributed to the members of the Board of Directors. This packet included a message from Franklin D. Raines which stated:

> Dear Fannie Mae Board Members:
>
>      *       *       *
>
> ***In spite of this tough external environment, Fannie Mae once again achieved its financial performance goals for the period*** as it also achieved- well ahead of schedule- its seven-year, Trillion Dollar Commitment to underserved families and launch a new, $2 trillion American Dream Commitment. And ***even though business volume was behind plan, Fannie Mae extended a record that few companies in America have ever claimed- 50 consecutive quarters in which we have achieved a double-digit growth rate in operating earnings per share (EPS)***.

Unfortunately, this "red flag," like those to come and those past, was ignored.

244.    The Audit Committee met on July 18, 2000. Attendees included defendant Gerrity (Audit Committee Chairman) and defendants Raines, Mudd and Howard. KPMG representatives participated by telephone. At this meeting, Howard delivered a report on "Re-sizing the Financial Challenge," in which he reviewed the Company's five-year financial goals for 1998-2003 and Fannie Mae's goal to double-digit earnings-per-share growth. Howard noted that the 2003 goals were ambitious and reviewed a number of challenges to achieving the goal.

245.    On October 11, 2000, Fannie Mae announced record 3Q00 earnings. The Company reported earnings of $1.124 billion, or $1.09 per diluted common share. This compared with earnings of $1.097 billion, or $1.05 per diluted common share, for the second quarter of 2000 and $991.0 million, or $0.94 per diluted common share, for the third quarter of 1999. For the first nine months of 2000, Fannie Mae's net income was $3.283 billion, or $3.16 per diluted common share,

compared with $2.874 billion, or $2.73 per diluted common share, for the same period in 1999.

Fannie Mae's earnings per share for the first nine months of 2000 were 15.8% above the first nine

months of 1999.

246.    Commenting on these results, defendant Raines stated: "Our third quarter financial

report extends a record of earnings consistency few in any industry can match . . . . *[d]uring a time*

*when the financial outlook for many companies has become less certain, Fannie Mae stands out*.

Our sound business strategies, proven risk management capabilities, and the broad and deep support

we have for our housing mission make our prospects for the future as bright as our record from the

past." Raines noted that Fannie Mae's third-quarter financial performance continued to be paced by

strong growth in revenues. At $1.98 billion, the Company's taxable-equivalent revenues in the third

quarter were 13% above the third quarter of 1999.

247.    These financial results, which stemmed from accounting violations including the

$200 million unreported amortization expense "catch up," were false, yet defendants did nothing to

question the results, stop the accounting manipulations or to keep the Company from reporting false

financial results.

248.    On October 17, 2000, the Board of Directors held a meeting. Attendees included

defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Mulcahy, Pickett, Swygert and

Howard. At this meeting, Howard discussed the fact that Fannie Mae is a major user of derivatives

and reviewed the primary objectives of FAS 133, the history of its consideration by FASB, its

expected impact on the Company, and the Company's options for adjusting to FAS 133. As

explained to the Board, the effects included a one-time transition adjustment to the Company's

income statement and balance sheet.

249.    Fannie Mae's Audit Committee held a meeting on November 21, 2000. At this

meeting, KPMG representatives discussed several accounting developments that might affect Fannie

Mae's financial statements. KPMG representatives told the Committee that it would focus on two particular accounting issues: (1) adoption of FAS 133 (accounting for derivatives) on January 1, 2001; and (2) the Company's reporting under FAS 133. KPMG representatives cautioned that there could be significant earnings and equity volatility under this standard, the earnings volatility being caused primarily by marking-to-market the time value of options. Also at this meeting, Howard stated that *equity adjustments will vary and could be significant and that it was a function of interest rate volatility.* Howard then informed the Board that when FAS 133 was implemented there would be a one-time transition adjustment and that the impact of this adjustment would not be known until January 2001. The failure of the predicted volatility in reported earnings to occur in later quarters was a "red flag" to defendants, who repeatedly ignored it.

250. On January 4, 2001, Barnes participated in a meeting with his superiors to discuss the effects of a recent cut in interest rates by the Federal Reserve. During the discussion, Barnes learned that senior management was planning on adjusting the "on-tops" – a term the Controller's division used to refer to manual journal entries that could be used to arbitrarily adjust the Company's income as the books were closed each month. Senior management had stated that "on-tops" could be used to reflect a desired amount of income for December 2000, which would maintain margin and net interest income levels. Juliane added that if the Company decided not to make "on tops" adjustments, he would produce modeling runs to support the desired income results. *Juliane indicated that he was prepared to generate any results desired by defendants Spencer and Howard through the modeling process.* Barnes was extremely troubled by what was clearly improper income management and he asked Juliane if management agreed with this approach, which seemed to violate GAAP. Julian told Barnes that the Company's management embraced this approach.

251. On January 10, 2001, Barnes alerted Lewers to a problem that arose when Juliane processed a factor change in December 2000, which included several errors. Specifically, the AIMS

system had applied a set of factors to the wrong inventory, thereby placing into question the AIMS system's reliability. Although Barnes voiced his concerns that the AIMS system might be inherently flawed, his concerns were dismissed.

252.    On January 11, 2001, Fannie Mae reported record 2000 earnings. The Company reported earnings for 2000 of $4.448 billion, or $4.29 per diluted common share. This compared with earnings of $3.912 billion, or $3.72 per diluted common share for 1999. Earnings per diluted common share in 2000 were up 15.3% compared with 1999. Fannie Mae's net income for the fourth quarter of 2000 was $1.164 billion, or $1.12 per diluted common share. This compared with net income of $1.124 billion, or $1.09 per diluted common share, for the third quarter of 2000 and $1.038 billion, or $0.99 per diluted common share, for the fourth quarter of 1999. These false financial results were incorporated into the Company's Annual Report for FY00, which was signed by Spencer and defendant Howard.

253.    Commenting on these results, defendant Raines stated: "The year 2000 was an exceptionally successful one for Fannie Mae in a variety of critical areas. We posted our *14th consecutive year of record earnings*, increased our earnings per share by over 15 percent for the second year in a row, achieved our $1 trillion affordable housing commitment ahead of schedule, and announced a set of voluntary liquidity, disclosure and capital enhancement initiatives that put us at the leading edge of financial institution practices." Raines added that Fannie Mae's financial results in 2000 kept the Company ahead of the pace required for meeting its goal of doubling EPS over the five years ending in 2003. Raines also said that the Company's record 2000 earnings per share performance was driven by top-line revenue growth, with taxable-equivalent revenue rising by 12.2% compared with 1999. Commenting on the outlook for 2001, Raines noted, "Fannie Mae's prospects for continued strong earnings growth are excellent. Our credit indicators are favorable, our 25 percent annualized portfolio growth last quarter gives us excellent momentum, and the

current financial environment suggests that secondary market activity will remain at an elevated level well into this year."

254.    These financial results, which were incorporated into the Company's Annual Report for fiscal year 2000 and distributed to its shareholders and signed by defendants Howard and Spencer, were admittedly false and are included in Fannie Mae's massive 6.3 billion earnings restatement.

255.    The Board of Directors then held a meeting on January 16, 2001. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Pickett, Swygert and Howard. At this meeting, Mudd told the Board that Fannie Mae exceeded its target for (reported) EPS growth in both 2000 and throughout the 1998-2000 performance cycle. He then stated that Fannie Mae was on track to achieve its three-part financial performance challenge for 1998-2003: (1) to grow EPS by at least 10% annually; (2) to match or exceed the average 13.6% EPS growth of the previous five years; and (3) to double EPS by the end of 2003. Mudd informed the Board that net income for 2000 was $536 million higher than 1999 and marked the 14th straight year of record earnings. He then reported that Fannie Mae's EPS growth of 15.3% represented the second year in a row of EPS growth above 15%.

256.    At the same meeting, Howard presented the Financial and Mortgage Portfolio Report in which he reviewed with the Board the income statement summary for 2000 actual versus 1999 actual and 2000 actual versus plan; 2000 growth rates, net interest margin and MBS fee rate; portfolio duration gap versus 10-year Fannie Mae debt; credit-related losses; and share repurchases. Howard also noted that in 2000 the Company had (reported) EPS of $4.29, and EPS growth of 15.3%. He stated that the EPS growth rate was higher than that necessary to meet the Company's goal of doubling EPS by year-end 2003. These numbers were falsely inflated, which was obvious

given the economic climate at the time, yet defendants did nothing to question the results, stop the accounting manipulations or prevent the Company from reporting falsified earnings.

257.    On February 1, 2001, Juliane sent an e-mail to several Controller's division employees, updating them on the incorporation of new factors into AIMS. Juliane stated that he had adjusted the net interest income factors "to evenly recognize $75 million of additional income in 2001, which [was] $50 million less than was originally forecasted in the plan." Juliane also stated that he had adjusted the guaranty fee factors to make the Company's actual reported income comport with "the plan" – *i.e.*, management's statement of income goals for amortization purposes. The guaranty fee factor adjustment resulted in a $57 million adjustment for 2001. Troubled by the fact that Juliane's use of "the plan" seemed arbitrary, and that the adjustments Juliane made appeared to be based on desired income results instead of loan prepayments, Barnes told Lewers that he believed Fannie Mae was improperly engaging in income management, but his concerns were again dismissed.

258.    On February 20, 2001, a meeting of the Audit Committee was held. Attendees included defendants Gerrity, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer told the Board that Fannie Mae extended its string of record (reported) earnings to fourteen consecutive years with earnings of $4.29 per share in 2000, up 15% over 1999.

259.    Also at this meeting, Howard reviewed the preliminary status of the FAS 133 adjustments and informed the Board that the transition to FAS 133 on January 1, 2001, *resulted in a large positive adjustment but that volatility during January caused a decrease of two-thirds of this amount*. Raines also noted that Fannie Mae had a written communication from OFHEO that the volatility in its equity due to FAS 133 impacts would not affect the calculation of its regulatory capital requirements. Howard added that the effects of FAS 133 on equity would require

- 98 -

management to increase the capital cushion by $200 million to $300 million to protect against options volatility.

260.    Given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, Fannie Mae's smooth earnings results – which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet no defendant stepped forward to question the results, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

261.    On April 17, 2001, Fannie Mae issued a press release entitled "Fannie Mae Reports Record First Quarter 2001 Financial Results; Operating Net Income of $1.238 Billion Up 16.6 Percent Over First Quarter 2000; Operating Earnings Per Diluted Common Share of $1.20 Up 17.6 Percent." Therein, the Company reported operating net income for the first quarter of 2001 of $1.238 billion, a 16.6% increase compared with the first quarter of 2000. Operating earnings per diluted common share of $1.20 were 17.6% above the same period in 2000. Operating net income and EPS exclude the one-time cumulative change in accounting principle and the quarter-to-quarter variability in the market value of purchased options which FAS 133 now required to be included in the income statement. Net income and earnings per diluted common share for the first quarter of 2001 including these FAS 133 items were $1.293 billion and $1.25, respectively.

262.    Commenting on these results, defendant Raines admitted: "*At a time when many companies are reporting disappointing results, Fannie Mae continues to meet or exceed performance expectations.*" Raines added that Fannie Mae's revenues grew by over 20% compared with the first quarter of 2000, nearly double the growth rate of the Company's operating costs over the same period.

263.    The financial results announced by defendants on April 17, 2001, were admittedly false and are included in Fannie Mae's December 6, 2006 $6.3 billion restatement.

264.    The Board of Directors again met on April 16, 2001. Attendees at this meeting included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Gerrity presented the report of the Audit Committee and reported to the full Board that the Committee heard a report from Spencer, Fannie Mae's Senior Vice President and Controller, on year 2000 financial statements. He informed the Board that the report indicated excellent overall results, including a 15% increase in (reported) EPS, good portfolio and revenue growth with prudent interest rate risk management, continued low credit losses and fulfillment of legislated housing goals.

265.    At this same meeting, Howard presented the Income Statement Summary for January 2001 and focused his presentation to the Board on the effects of the Financial Accounting Standards Board's rule for accounting for derivatives, FAS 133. Although this was the first month of implementation of the FAS 133 rule, Howard noted that FAS 133 had a large positive effect on net income and EPS in January. Howard did not explain how this enabled the Company to outperform its competitors.

266.    On April 17, 2001, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Howard reported to the Board that the year was off to a very good start, with (reported) first quarter earnings 17.6% higher than the period one year ago, operating net income 16.6% higher, and taxable-equivalent revenue more than 20% higher.

267.    Howard also reminded the Board that the FAS 133 regulation which had recently taken effect led the Company to use operating net income and operating EPS as the more meaningful

- 100 -

measures of financial performance. Howard told the Board that the financial results in the first quarter, which included the effects of FAS 133, were even stronger than operating results.

268.    On April 17, 2001, the Audit Committee held a meeting. Attendees included defendants Gerrity, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Rajappa presented the Audit Opinion on Internal Controls over Non-Mortgage Derivatives and described audit's test of a sample of swaps and hedge transactions to determine compliance with Board resolutions, Portfolio Investment Committee strategies, and with FAS 133 requirements.

269.    Given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, Fannie Mae's reported earnings results – which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet again no defendant stepped forward to question the results, to stop the manipulations from occurring or to prevent the Company from reporting false financial results.

270.    On June 12, 2001, Barnes discovered that during the closing of Fannie Mae's books for May 2001, the Company's management had posted a $10 million "on tops" entry in order to increase Fannie Mae's reported income. When Barnes questioned a superior about this entry, that superior admitted that senior management made the "on tops" adjustment so that it could report more than Fannie Mae's actual income for the month, in order to support what management had previously set as earnings goals and margins. In other words, even if the Company did not actually meet the goals set by management, the use of the "on tops" adjustments allowed Fannie Mae to make it appear that it had met those goals in the relevant time period. Barnes' concerns again were dismissed.

271.    On July 17, 2001, Fannie Mae reported operating net income for the second quarter of 2001 of $1.314 billion, or $1.27 per diluted common share.  Operating net income was 19.8% above the second quarter of 2000, while operating earnings per diluted common share (operating EPS) rose 21% over the same period.  For the first six months of 2001 Fannie Mae's operating net income was $2.553 billion, or $2.47 per diluted common share, compared with $2.159 billion, or $2.08 per diluted common share, for the same period in 2000.  Fannie Mae's operating EPS for the first six months of 2001 were 18.8% above the first six months of 2000.  Operating net income and earnings per common share excluded the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of FAS 133 on January 1, 2001.  Net income and EPS for the second quarter of 2001, including FAS 133 market value changes, were $1.402 billion and $1.36, respectively.  Net income and EPS for the six months ended June 30, 2001, including FAS 133 items, were $2.696 billion and $2.61, respectively.

272.    Commenting on these results, defendant Raines stated: "Slower economic growth, lower interest rates and contained inflation have combined to produce very favorable conditions for home buying and mortgage refinancing.  In this environment Fannie Mae has been called upon to provide a greater volume of support to housing finance than at any time in the company's history."  Raines said that Fannie Mae's combined book of business – its net mortgage portfolio and outstanding mortgage-backed securities – grew at a 22.3% annual rate during the second quarter.  Finally, Raines added, in spite of the slowing economy the Company's credit losses fell to a 17-year quarterly low of $16.2 million.  "With very strong business and revenue growth and well contained credit losses, Fannie Mae is extremely well-positioned to continue to play a critical role in providing mortgage credit to the economy, *while extending our enviable record of superior financial performance*."

273.    With respect to FAS 133, Fannie Mae stated:

Fannie Mae adopted Financial Accounting Standard No. 133 (FAS 133), *Accounting for Derivative Instruments and Hedging Activities*, on January 1, 2001. FAS 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options. At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax. The change in the market value of Fannie Mae's purchased options during the second quarter of 2001 was a net gain of $35.4 million. This amount includes $100.1 million in option cost amortization that formerly was included in net interest income.

FAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI. At June 30, 2001, the OCI component of stockholders' equity included a $3.7 billion reduction, or 0.6 percent of the net mortgage balance. The comparable reduction to OCI was $5.7 billion at March 31, 2001. Other comprehensive income is not a component of core capital.

274. The financial results released by defendants on July 17, 2001, were admittedly false and are included in Fannie Mae's massive December 6, 2006 $6.3 billion restatement.

275. The Board of Directors held a meeting on July 16 and 17, 2001. Attendees at the meeting included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Marron, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Howard presented the "Current Financial Outlook" and noted the Company's very strong (reported) financial performance and reviewed the operating net income for second quarter of 2001 compared to the second quarter of 2000, operating net income year-to-date-actual versus the 2001 plan; the earnings forecast for the full year 2001; the current Fannie Mae yield curve; mortgage portfolio liquidations and debt redemptions; the Company's net interest margin- actual and projection against 2001 plan; commitment volumes and mortgage spread; portfolio duration gap versus 10-year Fannie Mae debt; and rate-protected debt as a percentage of net mortgage portfolio. Howard then reviewed the Company's preliminary 2002 earnings projection.

276. Once again, given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, Fannie Mae's smooth earnings

results – which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole.  Yet no defendant stepped forward to questions the results, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

277.    On August 10, 2001, Barnes again raised his concerns regarding the Company's accounting practices with Richard Stawarz ("Stawarz"), one of his superiors.  The discussions concerned Fannie Mae's use of factor changes and "on-top" adjustments to manipulate the amount of income the Company reported each month, all of which Barnes believed violated GAAP. Stawarz agreed with Barnes that management often decided how much income they wanted to reflect before ensuring that such results could be achieved properly.  He too expressed frustration and concern about this approach but took no steps to rectify these problems.

278.    On September 11, 2001, terrorists struck New York, New York and Washington, D.C. in the infamous 9-11 attacks.  These attacks brought the nation to a standstill for days and sent the economy into a severe tailspin.

279.    Despite this extremely adverse economic climate, on October 15, 2001, Fannie Mae issued a press release entitled "Fannie Mae Reports *Record* Third Quarter 2001 Financial Results; Operating Net Income of $1.377 Billion up 22.5 Percent over Third Quarter 2000; Operating Earnings Per Diluted Common Share of $1.33 up 22.0 Percent."  Therein, the Company stated:

> Fannie Mae, the nation's largest source of financing for home mortgages, today reported operating net income for the third quarter of 2001 of $1.377 billion, or $1.33 per diluted common share.  Operating net income was 22.5 percent above the third quarter of 2000, while operating earnings per diluted common share rose 22.0 percent over the same period.
>
> For the first nine months of 2001 Fannie Mae's operating net income was $3.929 billion, or $3.80 per diluted common share, compared with $3.283 billion, or $3.16 per diluted common share, for the same period in 2000.  Fannie Mae's

operating EPS for the first nine months of 2001 were 20.3 percent above the first nine months of 2000.

\*       \*       \*

Operating net income and operating earnings per common share exclude the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of Financial Accounting Standard 133 (FAS 133) on January 1, 2001. Net income and EPS for the third quarter of 2001, including FAS 133 market value changes, were $1.230 billion and $1.19, respectively. Net income and EPS for the nine months ended September 30, 2001 including FAS 133 items were $3.925 billion and $3.80, respectively.

280.    The financial results released by defendants on October 15, 2001, were admittedly false and are included in Fannie Mae's massive December 6, 2006 $6.3 billion restatement.

281.    On October 16, 2001, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Howard presented the Finance Report and the Mortgage Portfolio Report and commented on the very positive (reported) third quarter financial results released the previous morning.

282.    In reality, the positive net interest income was the result of accounting manipulations. On November 6, 2001, an amortization factor change requested by management resulted in a $100 million increase to the Company's interest income. Barnes recognized this increase as concrete evidence that the AIMS system, as developed and used by the Company, produced grossly inaccurate and unreliable results when calculating Fannie Mae's income and expenses. On November 7, 2001, Barnes informed his superiors that the integrity of the AIMS system was seriously compromised, as evidenced by the $100 million increase to the Company's interest income. Barnes' concerns included that fact that the AIMS system was designed not to retain audit trails, making it impossible to accurately review the basis used to support the factors generated. Barnes' concerns were dismissed. It was in the interests of the Company's directors and officers to continue these improper accounting manipulations, and management approved the factor change.

- 105 -

283.    The Compensation Committee met on November 19, 2001. Attendees included Raines, Mudd and Howard. At this meeting, Raines reviewed for the committee what were termed as *the special challenges faced by the entire Company that negatively impacted every other market participants*. These special challenges, including the 9-11 attacks and their impact on the economy, and the Company's supposed outstanding performance versus the market, were "red flags" that should have signaled – once again – to defendants that Fannie Mae was engaging in accounting manipulations. However, no defendant questioned the results.

284.    On December 19, 2001, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Marron, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Raines told the Board that Fannie Mae's performance and current substantial increase in net interest margin provided it with a unique opportunity to make a special Foundation contribution while still meeting or exceeding the Company's securities analysts' consensus expectations for Fannie Mae's fourth quarter and full year EPS growth. Raines, as the representative of the management, recommended a $300 million-$350 million contribution in the form of Fannie Mae common stock. Given the economic ties between the defendants, the Foundation and various entities the Foundation contributed money to, of course, this resolution was adopted by the Board.

285.    In December 2001, Fannie Mae's financial performance was artificially enhanced by the first of two improper Real Estate Mortgage Investment Conduit ("REMIC") transactions with defendant Goldman Sachs. These REMIC transactions, $20 billion in December 2001 and $10 billion March 2002, were designed by Goldman Sachs and executed to shift $107 million of Fannie Mae's earnings into future years. According to the May OFHEO Report, neither REMIC transaction had any economic purpose other than shifting income, and therefore violated GAAP. Defendant

Howard approved the transactions, which Goldman Sachs presented to Fannie Mae for the sole expressed purpose of managing the recognition of income.

286.    In REMIC transactions, Fannie Mae transformed mortgage-backed securities with a constant yield into separate tranches of mortgage-backed securities with different maturities and risk classes. Varying yields were generated through premium and discount pricing. By varying yields depending on the average life of the securities, Goldman Sachs created a means for Fannie Mae to recognize lower income in early years, *i.e.*, 2002 through 2004, and increasingly higher income in later years. The $20 billion REMIC transaction – pitched by Goldman Sachs as "Project Libra" – was twice as large as any Fannie Mae previously issued, and unbeknownst to investors, Fannie Mae not only provided the collateral for the transaction, but also retained almost 90 percent of the securities issued. FAS 140 required the sale of 10 percent of the REMIC for Fannie Mae to treat the transaction as a sale of assets for tax and accounting purposes. Therefore, Fannie Mae (through Goldman Sachs & Co.) sold $2 billion of the $20 billion REMIC to investors and paid an underwriting fee of $625,000 to Goldman Sachs & Co. Fannie Mae and Goldman Sachs & Co. failed to properly disclose the income-shifting REMIC transactions in the related offering documents. Also, despite public scrutiny that the $20 billion REMIC transaction was a sham tax-avoidance transaction, Howard and the other defendants never properly disclosed the REMIC transactions or their true income-shifting purpose in Fannie Mae's financial statements.

287.    Goldman Sachs participated in Fannie Mae's cover-up of the income-shifting purpose of the REMIC transactions. In an e-mail exchange between Fannie Mae executives in December 2001 regarding public rumors about the transaction among mortgage securities dealers, Ramon DeCastro, Fannie Mae's Vice President for Portfolio Management, assured others that Goldman Sachs would conceal the true purpose behind the REMIC:

> Goldman in turn will say that they worked on a variety of large REMIC transactions in 2001 for balance sheet restructuring for a number of clients. This transaction is

another example of that trend, and Goldman does not reveal information on proprietary client transactions. Let me know if there is anything else you would like to convey to the market.

288.    In the same e-mail exchange, Howard wrote: "Who's working on the public response? I'd like to see it before it goes final. It sounds like the rumors will accelerate our timing, but I'm out all next week so we'd need to get our external story straight by then." Howard clearly knew of the improper purpose of the REMIC transactions as he approved the structure to reduce income through the transactions in 2002 by approximately $30 million and by $8 million in 2003.

289.    Fannie Mae also enlisted the help of Radian to manage earnings in 2001. By late 2001, Fannie Mae executives knew that Fannie Mae was going to earn significantly more than necessary to meet maximum bonus payouts in both 2001 and 2002. Consequently, defendants Raines, Howard, Mudd and others engaged in a strategy to defer and smooth earnings through a variety of manipulative transactions. By purchasing finite insurance through Radian at the end of 2001, and paying a one-time premium of $40 million to Radian, Howard, Mudd and other senior executives deferred $40 million of income from 2002 and 2003. To accomplish their goals to accelerate expenses and push income to future years, Howard and other senior executives improperly employed insurance accounting for the Radian transaction, notwithstanding the fact that the policy failed to transfer any risk sufficient to be considered insurance.

290.    Defendant Howard approved the Radian transaction on December 21, 2001. The day before the deal was closed, Lou Hoyes, an executive vice president at Fannie Mae, e-mailed defendants Howard, Mudd and others to strongly oppose the Radian transaction, stating: "I am terrified of the negative public relations aspects of a disclosure of a transaction like this. Should we be exposing Fannie Mae to this type of political risk to 'move' $40 million of income? I believe not." Nevertheless, the Radian deal was consummated on January 10, 2002. The improper

accounting for the transaction and its income-shifting effect will be reversed in Fannie Mae's massive restatement of its financial statements.

291.    On January 14, 2002, Fannie May issued a press release entitled "Fannie Mae Reports Record 2001 Financial Results; Operating Net Income of $5.367 Billion Up 20.7 Percent over 2000; Operating Earnings Per Diluted Common Share of $5.20 Up 21.2 Percent. Results Include Contribution of $300 Million in Common Stock to Fannie Mae Foundation." These results were incorporated into the Company's Annual Report for FY01 which was signed by defendants Howard and Spencer. The press release issued by the Company stated:

> Fannie Mae, the nation's largest source of financing for home mortgages, today reported operating net income for 2001 of $5.367 billion, or $5.20 per diluted common share. Operating net income was 20.7 percent above 2000, while operating earnings per diluted common share rose 21.2 percent over the same period. For the fourth quarter of 2001 Fannie Mae's operating net income was $1.438 billion, or $1.40 per diluted common share, compared with $1.164 billion, or $1.12 per diluted common share, for the fourth quarter of 2000. The Company's fourth quarter and full-year 2001 results include a commitment to contribute $300 million of Fannie Mae common stock to the Fannie Mae Foundation.

*    *    *

> Operating net income and operating earnings per common share exclude the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of Financial Accounting Standard 133 (FAS 133) on January 1, 2001. Net income and earnings per share (EPS) for 2001 including FAS 133 items were $5.894 billion and $5.72, respectively. Net income and EPS for the fourth quarter of 2001, including FAS 133 market value changes, were $1.969 billion and $1.92, respectively. Page one of the charts with this release provides a reconciliation of operating net income and net income.

292.    The financial results released by defendants on January 14, 2002, were admittedly false and are included in Fannie Mae's massive December 6, 2006 $6.3 billion restatement.

293.    On January 15, 2002, a meeting of the Board of Directors was held. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Marron, Korologos, Mulcahy, Pickett, Swygert and Howard. At this meeting, Mudd again described the many challenges of 2001 for the Board, noting that *the 2001 Corporate Objectives were put in place to reflect a "normal*

*market place" in terms of rates, originations, expenses and the Company's own initiatives*. Mudd then detailed the major negative events of 2001 for the Board which included: (1) a change in the Administration as well as in the Congress; (2) the eleven cuts by the Federal Reserve in the Fed Funds Rate; (3) the continued decline of the equity markets; and (4) the 9-11 attacks. Mudd reported to the Board that despite all of the challenges of 2001, Fannie Mae – once again – had a record breaking year and achieved a 21.2% operating EPS growth. As presented to the Board, this represented Fannie Mae's *56th consecutive quarter of double digit growth in operating EPS*.

294.    That same day, January 15, 2002, the Compensation Committee held a meeting at which Vincent Mai ("Mai"), at that time a Fannie Mae director, reiterated that, as indicated in the earnings release from the previous day, 2001 was a tremendously successful year for Fannie Mae, with the Company's EPS growth at 21.2%. Mai also asked the Committee to make an assessment of the Company's performance to determine the payout for the 1999 through 2001 Award Period and noted that achievement against the financial goal was based on actual EPS growth relative to the goal targets.

295.    Given Fannie Mae's sensitivity to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, Fannie Mae's smooth earnings results – which represented its 56th consecutive quarter of double digit growth regardless of the previously discussed change in Administration, eleven interest rate cuts, continued decline in the equity markets and the events of September 11, 2001 – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet no defendants stepped forward to question the results, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

296.    On February 19, 2002, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Mulcahy, Pickett, Swygert and

Howard. At this meeting, Thomas E. Donilon ("Donilon"), the Company's Executive Vice President of Law and Policy, delivered to the Board a special report on Fannie Mae's corporate governance practices and noted that the collapse of the Enron Corporation had prompted investors, regulators and Congress to take a comprehensive look at a range of corporate practices to ensure that companies had in place strong risk management, adequate controls and financial disclosures sufficient for investors to understand financial risks. Donilon reviewed a number of Enron's practices that were under scrutiny and provided the Board with information on Fannie Mae's practices in each area. The areas purportedly reviewed included corporate governance and Board practices, external auditor polices and practices, public financial disclosures, regulatory oversight, income taxes paid, insider stock trading policies, methods for considering employee concerns, earnings quality, off-balance sheet partnerships and derivatives.

297.    At this same meeting, Gerrity presented the Audit Committee Report informing the full Board that the Committee received a report from Spencer, Fannie Mae's Senior Vice President and Controller, on year 2001 financial statements, indicating excellent overall results, including a 30% increase in taxable- equivalent revenue, excellent interest rate risk management in light of high volatility, and the lowest credit losses since 1983.

298.    The Audit Committee met later that day on February 19, 2002. Attendees included defendants Gerrity, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At that meeting, Spencer reviewed the Company's net operating income for 2001 versus 2000, stating that Fannie Mae posted (reported) operating EPS of $5.20 in 2001, a 21% growth rate over 2000.

299.    At this same meeting, Rajappa reported that Fannie Mae had conducted due diligence efforts in response to the Enron events and discussed the steps that KPMG and internal audit were taking to minimize the likelihood of these types of events from occurring at Fannie Mae. Rajappa noted that the Audit Committee of the Board was to provide oversight, Fannie Mae management was

to establish controls, and KPMG and Internal Audit were to assess and report on the adequacy of controls. Rajappa described the Company's controls and audit activities to ensure auditor independence, earnings accuracy, appropriate model use, appropriate disclosures, adequate regulatory oversight, and appropriate management "tone at the top."

300.    Given Fannie Mae's sensitivity to economic conditions and interest rate fluctuations, the continually growing financial results enjoyed by Fannie Mae – which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates – as well as the warnings and discussion on the fraudulent manipulations that occurred at Enron – should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet no defendant stepped forward to question the result, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

301.    On March 20, 2002, Raines, as the Chairman of the Corporate Governance Task Force of the Business Roundtable, gave testimony before the U.S. House Committee on Financial Services. At this hearing, Raines stated:

> The Business Roundtable is recognized as an authoritative voice on matters affecting American business corporations and as such has a keen interest in corporate governance. Indeed, as leaders of some of our nation's largest businesses, the Roundtable has the strongest interest in corporate governance practices that secure the confidence of shareholders, employers, policy makers and other constituencies.

> *       *       *

> We understand why the American people are stunned and outraged by the failure of corporate leadership and governance at Enron. *It is wholly irresponsible and unacceptable for corporate leaders to say they did not know – or suggest it was not their duty to know – about the operations and activities of their Company, particularly when it comes to risks that threaten the fundamental viability of their Company.*

> The success of the American free enterprise system obtains from the merger of corporate responsibility with individual responsibility, and The Business Roundtable believes that *responsibility starts at the top.*

\*      \*      \*

In light of the public interest in issues growing out of the Enron situation, we thought it would be useful to articulate a set of guiding principles of corporate governance.

First, *the paramount duty of the Board of directors of a public corporation is to select and oversee competent and ethical management to run the Company on a day-to-day basis.*

Second, it is the responsibility of management to operate the Company in a competent and ethical manner. Senior management is expected to know how the Company earns its income and what risks the Company is undertaking in the course of carrying out its business. *Management should never put personal interests ahead of or in conflict with the interests of the Company.*

Third, *it is the responsibility of management, under the oversight of the Board and its audit committee, to produce financial statements that fairly present the financial condition of the Company and make sufficient disclosures to investors to permit them to assess the financial and business soundness of the Company.*

Fourth, it is the responsibility of the Board and its audit committee to engage an independent accounting firm to audit the financial statements prepared by management and to issue an opinion on those statements based on Generally Accepted Accounting Principles.

*The Board, its audit committee and management must be vigilant to ensure that the corporation or its employees do not take any actions that compromise the independence of the independent accounting firm.*

Fifth, it is the responsibility of the independent accounting firm to ensure that it is in fact independent, is without conflicts of interest, employs highly competent staff, and carries out its work in accordance with Generally Accepted Auditing Standards.

It is also the responsibility of the independent accounting firm to inform the Board, through its audit committee, of any concerns it may have about the appropriateness and quality of significant accounting treatments, business transactions, and about any weaknesses in internal control systems. The firm should do so in a forthright manner and on a timely basis, whether or not management has communicated to the Board or the audit committee on the same matters.

Sixth, the Company has a responsibility to deal with its employees in a fair and equitable manner. Employee benefit plans, once established, should be operated in a manner that is fair and equitable to all employees.

These responsibilities, and others, are critical to the functioning of the modern public corporation. No law or regulation alone can be a substitute for the voluntary adherence to these principles by corporate directors and management and by the accounting firms retained to serve American corporations.

Even as Raines was making this speech to Congress, he and the other defendants had been and were then violating, and would continue to violate virtually every one of these principles – and now deny and try to cover up their liability for having done so.

302.    On April 15, 2002, Fannie Mae issued a press release entitled "Fannie Mae Reports Record First Quarter 2002 Financial Results; Operating Net Income of $1.519 Billion up 22.7 Percent Over First Quarter 2001; Operating Earnings Per Diluted Common Share of $1.48 up 23.3 Percent." Commenting on these results defendant Raines stated: "Continued strong growth in top-line revenues enabled Fannie Mae to report its 57th consecutive quarterly increase in operating EPS during the first quarter of 2002. *This is a performance record few other companies can match*."

303.    Additionally, as to the Company's outlook, defendant Howard reiterated the Company's positive outlook for its financial performance. "We continue to expect that growth in Fannie Mae's operating earnings per share in 2002 will be above the very positive long-term EPS trend we anticipate for the company," said Howard. Longer term, Howard said, Fannie Mae should benefit from strong growth in residential mortgage debt, which the company expects to increase by an average of 8%-10% per year during the current decade. Howard added, "Over this period we expect to continue to be able to grow both our book of business and our earnings at rates that exceed the growth in mortgage debt."

304.    Howard noted that during the quarter the pace of commitments to purchase mortgages for portfolio fell to $50.8 billion from the record $100.5 billion in the fourth quarter of 2001. Said Howard, "With mortgage-to-debt spreads tightening we backed away from the market somewhat in February and March. We expect that we will have more attractive opportunities for portfolio commitments later in the year, and believe that portfolio growth for the full year will approximate the growth rate achieved in 2001." Howard said that with year-to-date business growth so strong and with the interest margin rising in February and March, the slower pace of portfolio commitments

over the past two months would not have any discernable effect on the Company's net income outlook.

305.    The financial results released by defendants on April 15, 2002, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.  Moreover, the "tightening mortgage-to-debt spreads" was a "red flag" to defendants regarding Fannie Mae's (once again) record earnings, yet they did nothing to question the results and stop the accounting manipulations from continuing.

306.    As 2002 progressed, Barnes continued to be concerned about serious flaws in AIMS and several of the Controller's division's amortization processes.  He further became aware that Fannie Mae was routinely using negative factors for discount and premium in order to revise current period net income.  This use of negative factors allowed management to incorrectly report income by incorporating it onto the balance sheet through accumulated amortization, thereby removing or adding income or expenses from the Company's income statement, even if those amounts had already been amortized.  In May 2002, he informed his superiors that Fannie Mae's use of retroactive and negative factors had caused improper changes to the Company's reported income, but his concerns again were ignored.

307.    On June 13, 2002, after Barnes realized Fannie Mae's use of negative factors had caused some of the Company's mortgage and MBS related assets to appreciate rather than to depreciate – a result completely inconsistent with GAAP and economic realities – he once again raised concerns about the use of negative factors to his superiors.  Again, because it was in the personal financial interests of those at the highest levels of the Company, from Raines on down, Barnes' concerns went unaddressed.

308.    Barely a month later, on July 15, 2002, Fannie Mae issued a press release entitled "Fannie Mae Reports Record Second Quarter 2002 Financial Results; Operating Net Income of

$1.573 Billion up 19.7 Percent over Second Quarter 2001; Operating Earnings Per Diluted Common Share of $1.55 up 22.0 Percent." Therein, the Company stated:

> Fannie Mae, the nation's largest source of financing for home mortgages, today reported operating net income for the second quarter of 2002 of $1.573 billion, a 19.7 percent increase compared with the second quarter of 2001. Operating earnings per diluted common share (operating EPS) of $1.55 rose 22.0 percent above the same period in 2001.
>
> For the first six months of 2002, Fannie Mae's operating net income was $3.091 billion, compared with $2.553 billion for the same period in 2001. Operating EPS for the first six months of 2002 was $3.03, or 22.7 percent above the first six months of 2001.
>
> *       *       *
>
> Operating net income and operating EPS exclude the variability in earnings that results from including unrealized gains and losses from the change in the market value of purchased options under Financial Accounting Standard No. 133 (FAS 133). Also excluded is the one-time cumulative change in accounting principle from the adoption of FAS 133 on January 1, 2001. Operating net income and operating EPS provide consistent accounting treatment for purchased options and the options embedded in callable debt, and are the performance measures used by company management.
>
> Net income for the second quarter of 2002 including FAS 133 items was $1.464 billion, an increase of 4.4 percent over the second quarter of 2001. EPS including FAS 133 items was $1.44, 5.9 percent above the same period last year. Net income and EPS for the six months ended June 30, 2002, including FAS 133 items, were $2.672 billion and $2.61, respectively. Page one of the attachments to this release provides a reconciliation of net income and operating net income.

309.    The financial results released by defendants on July 15, 2002, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.

310.    On July 15 and 16, 2002, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Malek, Mulcahy, Pickett, Swygert and Howard. At this meeting, Donilon addressed the Board on the increased intensity of policy issues public companies had to address since the collapse of Enron. At the same meeting, Arne Christenson outlined for the Board the three components of Fannie Mae's strategy to increase its political connection and influence with the Administration: first, to build relationships with key

policymakers; second, to engage on the facts in response to policy concerns; and third, to forge a partnership with the Administration on a positive housing agenda. One of the ways defendants sought to achieve these goals was through the Fannie Mae Foundation, as well as defendants' connections.

311. By September 23, 2002, it was clear to Barnes that management in the Controller's division had no intention of responding to his disclosures of accounting impropriety. The culture in the Controller's division was such that many employees knew or suspected that the Company was regularly engaging in improper income management, and it became a joke that the Controller's division could produce any income statement that the Company wanted. Therefore, in response to a September 17, 2002, presentation to employees by Raines regarding good corporate governance, Barnes sent a memorandum directly to defendants Raines and Howard regarding the serious financial improprieties going on at Fannie Mae.

312. In the September 23, 2002 memorandum, Barnes highlighted that (i) reconciliation differences from systems were being input as future deferrals instead of the current period's income and expenses; (ii) that the Controller's division was intentionally limiting the AIMS system capabilities so that it would not provide audit trails for modeling; (iii) that the division had a practice of using negative factors in amortization and allowed amortization to exceed 100%; (iv) that the division routinely understated and overstated income; (v) that the division managed income to meet the Company's desired objectives; (vi) that the division used on top entries in order to manage income and margin calculations; and (vii) that the Company was using a miscellaneous balance sheet account in order to manage reporting of some income in periods other than when it was received.

313. Barnes also noted that there were serious problems with the amortization of purchase discounts and premiums, and that "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of the current financial statements and those we will issue after

beginning compliance with SEC reporting in 2003." Barnes urged defendants Raines and Howard to investigate the issues he had identified.

314.    Of course, given that Raines and Howard were not only profiting from these blatant GAAP violations, but engineering them, neither of them responded to his concerns or took corrective action. Thus, the practices Barnes identified continued. Although Barnes sent the memorandum to defendants Raines and Howard as a "Finance Division Manager," without providing his name, the information he provided was easily traceable to him because he was one of only a handful of managers who possessed any detailed information about Fannie Mae's amortization processes. Further, as previously noted, he had been raising similar concerns with his managers over the preceding several years.

315.    Having seen no corrective action by defendants Raines or Howard, at the beginning of October 2002, in a meeting of the Controller's division management, Barnes asked questions regarding a number of the Company's accounting practices, including the practice of manipulating factors to generate desired levels of income, factor generation resulting in over 100% amortization of assets, the use of negative factors in amortization, use of "on-top" adjustments to manage income, and the Company's deliberate development of AIMS so that it would not retain audit trails of modeling runs generated and characteristics used, except those that the Company desired. Yet nothing was done to address these problems.

316.    On October 15, 2002, Fannie Mae issued a press release entitled "Fannie Mae Reports Record Third Quarter 2002 Operating Results; Operating Net Income of $1.631 Billion up 18.4 Percent over Third Quarter 2001; Operating Earnings Per Diluted Common Share of $1.62 up 21.8 Percent; Net Interest Margin Stable at 116 Basis Points." Therein, the Company stated:

> Fannie Mae, the nation's largest source of financing for home mortgages, today reported operating net income for the third quarter of 2002 of $1.631 billion, an 18.4 percent increase compared with the third quarter of 2001.

Operating earnings per diluted common share (operating EPS) of $1.62 rose 21.8 percent above the same period in 2001.

For the first nine months of 2002 Fannie Mae's operating net income was $4.722 billion, compared with $3.929 billion for the same period in 2001. Operating EPS for the first nine months of 2002 was $4.65, or 22.4 percent above the first nine months of 2001.

*     *     *

Operating net income and operating EPS exclude the variability in earnings that results from including unrealized gains and losses from the change in the time value of purchased options as required under Financial Accounting Standard No. 133 (FAS 133). Also excluded is the one-time cumulative change in accounting principle from the adoption of FAS 133 on January 1, 2001. Operating net income and operating EPS provide consistent accounting treatment for purchased options and the options embedded in callable debt, and are the performance measures used by Company management.

Net income on a generally accepted accounting principles (GAAP) basis for the third quarter of 2002 including the above FAS 133 items was $994.3 million, a decrease of 19.1 percent compared with the third quarter of 2001. GAAP EPS was $0.98, 17.6 percent below the same period last year. The decline in GAAP net income and EPS in the third quarter was due to a $965.2 million increase in unrealized losses in the time value of purchased options. This increase was driven by a change in interest rates that caused a shift in the value under FAS 133 between the time value and the intrinsic value of purchased options that is unrelated to portfolio rebalancing actions during the quarter. Moreover, because Fannie Mae holds options to maturity or exercise, mark-to-market losses in time value are never realized. The effects of FAS 133 are discussed more fully in the FAS 133 section later in this release. GAAP net income and EPS were $3.667 billion and $3.59 for the nine months ended September 30, 2002, and $3.925 billion and $3.80 for the nine months ended September 30, 2001. Page one of the attachments to this release provides a reconciliation of net income and operating net income.

317.    The financial results released by defendants on October 15, 2002, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.

318.    The Board of Directors later met on October 15, 2002. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Marron, Mulcahy, Pickett, Swygert and Howard. At this meeting, Howard addressed the Company's duration gap and the Company's manufactured housing bond investments. The duration gap tells how cash flows for assets and liabilities are matched. A positive duration gap is when the duration of assets exceeds the

duration of liabilities (which means greater exposure to rising interest rates). If rates go up by 1% the price of assets fall more than the price of liabilities. A negative duration gap is when the duration of assets is less than the duration of liabilities (which means greater exposure to declining interest rates). If rates go down by 1% the price of assets goes up less than the price of liabilities. Howard reported that due to the Company's rebalancing efforts and market development that, as of the morning of the Board meeting, the duration gap had moved to minus five months – in from minus ten months at the end of September and within management's target range, thus making the Company less at risk for declining interest rates than it had been – which was significant given the declining interest rate environment at the time.

319.    The Audit Committee met on October 15, 2002. Attendees included defendants Gerrity, Malek (by phone), Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Rajappa discussed "key performance indicators" ("KPIs"), including those related to financial reporting risks. He noted that it was necessary to ensure that general ledger accounts and sub ledger accounts were all reconciled and reconciling items cleared in a timely manner so that there would be no unanticipated financial impacts.

320.    The Board of Directors met on November 19, 2002. Attendees of the meeting included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett, Swygert and Howard. Howard reviewed the current downturn in the industry, which had resulted in rating agencies downgrading manufactured housing bonds. Howard reported on the Company's manufactured housing bond portfolio initiatives, including modeling and tracking potential exposure, valuing the securities and engaging on the issue of protecting the servicing on the bonds and the collateral underlying the securities. In response to a question from Mulcahy, Howard said that he did not believe that it was appropriate at this time to reserve against potential exposure on the bonds.

321.    Only four weeks later, on December 17, 2002, Conseco Inc. ("Conseco") filed for bankruptcy. Conseco was a mortgage lender that specialized in manufactured housing loans. Fannie Mae held as much as $8 billion in bonds backed by loans made to purchase manufactured housing. Conseco was the original servicer for 70% of those bonds. As a result of Conseco's ultimate restructuring, the manufactured housing-backed bonds that Conseco sold had a lesser claim on the cash flows from the underlying loans. This created a serious problem when Fannie Mae later refused to take a writedown on those bonds (doing so would have meant that the Company would have missed earnings targets and thus would have cost Company insiders their option grants).

322.    The Board of Directors met on January 9, 2003. Attendees included defendants Raines, Mudd, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett and Swygert. At this meeting, the Board was asked to and did authorize the Company to announce its intent to name Howard as Vice Chair, and to nominate Howard to be elected to the Board.

323.    On January 15, 2003, Fannie Mae reported financial results for the year ended December 31, 2002. Fannie Mae's reported net income was $4,619 million in 2002 compared with $5,894 million in 2001, and earnings per diluted common share were $4.53 in 2002 compared with $5.72. For 2002, strong growth in net interest income of 30.6% and guaranty fee income of 22.5% were more than offset by a $4,507 million increase in mark-to-market losses in the time value of purchased options used to hedge the Company's interest rate risk. Commenting on these results, defendant Raines stated: "*In an extremely difficult business environment that affected virtually every company in America, Fannie Mae's operating results in 2002 were among the best in the company's history*." Raines noted that in 2002 Fannie Mae reported a second consecutive year of growth in operating EPS in excess of 20%, and posted its 16th consecutive year of double-digit growth in operating EPS. Raines said credit-related losses remained at historically low levels in

2002, and that in spite of volatile interest rates the duration gap on the Company's mortgage portfolio remained within its preferred range for all but three months of the year.

324.    The financial results released by defendants on January 15, 2003, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.

325.    In the meeting packet for the Board of Directors meeting on January 21, 2003, which all members of the Board received, it stated:

"May you Live in Interesting Times[.]"

**Toughest business environment in recent memory.**

*    *    *

Strong performance in a challenging environment.

The juxtaposition of the foregoing statements should have been and undeniably was a "red flag" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet none of the defendants stepped forward to question the results, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

326.    The Board of Directors met on January 21, 2003. Attendees included defendants Raines, Mudd, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett, Swygert and Howard. At this meeting, Mudd delivered a brief report on year-end 2002 corporate performance. Mudd described 2002 as a record year for the Company and stated that during 2002 Fannie Mae had achieved "**record mission performance in a challenging environment**; established new records for business performance; demonstrated global leadership in financial safety and soundness, and continued leadership in risk management; recorded outstanding financial performance; continued to refine the corporation's corporate culture to enhance strategy execution; and expanded the corporation's position as a technology leader." Again, no one challenged Fannie Mae's defiance – through obvious accounting manipulations – of business realities regarding its (reported) earnings.

327. That same day, on January 21, 2003, the Audit Committee held a meeting. Attendees included Gerrity, Mulcahy and Mudd. KPMG representatives also attended. At this meeting Ann Eilers ("Eilers") (former Chief Audit Executive of the Company) discussed the December 2002 KPIs and referred to the derivatives valuations. As presented to the Board, one of the model assumptions, volatility, varied from market. *Eilers also noted that management, through its continuous monitoring of model assumptions, had been in the process of evaluating a model change and by incorporating this, the December results were in the acceptable range*. Despite this clear admission that management was tinkering with the derivatives modeling to achieve the desired results, defendants failed to question or stop this or the other accounting manipulations at the Company.

328. The Board of Directors met on February 12, 2003. Attendees included defendants Raines, Ashley, Duberstein, Malek, Korologos, Marron, Pickett, Swygert and Howard. The Board discussed various critical accounting policies. The Board of Directors met again on February 18, 2003. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett, Swygert and Howard. At this meeting, Howard delivered the Financial Report and reviewed January 2003 operating net income, actual versus plan; and 2002 net income, operating versus GAAP. Howard noted January income well above plan with record volume for the month and fee and other income especially well above plan.

329. The Audit Committee also met on February 18, 2003. Attendees included defendants Gerrity, Malek, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer informed the Board that Fannie Mae had achieved record core business earnings for 2002 and noted that the Company posed core business earnings of $6.4 billion, an increase of 21% over 2001. As presented to the Board, this was the *16th consecutive year that Fannie Mae posted an increase in core business earnings*. At this same meeting, Spencer reported on the

financial reporting restatement at Freddie Mac, stating that currently there were two transactions that were known to be in question, a spread lock transaction and a resecuritization of a mortgage security transaction. Spencer provided details on both transactions.

330.    The sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, along with the parallels between Fannie Mae and Freddie Mac and the volatility created by FAS 133 should have and undeniably did alert defendants to accounting issues with Fannie Mae's once-again record earnings. Yet again, none of the defendants heeded these "red flags" or stepped forward to question the results, to stop the accounting manipulations from occurring or to prevent the Company from reporting false financial results.

331.    Effective March 31, 2003, the Company decided to voluntarily register its common stock with the SEC under §12(g) of the 1934 Act. Also beginning in March 2003, Raines and Howard began voluntarily certifying the Company's periodic financial reports on Forms 10-Q and 10-K under Sarbanes-Oxley. Thus, when Fannie Mae filed its Annual Report with the SEC on Form 10-K for FY02 on March 31, 2003, Raines and Howard certified it under Sarbanes-Oxley. The Company's Form 10-K was also signed by defendants Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett and Swygert. The Annual Report was signed by Spencer and defendant Howard, which reaffirmed the Company's previously announced financial results and incorporated its financial results for 2002.

332.    On April 14, 2003, Fannie Mae reported financial results for the first quarter of 2003. Fannie Mae's reported net income for the first quarter of 2003 was $1,941 million, a 60.5% increase compared with $1,209 million in the first quarter of 2002. Diluted EPS were $1.93 in the first quarter of 2003, up 65% from $1.17 in the first quarter of 2002. Strong growth in net interest income contributed significantly to the Company's reported results. Net interest income for the first quarter of 2003 was $3,368 million, up 38.6% from the first quarter of 2002.

333.    Commenting on these results, defendant Raines stated: "Fannie Mae recorded extremely strong and balanced growth during the first quarter of 2003, *continuing a record of financial performance that few other companies have matched*." Raines noted that compared with the first quarter of 2002 the Company experienced double-digit growth in both its mortgage portfolio and outstanding MBS, and also posted increases in its net interest margin and average guaranty fee rate. Raines added that Fannie Mae's first quarter credit-related losses were $14 million below the previous quarter and $1 million below the first quarter of 2002. Said Raines, "For the last few years housing has been one of the notable bright spots of the U.S. economy. Fannie Mae's disciplined response to the demands for credit from this sector has benefited both home buyers and our shareholders."

334.    The financial results released by defendants in its 2002 10-K and in its press release on April 14, 2003, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.

335.    On April 15, 2003, the Board of Directors held a meeting. Attendees included defendants Raines, Mudd, Ashley, Duberstein, Korologos, Malek, Mulcahy, Pickett, Swygert and Howard. At this meeting, Duberstein delivered an Assets and Liabilities Policy Committee Report and reported that the Committee had received its annual derivatives report from Linda Knight ("Knight"), Fannie Mae's Senior Vice President and Treasurer. He noted that Knight reviewed the volume and composition of the Company's derivatives book, the Company's position in the world derivatives market, reviewed the accounting impact of the Company's use of derivatives, the credit quality of the derivatives book, counterparty exposure management, and discussed the Company's enhanced derivatives disclosures made in Fannie Mae's recently released Form 10-K. Howard delivered the Finance Report and the Mortgage Portfolio Report. Howard reviewed the core business earnings including: first quarter 2003 results versus first quarter 2002 results; and first

quarter 2003 results versus plan, fees and other income. He reported that the year was off to a strong start, with first quarter core business earnings 21.8% higher than the period one year ago and taxable-equivalent revenue 26.9% higher. Howard stated that the strong first quarter performance was supported by growth in net interest income and fee income, reflecting lower rates, strong volume and resulting higher margins. Howard then delivered a report on the Company's portfolio duration gap and reviewed core business earnings versus GAAP results, focusing on the key difference – purchased options expense.

336.    The net interest income, of course, was being manipulated through accounting devices. At the same time Howard was trumpeting that income, Barnes was once again calling to his superiors' attention his concerns regarding Fannie Mae's amortization accounting practices. He told Stawarz that he felt that it might be necessary to again make the Company's management aware that several of the amortization accounting policies and procedures were not in compliance with GAAP, and affected the accuracy of Fannie Mae's financial reporting. Stawarz agreed that there were significant problems, but told Barnes that in Fannie Mae's corporate climate – a climate in which employees actually joked about improper income management because it was such a regular occurrence, and a climate in which employee morale suffered because management offered promotions, bonuses, and perks only to employees who supported management's improper goals – he should not bother. As a result of this discussion, Barnes decided to undertake a detailed study of Fannie Mae's amortization accounting and other areas in which he had noticed irregularities, in order to document the seriousness and prevalence of these irregularities.

337.    Barnes then began a detailed study of the unamortized balances he had come across as part of his responsibility for 400 general ledger accounts. Over a period of weeks, he painstakingly reviewed the Company's amortization transactions and found abundant evidence of the

same kinds of problematic and unlawful financial practices he had identified in his September 23, 2002, memorandum to defendants Raines and Howard.

338.    On May 15, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was certified by defendants Raines and Howard. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods." The financial results included in Fannie Mae's 1Q03 Form 10Q were admittedly false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

339.    The Board of Directors met on May 20, 2003. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Mulcahy, Pickett and Swygert. At this meeting, Raines provided an update on the Freddie Mac situation and related events, including statements by Freddie Mac, media coverage, scheduled Congressional hearings, and legislation proposed by Representative Baker. Raines reviewed the Company's actions over the prior week, including meeting with policymakers, media efforts, investor communications, and a new advertising initiative.

340.    In June 2003, Fannie Mae's rival, Freddie Mac, stunned the investment community when it disclosed it had understated profits by approximately $4.5 billion for FY00-FY02 in an effort to smooth earnings and maintain its image on Wall Street as a steady performer. The accounting crisis resulted in the ouster of several top executives at Freddie Mac, investigations by the DOJ and the SEC, and a $400 million fine in a settlement with the SEC and OFHEO.

341.    The Board of Directors met via teleconference on June 13, 2003 to discuss the Freddie Mac situation.    Participants included defendants Raines, Mudd, Howard, Ashley, Duberstein, Korologos, Malek, Marron, Pickett and Swygert.

342.   The Board of Directors met on June 27, 2003. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett and Swygert. Howard addressed the Freddie Mac accounting issues that had been raised publicly, discussing seven Freddie Mac accounting issues disclosed in Freddie Mac's public statements, including security classification, accounting for derivative instruments, asset transfers and securitizations, and valuation of financial instruments.

343.   Raines then reviewed the Freddie Mac related items since the last Board meeting, including statements by Freddie Mac, media coverage, scheduled Congressional hearings, and legislation proposed by Representative Baker. Raines reviewed the Company's actions over the past week including meetings with policymakers, media efforts, investor communications, and a new advertising initiative. The similarities between Fannie Mae and Freddie Mac and the common issues that were the focus of the Freddie Mac violations should have and did serve as "red flags" to defendants, who continued to ignore them because of their own personal, political and financial conflicts of interest.

344.   The Board of Directors met again on July 14 and 15, 2003. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy and Swygert. At this meeting, Howard introduced a discussion on risk tolerance viewed from the corporate wide perspective. He reviewed various alternative gauges of risk appetite indicators. He noted the key benefits conveyed by Fannie Mae's Charter – debt market access and capital requirements that reflected the low-risk nature of the Company's business. Howard reviewed the Company's goal to·be and to be perceived as a low-risk Company, reflected in unquestioned capital adequacy, a stable pattern of earnings, and a high "stand alone" credit rating.

345.   Howard then reported on the Company's second quarter financial results. He reported on core business earnings and core business earnings versus GAAP results for the second

quarter 2003 versus second quarter 2002. Howard reviewed the growth in core net interest income including amortization expense driven by an increase in the net interest margin. He also reviewed the growth in guaranty fee income driven by an increase in the effective guaranty fee rate over the same period. Howard reported on income increases in the quarter from transaction fees, technology fees, and multifamily fees.

346.    Mudd highlighted the strong results that year, including record volumes in all channels. Mudd reported that Fannie Mae was on track for another strong year with strong performance in a challenging environment. As with many other seemingly oxymoronic statements, Mudd's statement that Fannie Mae was "on track for another strong year with strong performance in a challenging environment" should have alerted and did alert defendants that Fannie Mae's accounting was being manipulated, yet defendants did nothing to stop it.

347.    On July 15, 2003, Fannie Mae reported financial results for the second quarter of 2003. The Company reported core business earnings at $1,860 million, up 18.2% over the second quarter of 2002 and core business diluted EPS at $1.86, up 20%.

348.    Commenting on these results, defendant Raines stated: "Fannie Mae delivered an *extremely strong financial performance in the second quarter*, again demonstrating the success of our balanced and disciplined strategies for growth. With interest rates at their lowest levels in 45 years, the efficiency of our business model enabled us to finance a truly extraordinary volume of mortgage product." Said Raines, "The quality and liquidity of our mortgage-backed securities have proven to be invaluable in this environment. Our outstanding mortgage-backed securities increased at a 56 percent rate during the quarter, and over the past four quarters they have grown by more than 30 percent, to over $1.2 trillion. We anticipate that these loans will generate profitable revenues for us for many years to come." Raines added that the Company strengthened its capital base by $1.2

billion during the quarter, while at the same time taking advantage of market opportunities to repurchase 5.3 million shares of common stock.

349.    Fannie Mae's financial results, announced on July 15, 2003 were admittedly false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

350.    The Audit Committee also met on July 15, 2003. Attendees included defendants Gerrity, Malek, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer provided a summary of the seven accounting issues at Freddie Mac, as identified by the internal investigations report as of July 22, 2003. With respect to Freddie Mac's accounting issues, Spencer discussed with the Board: (1) FAS 133 applicability to forward commitments; (2) the topic of security classification, specifically, moving securities from "held to maturity" to "available for sale"; and (3) controls surrounding the valuation of financial instruments.

351.    The accounting manipulations at Freddie Mac were detailed in a 107-page report released on July 23, 2003 after an investigation by a team of attorneys led by former SEC General Counsel James R. Doty. The Doty Report was commissioned after anonymous letters were sent to defendant Raines, the head of Fannie Mae, and the finance rival of Freddie Mac. While Raines was more than willing to expose the fraud at his Company's major rival, he did just the opposite – nothing – when he received the anonymous memo from Barnes detailing his own Company's accounting fraud. This is particularly true given that Freddie Mac was engaged in similar misconduct to Fannie Mae and was violating many of the same accounting rules Fannie Mae has been found to have violated, specifically, FAS 91 and 133.

352.    A little over a week later, on July 23, 2003, Barnes completed his research regarding Fannie Mae's unamortized balances. Over the prior months he had confirmed and documented his earlier suspicions that Fannie Mae's general ledger accounts reflected a large number of irregular unamortized balances, that there were numerous amortization factor errors produced by the modeling

system, and that the amortization speeds employed by the Company frequently conflicted with GAAP and economic realities. Upon completing his research and confirming that there were significant problems with Fannie Mae's amortization accounting, Barnes attempted, without success, to set up a meeting with Rajappa, the head of the Internal Audit division.

353.    On July 28, 2003, Barnes alerted Lewers to a major problem with a July 2003 factor change. This factor change produced an unusually large number of factor errors, resulting in approximately 40 pages of errors. As he had done on numerous prior occasions, Barnes again told Lewers that there were serious problems with the AIMS system and how it was being used by Fannie Mae. He also expressed concern to Lewers regarding Juliane's request that he provide him with expected PDI results before corrections were made. Barnes told Lewers that he thought these requests were a clear sign that the Company intended to intentionally misstate income, and informed Lewers that Juliane's requests were a clear red flag of improper practices.

354.    His concerns were dismissed. So, on July 29, 2003, Barnes again attempted to set up a meeting with Rajappa, this time by e-mail. Barnes wrote Rajappa, "it is necessary that I schedule an important meeting with you regarding analysis and research I have been conducting for a number of weeks."

355.    That same day Pennewell informed Barnes that the Company had promoted Juliane to Director, and that Barnes would begin reporting to him. Barnes explained to Pennewell that it violated internal controls for him to report to Juliane, since he would then be responsible for both the AIMS and PDI systems, and would be in charge of both the accounting and estimating sides of amortization accounting. Nevertheless, the change was made.

356.    By August 2003, OFHEO initiated an investigation of Fannie Mae's accounting practices, in which the agency found a pattern of accounting manipulation aimed at smoothing out volatility in profits from quarter-to-quarter similar to which occurred at rival Freddie Mac.

Throughout the process, Fannie Mae's management was sharply criticized for failing to fully cooperate in the investigation.

357.    On August 1, 2003, Juliane requested yet another improper factor change from Barnes. During the July 2003 closing, the Controller's office management indicated, during routine meetings related to the monthly closing, that Fannie Mae's net interest income for the month would be approximately $6.5 million less than management had projected. Barnes' group's preliminary amortization had already been completed. However, on August 1, 2003, Juliane told him that there was a single factor error in one FAS 91 type that needed to be corrected. When Barnes asked Juliane for documentation to support the factor change and to create an audit trail, Juliane was unable to provide any at the time. Only later did a member of Juliane's staff produce data in an e-mail memorandum that represented the factor.

358.    When Barnes processed the new factor change, he realized that the impact of the new factor change turned out to be an increase in income of $6.5 million. Given the exact match between the results of the factor change and the income shortfall management had commented on only a few days earlier, Barnes strongly suspected that management was preparing to intentionally misstate income to achieve its desired result of creating a picture of stable earnings.

359.    On August 4, 2003, Barnes met with Rajappa and Eilers of the Internal Audit division. Barnes gave them a memorandum titled "Unamortized Balances And Factor Analysis" that summarized the findings of his substantial research of the previous months. The memorandum raised several concerns regarding Fannie Mae's accounting practices, including: (i) the inadequacy of controls and review of accounting processes; (ii) the AIMS system's failure to retain audit trails; (iii) the lack of correlation between factors and loan prepayments; (iv) the inaccuracy of Fannie Mae's financial statements as a result of the arbitrary selection of factors; (v) the lack of adequate checks and balances for the PDI and AIMS systems; (vi) the problem of on top adjustments; (vii) the

problem of deferred assets being amortized in excess of 100% or in reverse; and (viii) the fact that improper amortization speeds were being used. All of the practices Barnes' highlighted were ones that caused Fannie Mae to not be in compliance with GAAP.

360.    In addition, Barnes provided Rajappa and Eilers with approximately 60 examples of factor errors and other analyses that he had completed relevant to the issues he raised. These 60 examples were all taken from the period ending June 30, 2003. Barnes also alerted Rajappa and Eilers to the most recent $6.5 million factor change, which he believed was an example of intentional misstatement of income. He told Rajappa and Eilers that, based on his research, Fannie Mae's amortization accounting was not in compliance with GAAP, and that the Company was manipulating and managing income in order to create a picture of artificially stable earnings.

361.    On August 8, 2003, Rajappa convened a meeting of the Controller's Office managers, including, among others, Barnes, Jonathan Boyles ("Boyles") of the Financial Standards division, Eilers, Paul Jackson and Gunes Kulaligil of the Internal Audit division, Deborah House ("House") from the Office of Corporate Justice, and two representatives from KPMG. Although Barnes had hoped that the purpose of the meeting would be to discuss how to rectify the problems he had identified, it quickly became clear that the purpose of the meeting was to determine how to justify the improper practices he had identified so that defendants Raines and Howard could certify Fannie Mae's financial statements by an August 15, 2003, deadline.

362.    The Audit Committee met on August 12, 2003. Attendees included defendants Gerrity, Malek, Pickett, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. *At this meeting, Gerrity discussed the accounting and other concerns raised by Barnes and his August 4, 2003, memorandum.* Because amortization and its effect on interest income and expenses were a vital part of Fannie Mae's business and its purported profits, defendants were well aware of both the significance and validity of Barnes' complaints – complaints that were later fully vindicated

by both OFHEO and the SEC in their investigations, and complaints that form a significant part of the ongoing earnings restatement that Fannie Mae has been ordered to undertake. These complaints transcended any "red flags" and rose to the level of direct knowledge of systematic accounting manipulations.

363.    So what did defendants do when presented with Barnes' allegations of accounting fraud? The same thing they did in response to the "red flags" that they routinely were presented with regarding accounting manipulations at the Company – they swept them under the rug. In fact, the Audit Committee "expressed satisfaction with the results of the review and commended . . . Kappler, . . . Rajappa, and . . . Spencer for working quickly and thoroughly to address" Barnes' "concerns." And they permitted the various amortization factor manipulations, "on top" entries, "other receivables" account, lack of an audit trail and other accounting violations to continue.

364.    On August 14, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. Even though Barnes had formally placed the Company, including Raines, Howard and the Audit Committee, on notice of flaws in Controller's division processes that resulted in the understatement and overstatement of income, both Raines and Howard certified the Company's financial results, which contained false information generated by the Controller's division's processes as stated by Barnes. The Company's Form 10-Q was certified by defendants Raines and Howard. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods." However, in reality the financial results included in Fannie Mae's 2Q03 Form 10-Q were false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

365.    In September 2003, Falcon, the head of OFHEO, personally confronted Raines, vowing to uncover and disclose any financial fraud at Fannie Mae. At a lunch meeting between the two, Falcon told Raines "I am not going to be dissuaded. This is necessary. If there are no problems with the company, the company will be better off, as we will so notify all interested parties. But we are going to go ahead."

366.    Nonetheless, in order to actually dissuade OFHEO, Fannie Mae deliberately excluded Barnes from assisting in the preparations for OFHEO's review of the Company's accounting policies, practices and internal controls. On October 3, 2003, the Company sent an e-mail to its financial management, including employees at or below Barnes' manager level, regarding the need to retain documents pertinent to OFHEO's investigation. However, Fannie Mae did not send the e-mail to Barnes, even though he had direct knowledge and involvement in the areas OFHEO planned to investigate, and despite the fact that other managers were included in the e-mail. In fact, Fannie Mae failed to even inform Barnes that OFHEO was planning a review of the Company's accounting policies, which certainly included his areas of responsibility.

367.    As a result of Fannie Mae's refusals to take the concerns Barnes had raised about financial and accounting practices seriously, and the retaliation he faced for raising these concerns, Barnes ultimately resigned from the Company in October 2003.

368.    On October 16, 2003, Fannie Mae reported financial results for the third quarter of 2003. In a revised press release on October 29, 2003, the Company reported net income at $2,666 million, up 168% over the third quarter of 2002 and diluted EPS at $2.69, up 175%. The Company also reported core business earnings at $1,826 million, up 12% over the third quarter of 2002; Core business diluted EPS at $1.83, up 13%.

369.    Commenting on these results, defendant Raines stated:

Fannie Mae delivered *outstanding financial results in the third quarter*, driven by record business volume and portfolio growth. In a quarter marked by *historic levels*

*of volatility* in the fixed income markets, our Company continued to benefit from the disciplined strategies for growth that have resulted in consistently strong financial performance through a wide range of economic and financial environments. The 21.9 percent year-to-date growth rate in our mortgage portfolio was achieved even as refinancing activity slowed and portfolio liquidations reached an all-time high. The strength of our performance also enabled us to repurchase nearly $6.8 billion in higher cost outstanding debt, which will benefit our shareholders in the future.

We are particularly pleased by the demonstrated effectiveness of our corporate risk disciplines in a *period of sustained volatility and stress in the financial markets*. Our duration gap remained within our preferred range in each month of the third quarter, and while our credit loss ratio increased slightly compared with the second quarter of 2003, this measure remains at extremely low historical levels.

370.    On November 14, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was certified by defendants Raines and Howard. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all that, in the opinion of management, are necessary for a fair presentation of the results for such periods." However, the financial results included in Fannie Mae's 3Q03 Form 10Q were admittedly false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

371.    The Audit Committee met on November 17, 2003. Attendees included defendants Gerrity, Malek, Pickett, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer provided the meeting's Critical Accounting Policy presentation on the amortization of deferred price adjustments, which includes premium/discount, buy-up/buy down and deferred guaranty fees – some of the precise areas identified by Barnes as having been systematically manipulated quarter after quarter and year after year. Spencer also described FAS 91, the accounting policy used for deferred price adjustments, provided a summary of the deferred balances as of September and discussed the criteria for Fannie Mae's amortization catch up policy. Spencer reported that the September 2003 catch up position was provided to KPMG in conjunction with their timely quarterly review procedures. Yet nothing was done to unwind or correct the ongoing problems with these accounting manipulations.

- 136 -

372.    The Board of Directors met on November 18, 2003. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Mulcahy, Pickett and Swygert. At this meeting, Mudd delivered the COO's Report in which he reviewed the status of corporate objectives through September stating that, as of the end of the third quarter, the corporation had met or was currently on track to meet at least 85% of its 2003 corporate objectives, outlining the challenges ahead in the remaining goal areas.

373.    On January 21, 2004, Fannie Mae reported financial results for 4Q03 and for the year ended December 31, 2003. For the fourth quarter of 2003, the Company reported net income of $2,196 million compared with $952 million for the fourth quarter of 2002, a 130.7% increase, and EPS of $2.21 per share compared with $.94 per share for the fourth quarter of 2002, a 135.1% increase.

374.    Commenting on these results, defendant Raines stated:

Fannie Mae delivered *outstanding business results in 2003*, capitalizing on opportunities and meeting the *significant challenges posed by a year of historic refinance and purchase volumes and volatility in our market*. Our financial performance was balanced and strong by virtually every measure, as we recorded our 17th consecutive year of double-digit growth in core business earnings per share (EPS). We also met our goal – established in 1999 – to double our core business earnings in five years. Equally important, we achieved our mission objectives, building on our demonstrated record of lowering costs, removing barriers, and increasing homeownership opportunities for American families.

Our business volumes in 2003 reached extraordinary levels – over 67 percent above those recorded in 2002 – and our capacity to handle these enormous demands for housing finance benefited home buyers and our shareholders alike. *Even as liquidations reached record levels*, our total book grew by 21 percent, and we delivered solid growth in each of our businesses. Strong year-over-year increases in core net interest and guaranty fee income, and the maintenance of credit losses within a historically low range, contributed to a 15.7 percent increase in core business EPS. *This exceptional financial performance in an extremely challenging environment* is a testament to the balance of our business model, and our strict adherence to the financial and risk disciplines that govern it.

Raines continued, "These business and mission successes were at times obscured during the year by regulatory and legislative concerns growing out of the situation at Freddie Mac." Raines said, "We

believe that Congress will not enact any changes to our regulatory status that would harm our ability to perform our mission and produce returns for our shareholders."

375.     Fannie Mae's financial results, announced on January 21, 2004, were admittedly false and represented a portion of Fannie Mae's massive $6.3 billion restatement. The Board continued to ignore the "red flag" of continued "record results" in such an "extremely challenging environment."

376.     Moreover, by this time, Fannie Mae had taken only about $200 million in writedowns on the Conseco manufactured housing bonds that, because of Conseco's restructuring, now had a lesser claim on the cash flows from the underlying loans. A writedown of approximately $1 billion was more appropriate. However, such a large writedown at the end of 2003 would have prevented Fannie Mae from hitting earnings numbers, which would have prevented the Company's senior executives from receiving a lucrative grant of stock options. Thus, the writedown was not taken. Defendants ignored the "red flags" related to the Conseco bankruptcy and its impact on Fannie Mae, for which OFHEO would later take them to task.

377.     The Audit Committee met on January 23, 2004. Attendees included defendants Gerrity, Malek, Pickett, Mulcahy, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer stated that Freddie Mac had not applied FAS 140, Accounting for Transfers of Financial Instruments and Extinguishment of Debt in their securitization program. She reported that Fannie Mae had only applied FAS 140 in 2003 but told the Board that the net effect of failing to apply FAS 140 in prior years was relatively immaterial – approximately $8.6 million over five years.

378.     The entire Board of Directors held a meeting later that same day, January 23, 2004. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Mulcahy and Pickett. At this meeting the Board received a letter dated January 7, 2004, from counsel for Martin Hacker, a shareholder of the Company. The letter demanded that the Board of Directors of the Company investigate certain alleged accounting and financial risk management

practices and to take necessary actions to recover damages for any false and misleading accounting that is identified. In response to this letter, the Board adopted a resolution which acknowledged that OFHEO was currently conducting a special examination of Fannie Mae's practices in the areas which were the subject of Mr. Hacker's letter. This resolution also formed a Review Committee – made up of Korologos, Ashley and Marron – to investigate these allegations.

379.    Also at this meeting, Mudd presented a summary of the Company's performance review and compensation processes and the Company's performance against each of its six strategic goals. Each member of the Board had received the Company's Corporate Performance Assessment. Mudd noted strong performance against each of the goals by the Company.

380.    The Audit Committee met on February 17, 2004. Attendees included Gerrity, Malek, Pickett, Mulcahy (by telephone), Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Spencer reviewed the Company's balance sheet and the statement of cash flows. She noted components of the cash flow activities that were impacted by the record refinance volumes. Spencer discussed the cash flow financing activities that showed increased activity in redemptions. In response to a question from Malek, Howard stated that the reason for the dramatic change in amortization – manipulations of which had been expressly called to defendants' attention by Barnes – on the cash flow statement between 2001 and 2003 was due to rate changes and loan purchases at a premium verses a discount.

381.    On March 12, 2004, the Audit Committee held a meeting. Attendees included defendants Gerrity, Malek, Mulcahy, Raines and Howard. KPMG representatives also attended. Spencer reviewed with the Committee the SEC's conclusions regarding the proper accounting treatment of buy-ups – which are negotiated up-front cash disbursements from Fannie Mae to lenders in return for a higher guarantee fee – which would result in treating them as assets that are marked to market through equity, beginning with buy-ups entered into after January 1, 2003.

Spencer explained the impact on the financials dated as of December 31, 2003, and walked the Committee through draft language in the Form 10-K relating to the issue.

382.    Given the sensitivity of Fannie Mae's business to economic conditions and interest rate fluctuations, including FAS 133 fluctuations, Fannie Mae's smooth earnings results – which consistently delivered quarter after quarter of record growth and profitability regardless of ups and downs in the economy and interest rates - as well as the admitted failure of Fannie Mae to apply FAS 140 to all of its previous years, should have been and undeniably were "red flags" of serious accounting manipulations to management, the Audit Committee and the Board as a whole. Yet again, no defendant stepped forward to question the results, to stop those manipulations from occurring or to prevent the Company from reporting false financial results.

383.    On March 15, 2004, Fannie Mae filed its Annual Report with the SEC on Form 10-K FY03. The Company's Form 10-K was signed by defendants Raines, Howard, Ashley, Gerrity, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Swygert and Rahl and the Annual Report was signed by defendants Howard and Spencer, which reaffirmed Company's previously announced financial results. Raines and Howard also certified the 10-K pursuant to Sarbanes-Oxley.

384.    On April 19, 2004, Fannie Mae issued a press release entitled "Fannie Mae Reports First Quarter 2004 Financial Results." The Company reported a 9.2% increase in core business earnings compared to the first quarter of 2003 and a 10.3% increase in core business EPS compared to the first quarter of 2003.

385.    The financial results released by defendants in its 2003 10-K and in its press release on April 19, 2004, were admittedly false and are included in Fannie Mae's massive $6.3 billion restatement.

386.    The Board of Directors met again on April 20, 2004. Attendees included defendants Raines, Mudd, Howard, Ashley, Duberstein, Gerrity, Korologos, Malek, Marron, Mulcahy, Pickett,

- 140 -

Rahl and Swygert. At this meeting, Duberstein reported that the Audit Committee had received a report from Company Controller Spencer on the Company's approach to impairment of assets accounting. While Duberstein informed the Board that the accounting for impairments issue was a current and important focus of the on-going OFHEO special examination, he reported that the Audit Committee was comfortable with the Company's approach.

387.    Despite Raines' oft-repeated public pledges that Fannie Mae's books were sound, by May 2004, Falcon and his staff had determined and publicly revealed that Fannie Mae had been violating GAAP in the way it recorded impairments and recognized revenue in respect to two categories of securities, manufactured housing and aircraft leases, in the periods in which they occur.

388.    On May 6, 2004, the members of the Audit Committee held a meeting. Attendees included defendants Gerrity, Malek, Pickett, Raines, Mudd and Howard. KPMG representatives also attended. At this meeting, Ann Kappler ("Kappler") informed the Board that OFHEO had reached the conclusion that Fannie Mae was not correctly accounting for impairments in connection with its portfolio of manufactured housing securities – which defendants had expressly discussed around the time of the Conseco bankruptcy, and thus were aware of. Kappler reported that Stephen Blumenthal, Acting Deputy Director OFHEO, read to KPMG and Fannie Mae management on a conference call the text of a letter that Blumenthal indicated would be sent to Raines as soon as Director Falcon signed it. Blumenthal said that the letter would direct the Company to recalculate its impairment pursuant to a formula attached to the letter. Kappler further reported that Blumenthal, in response to her question, indicated that OFHEO had concluded that the manner in which Fannie Mae had been calculating its impairments was not consistent with GAAP. Kappler indicated that, in response to her question, Blumenthal stated that they had not discussed their conclusion with the SEC but would be briefing the SEC later in the day. Kappler also explained that Blumenthal indicated that OFHEO would be making the letter public with a press release.

389.    On May 10, 2004, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was certified by defendants Raines and Howard. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

390.    The financial results included in Fannie Mae's 1Q04 Form 10-Q were admittedly false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

391.    The Audit Committee met on July 19, 2004. Attendees included defendants Gerrity, Pickett, Malek, Mulcahy, Raines, Mudd and Howard. KPMG and legal representatives also were present. At the meeting, the Committee was provided with a more detailed summary of the Company's FAS 91 accounting and the related issues raised by OFHEO, some of which had been previously brought to the Board's attention by Barnes. As background, it was explained to the Board that FAS 91 requires companies to amortize all loan fees and loan origination costs over the life of the loan. Because Fannie Mae held a large number of similar loans for which prepayments could be modeled, the Company's FAS 91 policy estimated prepayments and amortizes fees and costs using a constant effective yield on loans and MBS. It was explained that one area of OFHEO's focus was the Company's policy regarding how and when it should book "catch up" adjustments to amortized fees and costs due to the difference between estimated and actual prepayment speeds. In order to differentiate between differences due to imperfect models and true market volatility, the Company concluded that the functional equivalent of zero should be plus or minus 1% of net interest income for premium and discount. In other words, if the catch-up position were outside the range, the Company would be required to take an adjustment to get back within the range. The Board was told that OFHEO was critical of this approach, at least in part because the FAS 91 literature does not

approve this methodology. The Board was told that OFHEO had raised questions about the amount of the catch-up booked in 1998 and some aspects of the policy's implementation.

392.    The Board then discussed FAS 133 accounting and related issues. After outlining the basic requirements of FAS 133 and drawing the distinction between the various methods of hedge accounting, Boyles explained the Company's extended process of implementing FAS 133, its engagement of KPMG to assess its implementation and its current practices. He used a hypothetical term-out hedging transaction to list the issues OFHEO seemed to be focused on in its examination. As explained by Boyles, these included documentation and other criteria for qualifying for terms-matching hedge accounting (*e.g.*, +/- seven days, duration matching and value of the hedge at the time of designation).

393.    That same day, July 19, 2004, the Compensation Committee held a meeting. Attendees included defendants Mulcahy, Marron, Korologos, Pickett, Raines, Mudd and Howard. Alan Johnson ("A. Johnson") of Johnson Associates and Roger Brossy ("Brossy") of Semler Brossy Consulting Group, LLC also participated. At this meeting, Mudd addressed the issue of EPS as the sole annual incentive plan ("AIP") performance measure and noted regulatory criticism of EPS as a measure. He said that after study and consultations with A. Johnson and Brossy, management recommended establishing multiple performance criteria for determining the pool funding for the AIP, including an earnings component (EPS), a risk management component and a mission achievement component, and to establish a threshold for funding of the AIP pool to eliminate the cliff aspect of the program. The Committee decided to move to the multiple performance criteria approach for AIP funding beginning in 2005 with specific aspects of the criteria to be developed in consultations with the Company's and Committee's outside compensation advisors.

394.   On July 21, 2004, Fannie Mae reported financial results for the second quarter of 2004 and updated its performance outlook for the full year. The Company reported net income of $1,112 million, up 0.9% over the second quarter of 2003 and diluted EPS at $1.10, up 0.9%.

395.   Fannie Mae's financial results, announced on July 21, 2004 were admittedly false and represent a portion of Fannie Mae's massive $6.3 billion restatement.

396.   On August 6, 2004, the Audit Committee held a meeting.  Attendees included defendants Gerrity, Pickett, Malek, Raines, Mudd and Howard.  KPMG representatives also attended.  At this meeting Kappler stated that the original purpose of the telephone conference call meeting was to review with the Committee the certifications of the CEO and the certifications of the CFO regarding facts and circumstances relating to the Form 10-Q for the quarter ending June 30, 2004.   She noted, however, that events had overtaken that intended purpose and that the certifications had not yet been executed.

397.   Spencer then referred the Committee to the July meeting of the Committee in which they had discussed the issues relating to the Company's implementation of FAS 133 that OFHEO seemed to raise in its special examination.  In particular, she noted the Committee's directive that the Company perform work to assess the potential ineffectiveness in hedge relationships of certain derivatives as to which the Company had elected terms-matching accounting under FAS 133. Spencer reported that, in working with KPMG, the Company had identified a sample of 40 transactions it was testing. She explained the work involved in testing ineffectiveness, and reported that, although the work was not yet complete, she believe it could be completed in time for the Company to file its 10-Q.

398.   On August 9, 2004, Fannie Mae filed its quarterly report with the SEC on Form 10-Q, which was certified by defendants Raines and Howard.  Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The

interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

399.    The financial results included in Fannie Mae's 2Q04 Form 10-Q were admittedly false and represented a portion of Fannie Mae's massive $6.3 billion restatement.

400.    Simultaneous with the revelations regarding the massive accounting fraud at Fannie Mae, during September 2004, Raines and Howard began negating certain amendments to their employment agreements. Although what the actual affect of these amendments is subject to debate and interpretation, defendants have argued that these amendments stripped the Board of its right to terminate Raines and Howard "for cause."

401.    In reaction to the news of the accounting improprieties, the price of Fannie Mae's common stock collapsed from $75.65 per share on September 22, 2004 to as a close of $65.51 on September 24, 2004 on extremely heavy volume, erasing over $9.8 billion in market capitalization.

402.    The SEC instituted a formal investigation into the Company's accounting irregularities and Congress announced it would, and in fact did on October 6, 2004, hold hearings on Fannie Mae's accounting improprieties. An article by Reuters on September 27, 2004 entitled "UPDATE 1 - House panel to hold Fannie accounting hearing" stated in relevant part:

> A U.S. House of Representatives panel said on Monday it will hold hearings on accounting irregularities that Fannie Mae is accused of using to smooth its earnings and hide profit volatility.
>
> Rep. Richard Baker, a Republican from Louisiana, said in a statement he will convene the House Financial Services subcommittee he chairs on October 6 at 10 a.m. EDT (1400 GMT) to focus on the findings of Fannie Mae's regulator, the Office of Federal Housing Enterprise Oversight.
>
> An OFHEO report last week accused the company of pervasive problems with accounting and internal controls and ordered the company's board to take immediate remedial action.
>
> *"The outrageous conduct outlined in OFHEO's report suggests that for far too long Fannie Mae has acted as if it were somehow above the law while arrogantly flouting all responsibility to the Congress, and that must come to an end," Baker said.*

House Financial Services Committee Chairman Michael Oxley said OFHEO's findings point to the need for stronger oversight of Fannie Mae and its sibling mortgage finance enterprise Freddie Mac, which revealed its own accounting scandal in 2003.

"It's time for us in Congress to renew our efforts to ensure that Fannie Mae and Freddie Mac have a first-rate regulator, with all necessary powers and resources," the Ohio Republican said in the same statement.

403.    On September 29, 2004, the Company had its subordinated debt and stock ratings lowered by Fitch to AA- and other rating agencies have placed the Company on review for possible downgrades. Fannie Mae was downgraded by multiple analysts including Morgan Stanley, Prudential Equity Group, Wachovia and Friedman Billings.

404.    In addition, the DOJ requested the Company preserve certain documents, including documents relating to the matters discussed in the OFHEO Report.

405.    During this time period, Howard disposed of nearly $4.5 million worth of Fannie Mae stock since March of 2004, while OFHEO's investigation into the Company's accounting practices was ongoing.

406.    On October 6, 2004, hearings concerning the Company's improper accounting practices were held before Congress. In his opening remarks, Representative Baker, chairman of a House Subcommittee overseeing Fannie Mae, stated that about a year earlier he had made an inquiry to the Company concerning the executive compensation of Fannie Mae's top 20 executives. A few days later, Representative Baker was informed that the Company had hired Ken Starr and that if any such information was made public, the Company would pursue civil actions. Specifically, Representative Baker stated:

> I also wish to inform members of the Committee of another troubling incident, which I now choose to make public. About a year ago, I corresponded with the Director's office making inquiry about the levels of executive compensation at the enterprise for the top twenty executives. This is information that had not been made public previously. In a matter of days, Fannie Mae had engaged the services of Mr. Ken Starr for the purpose of informing my staff and committee counsel of the potential consequences of making that information public. It was made clear that civil legal actions would be filed if the information were to be released. At that time,

I made the decision not to release the data since there was no clear relevance to the reform effort underway, not out of concern for any litigation that might be filed. The realization that the disclosure of this information was so sensitive to the Enterprise never fully impacted me, until I read the Director's report. Now I understand why the Enterprise was so anxious not to have public disclosure of compensation of an entity that was created by the Congress, and supported by the taxpayer.

Circumstances have now changed. *As a direct result of abhorrent accounting practices, executives have been able to award themselves bonuses they did not earn and did not deserve. For that reason alone, disclosure of where the money went is highly appropriate.*

407.    On November 1, 2004, the members of the Audit Committee held a meeting. Attendees included defendants Gerrity, Ashley, Pickett and Raines. KPMG representatives also were present. Britt stated that it was KPMG's view that the post January 1, 2003 consistent FAS 91 application of the Company's precision threshold was GAAP compliant. Boyles then explained to the Board that the conclusion that the pre- January 1, 2003 practice was not GAAP compliant was reached after recent careful analysis of each quarter's practices. These are issues that Barnes brought to defendants' attention, which they swept under the rug to protect their personal, political and financial interests rather than act on.

408.    Shortly thereafter, on November 15, 2004, the Audit Committee held a meeting. Attendees included defendants Gerrity, Ashley, Pickett, Raines, Mudd and Howard. KPMG representatives also attended. KPMG had identified three general areas to the Committee that could represent a material weakness, including restatement, regulatory comments critical of controls with each being addressed as to materiality, and post-closing differences. Britt then informed the Board that KPMG would continue to need additional work from Fannie Mae's outside counsel, Paul Weiss, in order to sign off on its third quarter financials.

409.    That same day, November 15, 2004, the Company filed a Form NT-10-Q with the SEC stating it would be unable to file its quarterly report on Form 10-Q for the third quarter of fiscal year 2004 because its auditors would not complete their review until the SEC determined whether or not the Company had previously complied with GAAP. Additionally, the Company stated that if the

SEC determined it had been improperly accounting for derivatives under FAS, it would have to record a multi-billion dollar loss.

410.    On December 15, 2004, the SEC announced the resolution of its inquiry into accounting issues raised in the OFHEO report, confirming the improper accounting practices and stating the Company would have to restate its now admittedly false financial results for 2001 to mid-2004 (the period the SEC reviewed).

411.    Between December 15, 2004 and December 21, 2004, Raines and Howard pressured the Board to spare their jobs, and the Board for a short while bowed to their wishes – ignoring the interests of Fannie Mae and its shareholders. Then Raines and Howard pressured the Board to allow them to resign or retire rather than firing them for cause for manipulating Fannie Mae's accounting. This issue was not discussed by the Compensation Committee, which had no meetings during this timeframe. It was discussed in Board meetings on December 19, 20 and 21, 2004, but without input from any compensation consultants.

412.    On December 21, 2004, in complete abdication of their fiduciary duties to shareholders to fire Raines and Howard for cause and to require them to disgorge previously awarded incentive compensation, defendants announced that they were allowing Howard to resign and Raines to retire – both for "other than good cause." This paved the way for Raines and Howard to collect tens of millions of additional dollars in undeserved severance benefits under no-fault termination provisions in their employment agreements, which defendants had improperly modified in September 2004 – in the midst of the revelations of defendants' accounting fraud. Defendants further agreed to allow Raines and Howard to keep millions of dollars in previously received incentive compensation and stock sales proceeds that the Company was entitled to rescind under Sarbanes-Oxley. Defendants Ashley, Marron, Duberstein, Pickett, Gerrity, Rahl, Korologos, Swygert, Malek and Wulff made these decisions, to the detriment of the Company.

413.    On December 22, 2004, the Company filed a Form 8-K with the SEC in which it confirmed the violations of FAS 91 and 133 and that its losses would be about $9 billion dollars.

414.    On December 28, 2004, the Company filed another Form 8-K disclosing that the Company's Audit Committee had dismissed KPMG as its auditor on December 21, 2004. The Company also disclosed that KPMG had notified the Company that there existed strong indicators of material weaknesses of the Company's internal controls over financial reporting.

415.    On December 30, 2004, the Company was forced to sell $5 billion worth of securities at a fire-sale price to select institutional investors – the largest capital placement ever by Fannie Mae – to quickly deal with the "significant undercapitalization" occasioned by the massive fraud and earnings restatement. The amount received was far below what the Company would have received had it been able to conduct a public offering, which it now could not do because of the accounting scandal. Thereafter, Fitch cut the rating on the Company's preferred shares and also then placed the Company's preferred and sub-debt ratings under review for possible downgrade.

416.    In January 2005, Fannie Mae was forced to significantly scale back its purchases of new mortgage assets which has and will adversely affect the Company's operations. On January 19, 2005, the Company had to cut its dividend in half, the first dividend cut at Fannie Mae in over two decades.

417.    On February 23, 2005, Fannie Mae filed its Form 8-K in which it announced that OFHEO had informed Fannie Mae's Board of additional newfound problems and had identified internal control deficiencies at the Company "that it believes raise safety and soundness concerns." According to the filing, the additional issues and questions raised by OFHEO pertain to the following areas: securities accounting, loan accounting, consolidations, accounting for commitments, and practices to smooth certain income and expense amounts. OFHEO also raised concerns regarding journal entry controls, systems limitations and database modifications, as well as new

developments relating to FAS 91. While OFHEO indicated that it had not completed its review of all aspects of these issues, it had identified policies that do not appear to be consistent with GAAP. OFHEO advised Fannie Mae's Board of Directors and management that these matters should be included in the internal reviews being conducted by management and the Board and should be reviewed by Fannie Mae's external auditor, with a report of the findings to OFHEO.

418.    In reaction to this news, shares of Fannie Mae fell that day to close at $57.16 – its lowest level in more than four years and about 30% below their high of $80.82 the previous year.

419.    Also on the same day, after learning of the additional issues of improper accounting, Representative Baker said that he wasn't surprised by OFHEO's new criticisms. "It's unfortunate that additional disclosures have been made that reflect on management deficiencies," he said. "Although disappointing, the disclosure could add momentum to the need to consider a new regulatory system."

420.    As a consequence of the accounting scandal, Fannie Mae said it would have to reduce the number of assets it holds. Moreover, because of the recent revelations of additional improprieties, the Company is likely going to have to additionally restate another $2.8 billion in losses on top of the already estimated $9.18 billion restatement. These losses result from the Company's failure to correctly apply FAS 149 by properly documenting its mortgage commitment derivatives, an issue similar to the SEC's finding that the Company violated FAS 133 for failing to properly document its derivative contracts.

421.    On Thursday August 11, 2005, Fannie Mae announced that that the task of completing its massive earnings restatement was going to require the dedication of between six and eight million labor-hours and an additional $100 million in technology projects. Fannie Mae President and CEO Mudd said that the restatement could take a full year to complete. According to the Company's statements and filings, more than 30% of its employees will spend more than half

their time working on the restatement this year. An additional 1,500 consultants will also be brought in. Related administrative expenses will add up to more than $420 million in 2005 alone. Fannie Mae estimates that it will need to record over one million lines of journal entries, determine hundreds of thousands of commitment prices and securities values and verify some 20,000 derivative prices.

422.    On September 8, 2005, Fannie Mae filed a Form 8-K disclosing that on September 1, 2005, Fannie Mae and OFHEO had agreed upon a process to formalize the voluntary initiatives the Company has undertaken to ensure market discipline, liquidity and capital. The Form 8-K was attached as an exhibit to a letter which set forth the agreement. The letter defined Fannie Mae's new commitments related to subordinated debt, liquidity management and contingency planning, and public disclosures and set forth, in pertinent part that:

(a)    Fannie Mae will issue subordinated debt for public secondary market trading that is rated by no less than two nationally recognized statistical rating organizations;

(b)    The subordinated debt Fannie Mae issues must be issued in a quantity such that the sum of total capital (core capital plus general allowance for losses) plus the outstanding balance of qualifying subordinated debt will equal or exceed the sum of outstanding net MBS times 0.45% and total on-balance sheet assets times 4%. Subordinated debt will be discounted for the purposes of this calculation during the last five years before maturity;

(c)    The subordinated debt Fannie Mae issues will be considered qualifying if it requires the deferral of interest payments for up to five years if (1) Fannie Mae's core capital falls below minimum capital and, pursuant to Fannie Mae's request, the Secretary of the Treasury exercises discretionary authority to purchase the Company's obligations under Section 304(c) of the Fannie Mae Charter Act, or (2) Fannie Mae's core capital falls below 125% of critical capital;

(d)    Fannie Mae shall take reasonable steps to maintain outstanding subordinated debt of sufficient size to promote liquidity and reliable market quotes on market values;

(e)    Every six months, commencing January 1, 2006, Fannie Mae will submit to OFHEO a subordinated debt management plan that includes any issuance plans for the upcoming six months. The plan submitted to OFHEO may include information including, but not limited to, the amount, timing and feasibility of issuing such debt, particularly in situations where current financial statements for a corporation are not available;

(f)    OFHEO will evaluate each plan submitted and provide the corporation with its views;

(g)    Each quarter Fannie Mae shall submit to OFHEO calculations of its quantity of subordinated debt and total capital as part of its quarterly capital report. OFHEO will disclose Fannie Mae's calculation as a separate item in its quarterly capital classification of the corporation;

(h)    Fannie Mae will comply with principles of sound liquidity management consistent with industry practice; and

(i)    Fannie Mae will provide periodic public disclosures of its risks and risk management practices and will inform OFHEO of its disclosures. Where disclosures are affected by situations where Fannie Mae's current financial statements are not available, this should be reported to OFHEO. These disclosures will include, among other things, Subordinated Debt Disclosures, Liquidity Management Disclosures, Interest Rate Risk Disclosures, Credit Risk Disclosures and Public Disclosure of Risk Rating.

423.    In May 2006, OFHEO publicly released the May OFHEO Report, and Fannie Mae entered into a settlement with OFHEO and the SEC, agreeing to pay $400 million in civil penalties. Fannie Mae also agreed to OFHEO's issuance of a consent order under which the Company agreed to undertake remedial actions to address OFHEO's recommendations in the special examination

reports, including actions relating to Fannie Mae's internal controls, accounting practices, corporate governance and Board of Directors. As part of its consent, Fannie Mae agreed to develop new structures and operational plans for its Board of Directors related to Board reporting, maintenance of minutes and other changes to enhance Board oversight of Fannie Mae's management.

424.    In August 2006, Fannie Mae filed a Form 12b-25 Notification of Late Filing to notify the SEC that the Company was unable to file its Form 10-Q for the quarter ended June 30, 2006. The Company reiterated that its financial statements from January 2001 through second quarter 2004 are being restated and should not be relied upon because Fannie Mae's accounting practices did not comply with GAAP.

425.    On December 6, 2006, the Company finally restated its financial results wiping out $6.3 billion in earnings. The restatement detailed the staggering impact defendants' wrongdoing had on the Company:

> The consolidated financial statements for the years ended December 31, 2003 and 2002 included in this Annual Report on Form 10-K include restatement adjustments that we have categorized into the following seven areas: our accounting for debt and derivatives; our accounting for commitments; our accounting for investments in securities; our accounting for MBS trust consolidation and sale accounting; our accounting for financial guarantees and master servicing; our accounting for amortization of cost basis adjustments; and other adjustments.
>
> The overall impact of our restatement was a total reduction in retained earnings of $6.3 billion through June 30, 2004. This amount includes:
>
> - a $7.0 billion net decrease in earnings for periods prior to January 1, 2002 (as reflected in beginning retained earnings as of January 1, 2002);
>
> - a $705 million net decrease in earnings for the year ended December 31, 2002;
>
> - a $176 million net increase in earnings for the year ended December 31, 2003; and
>
> - a $1.2 billion net increase in earnings for the six months ended June 30, 2004.
>
> *        *        *
>
> *Replacement of Independent Auditors.* In December 2004, the Audit Committee of our Board of Directors dismissed KPMG LLP ("KPMG") as our independent

registered public accounting firm. KPMG had served as our independent auditor since 1969 and had audited the previously issued financial statements that we have restated. The Audit Committee engaged Deloitte & Touche LLP ("Deloitte & Touche") to serve as our independent registered public accounting firm effective January 2005. The consolidated financial statements included in this Annual Report on Form 10-K have been audited by Deloitte & Touche.

*    *    *

*OFHEO Final Report and Settlement.* On May 23, 2006, OFHEO issued a final report on its special examination. OFHEO's final report concluded that, during the period covered by the report (1998 to mid-2004), a large number of our accounting policies and practices did not comply with GAAP and we had serious problems in our internal controls, financial reporting and corporate governance. On May 23, 2006, we agreed to OFHEO's issuance of a consent order that resolved open matters relating to their investigation of us. Under the consent order, we neither admitted nor denied any wrongdoing and agreed to make changes and take actions in specified areas, including our accounting practices, capital levels and activities, corporate governance, Board of Directors, internal controls, public disclosures, regulatory reporting, personnel and compensation practices. In addition, as part of this consent order and our settlement with the SEC discussed below, we have paid a $400 million civil penalty, with $50 million paid to the U.S. Treasury and $350 million paid to the SEC for distribution to stockholders pursuant to the Fair Funds for Investors provision of the Sarbanes-Oxley Act of 2002.

*    *    *

*SEC Investigation and Settlement.* The SEC initiated an investigation of our accounting practices and, in May 2006, without admitting or denying the SEC's allegations, we consented to the entry of a final judgment which resolved all of the SEC's claims against us in its civil proceeding. The judgment permanently restrains and enjoins us from future violations of specified provisions of the federal securities laws. In addition, as discussed under "OFHEO Final Report and Settlement" above, as part of our settlements with OFHEO and the SEC, we have paid a $400 million civil penalty, with $50 million paid to the U.S. Treasury and $350 million paid to the SEC for distribution to stockholders pursuant to the Fair Funds for Investors provision of the Sarbanes-Oxley Act of 2002.

**COUNT I**

**(Breach of Fiduciary Duty and/or Aiding and Abetting
Breach of Fiduciary Duty Against All Individual Defendants)**

426.    Plaintiff incorporates by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

- 154 -

427.    Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to overstate Fannie Mae's earnings in violation of applicable rules, regulations and industry standards, thus falsifying Fannie Mae's SEC filings and communications to shareholders and investors, including Fannie Mae's financial statements and information. These defendants knew that if they disclosed the true facts concerning Fannie Mae's expenses, use of hedge accounting and financial condition, they would jeopardize their control over the Company, the remuneration they received and their positions of power, prestige and profit at Fannie Mae, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

428.    As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fannie Mae's operations, financial condition, assets and earnings to their shareholders, as well as the financial markets. The Individual Defendants did not do this. Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about Fannie Mae to Fannie Mae's shareholders.

429.    The Individual Defendants, as officers and directors of Fannie Mae, participated in the acts of fraud and mismanagement alleged herein – knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to Fannie Mae shareholders. They have thus exposed Fannie Mae to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased Fannie Mae stock while its financial statements were falsified.

430.    The Individual Defendants also each owed a duty to Fannie Mae to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia*, the Sarbanes-Oxley Act. Pursuant to Sarbanes-Oxley,

because Fannie Mae was required to make an accounting restatement for 2001 through mid-2004, due to noncompliance with GAAP and fraud in financial reporting as a result of the misconduct alleged herein, the Individual Defendants who served as CEO or CFO of Fannie Mae are required to reimburse Fannie Mae for the bonuses and other incentive-based and equity-based compensation received by them from Fannie Mae for 2001 through mid-2004.

431.    Independent of Sarbanes-Oxley, such defendants should be required to disgorge any and all gains unjustly obtained at the expense of Fannie Mae and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

432.    Because Fannie Mae insiders are not required to file "Form 4s" with the SEC disclosing their personal transactions in the stock of Fannie Mae, it is impossible, without discovery, to determine which insiders sold off Fannie Mae stock at inflated prices while they were fraudulently falsifying Fannie Mae's proved earnings and financial statements. To the extent such insider trading occurred during the period of financial statement falsification, Fannie Mae is entitled to recover any profits obtained by such insiders.

433.    The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

434.    By reason of the foregoing, Fannie Mae has been damaged.

## COUNT II

### (Abuse of Control Against All Individual Defendants)

435.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

436.    For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Fannie Mae, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions, the Individual Defendants employed the alleged scheme. As a part of this scheme, these Individual Defendants actively made

and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding Fannie Mae to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

437.    The Individual Defendants' conduct constituted an abuse of their ability to control and influence Fannie Mae.

438.    By reason of the foregoing, Fannie Mae has been damaged.

## COUNT III

### (Gross Mismanagement Against All Individual Defendants)

439.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

440.    The Individual Defendants had a duty to Fannie Mae and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Fannie Mae.

441.    These Individual Defendants by their actions and by engaging in the fraud described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Fannie Mae in a manner consistent with the duties imposed upon them by law, including Sarbanes-Oxley. By committing and concealing this fraud, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Fannie Mae's affairs and in the use and preservation of Fannie Mae's assets.

442.    The Individual Defendants caused Fannie Mae to engage in a fraud upon purchasers of its common stock. During the course of the discharge of their duties, these defendants knew or recklessly disregarded the unreasonable risks and losses associated with their fraud and misconduct, yet these defendants caused Fannie Mae to engage in this scheme which they knew had an

unreasonable risk of damage to Fannie Mae, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged Fannie Mae.

443.    By reason of the foregoing, Fannie Mae has been damaged.

## COUNT IV

### (Constructive Fraud Against All Individual Defendants)

444.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

445.    As corporate fiduciaries, the Individual Defendants owed to Fannie Mae and its shareholders a duty of candor and full accurate disclosure regarding the true state of Fannie Mae's business and assets and their conduct with regard thereto.

446.    As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Fannie Mae's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Fannie Mae. Thus they have committed constructive fraud and violated their duty of candor.

447.    By reason of the foregoing, Fannie Mae has been damaged.

## COUNT V

### (Corporate Waste Against All Individual Defendants)

448.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

449.    As a result of the improper accounting, by failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by refusing to seek recovery against KPMG, defendants have caused Fannie Mae to waste valuable corporate assets by paying incentive-based bonuses to certain of its executive officers and refusing to recover them, to incur potentially millions of dollars of legal liability and/or legal costs to defend defendants'

unlawful actions to face potential criminal sanctions and to suffer the multitude of damages alleged herein.

450.    In regard to their decision to accept the resignations of Raines and Howard rather than taking action to (i) enforce the Company's rights under Sarbanes Oxley, and (ii) terminate Raines and Howard for cause, and thus triggering the no-fault severance provisions they amended the employment agreements in June 2004 to provide (while the OFHEO investigation was ongoing). The Individual Defendants have caused Fannie Mae to waste valuable corporate assets by paying incentive-based bonuses to certain of its executive officers and refusing to recover them.

451.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### COUNT VI

### (Unjust Enrichment Against All Individual Defendants)

452.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

453.    As a result of the conduct described above, the Individual Defendants will be and have been unjustly enriched at the expense of Fannie Mae, in the form of unjustified salaries, benefits, bonuses, stock options and/or grants and other emoluments of office.

454.    Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up the Individual Defendants' complicity in the scheme.

455.    All the payments and benefits provided to these defendants were at the expense of Fannie Mae. The Company received no benefit from these payments. Fannie Mae was damaged by such payments.

456.    Certain of the Individual Defendants sold Fannie Mae stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants

- 159 -

should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Fannie Mae. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT VII

### (Against Defendants Raines and Howard for Disgorgement Under the Sarbanes-Oxley Act of 2002)

457.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

458.    Defendants Raines and Howard must disgorge the gains they unjustly obtained at the expense of Fannie Mae and its shareholders and a constructive trust for the benefit of Fannie Mae and its shareholders should be imposed upon them as contemplated (upon restatement of false and misleading financial statements) by the disgorgement provisions of §304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7243.

## COUNT VIII

### (Aiding and Abetting Breach of Fiduciary Duty Against Goldman Sachs and Goldman Sachs & Co.)

459.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

460.    The Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to state falsely Fannie Mae's earnings in violation of applicable rules, regulations and industry standards, thus falsifying Fannie Mae's SEC filings and communications to shareholders and investors, including Fannie Mae's financial statements and information. As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fannie Mae's operations, financial condition, assets and earnings to the Company's shareholders, as well as the financial markets. The

Individual Defendants did not do this. Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about Fannie Mae to Fannie Mae's shareholders.

461.    The Individual Defendants, as officers and directors of Fannie Mae, participated in the acts of fraud and mismanagement alleged herein – knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to Fannie Mae shareholders.

462.    Goldman Sachs and Goldman Sachs & Co. knowingly, willfully, intentionally or recklessly participated in the acts of fraud and income smoothing at Fannie Mae by the Individual Defendants and others.

463.    Goldman Sachs and Goldman Sachs & Co. also knew of Fannie Mae's failure to disclose adequately its income, earnings and transactions designed and undertaken to manipulate the Company's reported financial condition in its communications to shareholders, investors and the financial markets. Despite this knowledge, Goldman Sachs and Goldman Sachs & Co. promoted Fannie Mae to the investment community, through positive ratings on the Company's securities and through marketing and selling various offerings, buybacks and other deals. Goldman Sachs designed and executed two multi-billion dollar REMIC transactions to shift $107 million of Fannie Mae's earnings from 2001 and 2002 into future years and, with Goldman Sachs & Co., helped Fannie Mae conceal the true nature of its dealings in the related offering documents.

464.    Goldman Sach's and Goldman Sachs & Co.'s activities in arranging REMIC transactions, securities offerings and buybacks for Fannie Mae, and its promotion of the Company in those transactions and deals, and its positive coverage of the Company, all substantially helped the Individual Defendants' improper earnings management to increase executive compensation and helped maintain an artificially-inflated price of Fannie Mae's stock.

465.    By their actions, Goldman Sachs and Goldman Sachs & Co. knowingly participated in, and aided and abetted, the Individual Defendants' breaches of fiduciary duties and their improper earnings management.    As a result of Goldman Sachs' and Goldman Sachs & Co.'s knowing participation and aiding and abetting the improper actions of the Individual Defendants, Fannie Mae and it shareholders have been and continue to be irreparably damaged.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing Fannie Mae to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Sarbanes-Oxley, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance Policies:

(i)    a proposal to strengthen the Fannie Mae Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)    appropriately test and then strengthen the internal audit and control functions;

      (iii)    rotate independent auditing firms every five years;

      (iv)    control and limit insider stock selling; and

      (v)    reform executive compensation.

D.    Awarding punitive damages;

E.    Awarding disgorgement as provided by §304 of the Sarbanes-Oxley Act;

F.    Awarding costs and disbursements of this action, including reasonable attorneys',

accountants' and experts' fees; and

G.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 5, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
BENNY C. GOODMAN III (D.C. Bar #489187)


BENNY C. GOODMAN III

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

- 163 -

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA (D.C. Bar #445487)
1100 Connecticut Avenue, N.W., Suite 730
Washington, DC 20036
Telephone: 202/822-2024
202/828-8528 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: 610/225-2677
610/225-2678 (fax)

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

Attorneys for Plaintiff

S:\CasesSD\Fannie Mae Derv\Demand Refused Complaint.doc

## VERIFICATION

I, BENNY C. GOODMAN III, hereby declare as follows:

2.      I am associated with the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff Arthur Middleton in the above-captioned action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

3.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 5th day of July, 2007 at San Diego, California.

BENNY C. GOODMAN III

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Arthur Middleton, Derivatively on Behalf of FEDERAL NATIONAL MORTGAGE ASSOCIATION | Franklin D. Raines, J. Timothy Howard, Daniel H. Mudd, Kenneth M. Duberstein, Stephen B. Ashley, Thomas P. Gerrity, Ann Korologos, Frederic V. Malek, Donald B. Marron, Joe K. Pickett, Leslie Rahl, H. Patrick Swygert, Anne M. Mulcahy, John K. Wulff, The Goldman Sachs Group, Inc. and Goldman Sachs & Co. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    San Mateo, CA (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Washington, D.C. (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Benny C. Goodman, III (D.C. Bar #489187) Lerach Coughlin Stoia Geller Rudman & Robbins 655 West Broadway, Suite 1900 San Diego, CA 92101 619/231-1058 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- O  1 U.S. Government Plaintiff
- ⦿  3 Federal Question (U.S. Government Not a Party)
- O  2 U.S. Government Defendant
- O  4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| O  A. *Antitrust* | O  B. *Personal Injury/ Malpractice* | O  C. *Administrative Agency Review* | O  D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | **Any nature of suit from any category may be selected for this category of case assignment.**<br><br>***If Antitrust, then A governs)*** |

| O  E. *General Civil (Other)* | OR | O  F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☒ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Shareholder Derivative Suit Alleging Breach of Fiduciary Duty and Violations of the Sarbanes-Oxley Act of 2002

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☒    NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  July 5, 2007    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

---

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.